ROBBINS GELLER RUDMAN
 & DOWD LLP
ARTHUR C. LEAHY (149135)
MATTHEW I. ALPERT (238024)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
malpert@rgrdlaw.com
ksciarani@rgrdlaw.com

GLANCY PRONGAY &
 MURRAY LLP
JOSHUA L. CROWELL (295411)
VAHE MESROPYAN (307244)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310/201-9150
310/201-9160 (fax)
jcrowell@glancylaw.com
vmesropvan@glancylaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In re INOGEN, INC. SEC. LITIG. ) | Master File No. 2:19-cv-01643-FMO-AGR |
| ) | |
| ——————————————— ) | |
| ) | CLASS ACTION |
| This Document Relates To: ) | |
| ) | CONSOLIDATED AMENDED |
| ALL ACTIONS. ) | COMPLAINT FOR VIOLATIONS OF |
| ) | THE FEDERAL SECURITIES LAWS |
| ——————————————— ) | |
| [Caption continued on following page.] ) | DEMAND FOR JURY TRIAL |

1    DR. JOHN VASIL and PARAGON   )
2    FUND MANAGEMENT, Individually  )
    and on Behalf of All Others Similarly  )
3    Situated,                       )
                                    )
4                     Lead Plaintiffs,   )
5                                )
6        vs.                       )
                                    )
7    INOGEN, INC., SCOTT WILKINSON  )
8    and ALISON BAUERLEIN,     )
                                  )
9                     Defendants.    )

# TABLE OF CONTENTS

Page

I.    SUMMARY OF THE ACTION ................................................................. 1

II.   JURISDICTION AND VENUE .............................................................. 7

III.  PARTIES .................................................................................................. 7

IV.   FACTUAL BACKGROUND ................................................................ 10

    A.   Inogen's Business ...................................................................... 10

    B.   Former Inogen Employee Accounts .......................................... 13

    C.   Muddy Waters and Citron Reports ............................................ 15

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ............................. 19

    A.   November 2017 .......................................................................... 19

    B.   January 2018 .............................................................................. 30

    C.   February 2018 ............................................................................ 34

    D.   April 2018 .................................................................................. 43

    E.   August 2018 ............................................................................... 52

    F.   September 2018 .......................................................................... 59

    G.   November 2018 .......................................................................... 63

    H.   January 2019 .............................................................................. 71

    I.   February 2019 ............................................................................. 74

VI.   MORE NEWS REVEALING DEFENDANTS' FRAUDULENT CONDUCT COMES OUT IN MAY 2019 ................................................ 82

VII.  ADDITIONAL SCIENTER ALLEGATIONS ...................................... 86

    A.   Defendants' Knowledge and Access to Knowledge of TAM, TAM Growth, Market Saturation and Unscrupulous Sales Tactics ........................................................................................ 87

    B.   Defendant Bauerlein's Suspicious Insider Stock Sales ............ 90

VIII. LOSS CAUSATION/ECONOMIC LOSS .............................................. 91

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE ..................... 95

X.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
       DEFENDANTS' MATERIALLY FALSE AND MISLEADING
       STATEMENTS AND OMISSIONS................................................................ 96

XI.   CLASS ACTION ALLEGATIONS ........................................................ 98

       A.   COUNT I:  For Violation of §10(b) of the Exchange Act and
             Rule 10b-5 Against All Defendants................................................ 99

       B.   COUNT II:  Violations of §20(a) of the Exchange Act Against
             All Defendants .......................................................................... 100

XII.  PRAYER FOR RELIEF .......................................................................... 101

XIII. JURY DEMAND .................................................................................... 101

1      Lead Plaintiffs Dr. John Vasil and Paragon Fund Management (collectively,

2  "Plaintiffs"), individually and on behalf of all others similarly situated, allege the

3  following based upon the investigation of Plaintiffs' counsel, which included a

4  review of U.S. Securities and Exchange Commission ("SEC") filings by Inogen, Inc.

5  ("Inogen" or the "Company"), securities analyst reports and advisories, press

6  releases, media reports, earnings conference call transcripts, and other public

7  statements issued by, or about, the Company.   Plaintiffs believe that substantial

8  additional evidentiary support will exist for the allegations set forth herein after a

9  reasonable opportunity for discovery.

10 **I.      SUMMARY OF THE ACTION**

11     1.      This is a securities class action brought on behalf of all purchasers of

12 Inogen common stock between November 8, 2017 and May 7, 2019, inclusive (the

13 "Class Period"), seeking to pursue remedies under the 1934 Securities Exchange Act

14 ("Exchange Act").    Defendants are: Inogen; Scott Wilkinson ("Wilkinson"),

15 Inogen's President and Chief Executive Officer ("CEO"); and Alison Bauerlein

16 ("Bauerlein"), a founder of the Company who also served as an Executive Vice

17 President of Finance and Chief Financial Officer ("CFO") during the Class Period.

18     2.      Inogen is a medical technology company that primarily develops,

19 manufactures and markets portable oxygen concentrators ("POC") used to deliver

20 supplemental long-term oxygen therapy ("LTOT") to patients suffering from

21 chronic respiratory conditions.

22     3.      As the majority of people using LTOT are the elderly and infirm,

23 Inogen publicly boasts on its website that its mission is "to increas[e] the freedom

24 and independence of oxygen therapy users."   But to chase ever higher profits, in

25 practice, Inogen preyed on its elderly and often ill customers by convincing them to

26 purchase the Company's POCs out-of-pocket at premium prices instead of using

27 their Medicare or private insurance coverage.  Even though LTOT via POCs is an

28 approved Medicare expense, at the beginning of the Class Period, Inogen shifted

significant resources and its focus to a direct-to-consumer ("DTC") marketing campaign to drive cash sales.  For its newly opened Cleveland, Ohio facility, Inogen rapidly hired sales representatives to staff a high-pressure call center to harass, cajole and sometimes commit outright fraud in order to convince susceptible patients not to rent an Inogen POC using their Medicare or private insurance benefits, but rather to pay a premium retail price out-of-pocket to purchase the Company's POC.

4.     However, when Defendants trumpeted the Company's impressive DTC sales numbers to the market, instead of accurately describing these abusive and dishonest sales practices to Inogen investors, Defendants misleadingly claimed that their success was due to the acumen of its salesforce and that Inogen's talented sales representatives could easily convert customers over to high-margin cash sales.

5.     Defendants portrayed the apparent success of this operation through an egregiously false narrative of both the POC market and the Company's growth opportunity to investors.  First, Defendants misleadingly asserted that the Total Addressable Market ("TAM") for its devices was 3 million patients and growing at a rate of 7% to 10% per year.  Defendants accomplished this by misrepresenting Medicare and other data, in addition to using unsupported and unrealistic estimates of the number of patients with Chronic Obstructive Pulmonary Disease ("COPD"), the primary indication for LTOT patients.

6.     Second, using these figures, Defendants repeatedly misled investors by publicly claiming that only a small portion of the TAM, in the range of 7% to 12%, was penetrated by POC devices.  Defendants further inflated Inogen's growth opportunity to investors by claiming that if the Company added additional sales representatives and proportionate marketing spends, it would generate additional sales at the same rates as its previous infusions of sales and marketing investments.

7.     Accordingly, defendant Wilkinson, Inogen's CEO, repeatedly touted to investors that Inogen still had "a significant growth opportunity before reaching full market saturation."  This growth was represented to be all but certain as one of

- 2 -

Inogen's founders and CFO, defendant Bauerlein, assured the market that the Company could easily recruit and retain talented sales representatives and that the addition of sales representatives was "closely correlated with, over time, the sales growth in that direct-to-consumer sales channel."  As a result, Defendants publicly misled investors by claiming that simply adding sales representatives would fuel a steady growth of DTC sales in an untapped market – the size of which they had materially exaggerated.

8.     Since going public in 2014, Inogen had been a high growth company that outpaced its projected earnings per share ("EPS") projections for 15 consecutive quarters leading up to the beginning of the Class Period in November 2017.  Given the Company's extremely high growth rate, analysts and investors were particularly concerned about the sustainability of this growth, especially since Inogen's TAM growth, market penetration figures and sales productivity metrics were baked into Inogen's guidance.  Investors recognized that if the market for POCs was actually close to saturation, sales growth would soon slow and the addition of sales and marketing expenditures would be insufficient to overcome the lack of prospective customers.

9.     By overstating the strength of Inogen's sales acumen in driving DTC sales, the size and growth rate of the TAM for the Company's POC, and understating the level of POC penetration into the market throughout the Class Period, Defendants misled the market into believing that Inogen's business metrics and growth opportunity were much stronger than they really were.

10.     However, unbeknown to investors, throughout the Class Period, Defendants knowingly (or at the very least recklessly):

(a)     falsely overstated the true size of Inogen's TAM for those patients on LTOT by claiming it was upwards of 3 million people;

(b)     misstated the basis for its calculation of the TAM;

- 3 -

(c)     misstated that the TAM would grow at the rate of up to 10% a year when it was really shrinking;

(d)     misstated that the POC market penetration was only approximately 6% to 12%;

(e)     misstated that the potential POC penetration would be 90% of the ambulatory supplemental LTOT market and 65% of the overall LTOT market;

(f)     misleadingly attributed Inogen's sales growth to the strong sales acumen of its salesforce and marketing team, when in reality it was due in large part to nefarious sales tactics designed to deceive its elderly customer base (including inducing them to purchase POCs from Inogen at inflated prices by claiming that Medicare did not otherwise cover payment for such devices if obtained from other providers);

(g)     misstated the growth opportunity for Inogen's domestic business-to-business ("B2B") sales to home medical equipment ("HME") providers which was actually inflated, unsustainable and would erode DTC sales;

(h)     misstated that Inogen could abandon the significantly larger Medicare reimbursement rental market and continue to sustain sales growth; and

(i)     failed to disclose a material risk that Inogen could lose its Medicare license due to existing fraudulent and abusive sales tactics.

11.     It was not until after market close on November 6, 2018 when Inogen released its third quarter 2018 ("3Q18") financial results that investors first began to learn that Defendants' rosy sales growth opportunities were overstated.  Although Inogen's quarterly financial results were in line with market expectations, Defendants revealed that the growth in domestic B2B sales to HME providers had slowed precipitously from 56% in the second quarter of 2018 ("2Q18") to 32% in 3Q18; this slowed growth occurred despite the fact that Defendants claimed adoption of POCs by the HME was in the early stages.  Additionally, for fiscal year

- 4 -

2018 ("FY18"), Inogen reduced its guidance for adjusted EBITDA from a range of $65 to $69 million to $60 to $62 million.

12.     As a result, the price of Inogen common stock sunk by more than 19%, or $37.44 per share, to close at $155.86 on November 7, 2018, on very heavy volume of approximately 2.6 million shares traded, *i.e.*, more than 6 times the average daily volume over the preceding 10 trading days.

13.     Then, on February 8, 2019, Muddy Waters Research ("Muddy Waters") published a detailed investigative report ("Muddy Waters Report"), which challenged, among other things: (1) the size of Inogen's actual TAM; (2) the basis for Defendants' prior TAM claims; (3) the growth rate of the TAM; and (4) the penetration of POCs into the LTOT market.

14.     Following the publication of the Muddy Waters Report, the price of Inogen common stock declined precipitously from the prior trading day's close of $139.74 to $136.72 per share on February 8, 2019, on heavy volume of approximately 2 million shares traded, *i.e.*, more than 5.5 times the average daily volume over the preceding 10 trading days.

15.     A few days later on February 12, 2019, Citron Research ("Citron") published a report ("Citron Report") highlighting deceptive sales practices by Inogen's reseller network.  Citron also uncovered that Inogen itself employed similar tactics designed to con its impressionable customer base to pay for POCs out-of-pocket, instead of applying for insurance reimbursement.

16.     On this news, the price of Inogen common stock declined from the prior trading day's close of $142.20 to $138.05 per share on February 12, 2019, on heavy volume of approximately 2.74 million shares traded, *i.e.*, more than 4 times the average daily volume over the preceding 10 trading days.

17.     After the close of trading on February 26, 2019, Inogen issued a press release announcing its fourth quarter of 2018 ("4Q18") and FY18 financial results. On the same day, Inogen also hosted a conference call with analysts and investors

- 5 -

to discuss its quarterly and year-end results.  During the conference call, defendant Wilkinson backtracked on the Company's prior TAM estimate of 2.5 to 3 million patients, and blamed Inogen's poor "domestic business-to-business sales" on "order activity" that "slow[ed] from one national home care provider in the fourth quarter of 2018."  Inogen also significantly lowered its expected growth rate of the TAM to the "low single digits" from its earlier 7% to 10% estimate.

18.    On this news, the price of Inogen common stock plummeted by more than 24%, from the prior day's close of $140.06 per share to $106.28 on February 27, 2019, on unusually high volume of more than 3.64 million shares traded, *i.e.*, more than 5 times the average daily trading volume over the preceding 10 trading days.

19.    Finally, after the close of trading on May 7, 2019, Inogen issued a press release announcing its first quarter of 2019 ("1Q19") financial results.  The press release revealed that Inogen was reducing its full year 2019 total revenue guidance to a range of $405 to $415 million (growth of 13.1%), down from the prior year's range of $430 to $440 million (growth of 15.9%).

20.    During Inogen's May 7, 2019 conference call with analysts and investors, defendant Wilkinson disclosed that the new sales representatives "took longer to come up the productivity curve than our historical target and were not at their full potential in the first quarter."  Worse yet, the Inogen CEO signaled that the market was becoming saturated because the Company planned to "slow down the addition of new sales representatives."  In addition, defendant Bauerlein informed investors that the Company expected "domestic business-to-business sales to have a slightly negative growth rate."

21.    On this news, the price of Inogen common stock plummeted more than 25%, from a close of $91.14 per share on May 7, 2019 to $67.79 on May 8, 2019, on unusually high volume of more than 5.2 million shares traded, which was more than 10 times the average daily volume over the preceding 10 trading days.

## II.   JURISDICTION AND VENUE

22.   This is a civil action arising under the laws of the United States of America.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5].   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

23.   Venue is proper in this District pursuant to §27 of the Exchange Act because certain of the acts and practices complained of herein occurred in this District.  Inogen is headquartered in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

24.   In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## III.   PARTIES

25.   Plaintiff Dr. John Vasil purchased Inogen common stock on the NASDAQ at artificially inflated prices and has been damaged thereby.  *See* ECF Nos. 37-2 and 37-3.

26.   Plaintiff Paragon Fund Management purchased Inogen common stock on the NASDAQ at artificially inflated prices and has been damaged thereby.  *See* ECF No. 42-2.

27.   Defendant Inogen is a medical technology company headquartered in Goleta, California.  Throughout the Class Period, Inogen common stock traded on the NASDAQ, an efficient market, under the ticker symbol "INGN."  As of May 7, 2019, Inogen had more than 21.9 million shares of common stock issued and outstanding.

- 7 -

28.     Defendant Wilkinson was the President and CEO of Inogen and a member of its Board of Directors throughout the Class Period.  Prior to becoming Inogen's President and CEO on March 1, 2017, Wilkinson served as the Company's President and Chief Operating Officer from January 1, 2016 through March 1, 2017. From 2008 through December 31, 2015, Wilkinson served as Inogen's Executive Vice President for Sales and Marketing, where he "oversaw Inogen's global operations in sales, marketing, customer service, product management, medical billing, and clinical services."  Additionally, between 2006 and 2008, Wilkinson was Inogen's Vice President of Product Management and between 2005 and 2006, he was the Company's Director of Product Management.

29.     Defendant Bauerlein is a founder of Inogen, and was its Executive Vice President and the CFO of the Company throughout the Class Period.  Bauerlein has also served as Inogen's Corporate Secretary and Treasurer since 2002, was its Vice President of Finance from 2008 until March 2014, was the Company's Controller from 2008 to 2009 and also 2001 to 2004, and was Inogen's Director of Financial Planning and Analysis from 2004 to 2008.  According to Inogen's 2018 SEC Form 10-K ("2018 10-K"), "Bauerlein has over 15 years experience in treasury, finance, accounting, risk management as well as strategic and tactical cost analysis and forecasting."

30.     Defendants Wilkinson and Bauerlein are collectively referred to herein as the "Individual Defendants."  Together, the Individual Defendants and defendant Inogen are referred to throughout this Complaint as the "Defendants."

31.     Because of the Individual Defendants' executive positions, they each had access to undisclosed adverse information about Inogen's business, operations, operational trends, controls, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board of Directors meetings and committees thereof.

- 8 -

32.    The Individual Defendants were directly involved in the management and day-to-day operations of the Company at the highest levels and were privy to confidential, proprietary information concerning the Company and its business, operations, operational trends, controls, markets, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

33.    As officers and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act and trades on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's business, operations, operational trends, controls, markets, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded stock would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of the various SEC filings, press releases and other public statements pertaining to the Company and issued during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements

- 9 -

1  detailed herein and is, therefore, primarily liable for the representations contained
2  therein.  Defendants are liable for making materially false statements and failing to
3  disclose adverse facts known to them about Inogen.  Defendants' fraudulent scheme
4  and course of business that operated as a fraud or deceit on purchasers of Inogen
5  stock was a success, as it: (i) deceived the investing public regarding Inogen's
6  business metrics and financial prospects; (ii) artificially inflated the price of Inogen
7  common stock; and (iii) caused Plaintiffs and other members of the Class (as defined
8  below) to purchase Inogen common stock at fraud-inflated prices.

9  **IV.     FACTUAL BACKGROUND**

10            **A.     Inogen's Business**

11       35.    Defendant Inogen is a medical device company specializing in the
12  design and manufacturing of POCs, which are used to provide oxygen therapy to
13  patients suffering from a range of respiratory conditions, such as COPD, chronic
14  bronchitis, or emphysema.   In most instances, respiratory diseases like COPD
15  develop over a lifetime, and, as a result, patients tend to be elderly with access to
16  Medicare insurance.

17       36.    Home oxygen production has traditionally been done through a two-
18  stage process.  The process uses large stationary machines (the size of a basement
19  dehumidifier or a college mini-fridge) to draw oxygen from the air and concentrate
20  it, and a separate portable oxygen tank to store the concentrated oxygen. For
21  ambulatory patients, the patient can then roll the separate oxygen tank along with
22  them as they move around outside of the house, providing the oxygen needed to
23  breathe.  Other patients rely on HME providers (also known as Durable Medical
24  Equipment ("DME") providers) to deliver replenished oxygen tanks.   Taking
25  advantage of improved battery technologies, Inogen develops, manufactures and
26  sells or rents smaller battery-powered tankless portable devices that concentrate
27  oxygen and provide it directly to the patient, removing the need for two separate
28  devices.

37.     Inogen's reported revenues grew dramatically over the past several years, increasing by more than 41% from $112.5 million during fiscal year 2014 to $159 million during fiscal year 2015, by more than 27% to $202.8 million during fiscal 2016, and by more than 45% to nearly $295 million during fiscal year 2017 ("FY17").  Indeed, based on its 2016 sales, Defendants claimed throughout the Class Period that Inogen was "the leading worldwide manufacturer of portable oxygen concentrators."  The Company also consistently beat the market's EPS estimates in the quarters leading up to the start of the Class Period in November 2017.  With Defendants reporting such rapid growth, a key concern for investors was whether this rise was in fact sustainable, and if so, for how long.

38.     One key metric to understanding the sustainability of Inogen's rapid growth is the TAM, which represents the number of potential customers for a given market.  In Inogen's case, it is the number of people with respiratory illness that could benefit from using a POC.  Not all patients on LTOT are potential customers because POCs are inappropriate for non-ambulatory patients or for those who require the continuous flow of oxygen rather than the pulse flow provided by a POC. The growth rate of the TAM is also relevant to the potential sales growth for Inogen. Finally, the market penetration of POCs replacing traditional oxygen therapy informs the Company of the market saturation.  Lower penetration means there is more room for sales growth.

39.     Inogen reports its financial results in three business segments: (i) DTC; (ii) domestic B2B; and (iii) international.  The DTC results are divided between cash sales to customers, in which the customer pays the retail price for the POC out-of-pocket, and rentals, in which the customer rents the device from Inogen, and Inogen bills Medicare or private insurance for a monthly reimbursement.

40.     While the retail price is set by Inogen (approximately $2,400 or $70 per month for a rental), Medicare sets the monthly reimbursement rate.  Medicare aggressively sets the reimbursement rates to control costs.  For example, in 2016,

- 11 -

1 Medicare reimbursed the cost of a POC rental at a range of $46.69 to $49.52 a month,

2 but that rate had dropped to $36.14 from $41.91 per month in 2017.

3      41.     POC rentals are generally for a term of five years.  Medicare pays for

4 36 months of oxygen treatment, at which point reimbursements are "capped" and

5 unreimbursed for the next 24 months of treatment.  That is, the patient pays no more

6 rental fees during this period, but the supplier retains ownership of the equipment.

7 Thus, it is not cost effective to provide a new device to Medicare patients to rent

8 when the patient has already exhausted many of the 36 available monthly payments.

9 This effectively eliminates patients who have received a substantial number of their

10 36 months of reimbursement from the rental market for at least, if not longer, than

11 the 2 capped years.

12     42.     Inogen is an accredited Medicare DME/HME provider and is licensed

13 to sell directly to Medicare customers in all 50 states and the District of Columbia.

14 As stated in the Company's 2017 and 2018 10-Ks, these licenses are critical to

15 Inogen because penalties associated with failing to comply with Medicare

16 regulations would have a materially adverse effect on Inogen's business.

17     43.     The domestic B2B segment involves sales of POCs to HME providers

18 who then sell or rent the POCs to patients.  B2B sales are divided between those to

19 Inogen's own private label HME, and those to other competing HMEs.  HMEs

20 typically buy the POC from Inogen at negotiated rates below retail price and rent or

21 sell the units to their customers.

22     44.     Due to the ability of Medicare and HME providers to demand lower

23 prices from Inogen, DTC sales at retail prices generate higher margins for Inogen.

24 Those higher margins, however, are tempered by the added cost of hiring sales

25 representatives and the associated marketing efforts.  However, so long as there was

26 sufficient demand for the out-of-pocket cash sales, these sales and marketing spends

27 may be justified.

28

- 12 -

**B.     Former Inogen Employee Accounts**

45.     A former Inogen employee ("FIE") who was employed at the Company during the Class Period, provided information demonstrating that Defendants knowingly, or at least recklessly, materially misled Inogen investors during the Class Period.

46.     FIE worked in Inogen's Cleveland sales office between September 2017 and December 2018.  FIE, an Inside Sales Representative, was responsible for contacting assigned leads and selling Inogen POCs to customers.  If a customer initially preferred to rent, FIE would begin the time consuming, yet poorly compensated, process of obtaining Medicare or insurance approval for a POC rental for the customer.  Contrary to Defendants' public representations to investors, FIE did not observe a highly effective sales office driving the Company's sales of POCs to eager customers.  Instead, FIE observed poorly trained sales representatives who were focused on obtaining cash sales by any means, due to the commission and quota structure which rewarded cash sales at a significantly higher level than the more time consuming insurance rental process.

47.     Because Inogen's POCs were sold at a premium retail price to individual customers, and despite rentals being covered by Medicare, FIE overheard sales representatives regularly mislead and lie to potential customers about their Medicare eligibility.  Inogen's commission and quota system was so effective at discouraging rentals that FIE observed sales representatives who were frequently unwilling to accept a rental patient.

48.     According to FIE, the Company knew about and tacitly condoned such abusive behavior.  Because lying to customers about Medicare eligibility is a violation of Medicare regulations, the Sales Directors at the Cleveland sales office, Susan Thomas and Mark Pietro, instructed sales representatives to not mislead customers whom the sales representatives suspected were Medicare secret shoppers.  These secret shoppers were used by Centers for Medicare & Medicaid Services

- 13 -

1   ("CMS") to investigate the regulatory compliance of Medicare accredited DME
2   providers, such as Inogen.

3       49.    FIE saw that Inogen's Sales Directors at the Cleveland sales facility did
4   essentially nothing to curb the sales representatives from lying to real customers.
5   Unsurprisingly, FIE noted that Medicare uncovered Inogen's fraudulent tactics and
6   threatened to revoke Inogen's Medicare accreditation in the fall of 2018.  Inogen
7   made changes to the training program to curb these abusive sales practices soon
8   after – albeit at the cost of forgoing additional cash sales.

9       50.    FIE also confirmed that defendant Wilkinson had a hands-on approach
10   to managing the Cleveland sales headquarters, where he maintained a separate
11   office.  FIE saw the Inogen CEO in the office approximately once a month.
12   Wilkinson hosted quarterly town hall office meetings which included a Q&A session
13   with the Cleveland office staff.  On account of the Q&A sessions, Inogen's CEO
14   was able to observe the same issues that FIE saw in the Cleveland office.

15       51.    During 2018, FIE observed a growing discontent amongst the sales
16   representatives as a result of Inogen's rapid expansion of the sales staff in late 2017
17   and early 2018.  This expansion diluted the quality of the sales leads and made it
18   significantly more difficult for the sales staff to generate sales at the same rates as in
19   prior quarters.

20       52.    During a summer 2018 Q&A session held with each sales team because
21   of the issues relating to poor lead quality, FIE confronted defendant Wilkinson about
22   Inogen's addressable market figures used to justify the number of sales
23   representatives hired in Cleveland.  FIE told the Company's CEO, as paraphrased
24   by FIE, "'[y]ou are telling me that out of three million people who need oxygen, all
25   are going to buy portable concentrators from Inogen.'"  Defendant Wilkinson
26   responded, as paraphrased by FIE, "'well no,'" an acknowledgment that
27   demonstrates the Inogen CEO's understanding of the misleading nature of the
28   Company's TAM figures.

- 14 -

## C.    Muddy Waters and Citron Reports

53.    On February 8, 2019, stock research analyst and short-seller Carson Block ("Block") of Muddy Waters published a detailed 27-page report challenging the claimed size of Inogen's TAM and lamenting that the Company had intentionally "created an egregiously false narrative" about its size.

54.    Based on his research, Block stated that Inogen's TAM was "actually shrinking," and that the Company's sales would peak "no later than next year." According to Block, Inogen "embodies much of what is dysfunctional about today's capital markets: Misleading statements by management, shoddy market research presented as authoritative, thorough sell-side capture, and of course significant enrichment of insiders through stock sales."

55.    In his report, Block asserted that Inogen publicly made misleading statements during the Class Period, statements that were based on information contained in a "middle school student quality" 2017 report on oxygen devices issued by the firm WinterGreen Research ("WinterGreen").[1]  Specifically, Block called out Defendants' Class Period claims regarding Inogen's TAM being 3 million Americans on LTOT and that it was growing at 7% to 10% annually.  He found that Defendants' numbers were based on WinterGreen estimates that "appear to have little grounding in reality."   Block was particularly critical of WinterGreen's 2017 report, which Inogen based its TAM claims on, wherein Block asserts that WinterGreen plagiarized the *New York Times*.  In reality, Inogen's TAM was only 1.3 million users according to Block.

56.    As support for his criticism of Defendants' materially misleading TAM figures, Block explained that, "[t]he key in analyzing CMS data is that the total

---

[1]    The WinterGreen report in question is not made available to the public free of charge.  This report can be purchased from WinterGreen's website for $4,200 for a single copy or $8,400 for a "[w]eb posting." *Available at*: http://wintergreenresearch .com/portable-oxygen.

- 15 -

1    number of users in a given year overstates the market at any given time due to users

2    ceasing therapy (often due to death)."  Because HME providers refurbish and reuse

3    POCs for seven to eight years for multiple patients, it follows that Inogen would be

4    unable to penetrate the portion of the market which relied on used POCs.

5        57.    Block further criticized Defendants' market size assertions on the

6    January 2019 slides published by Inogen (which were also repeated in Inogen's

7    November 2018 slides).  Muddy Waters queried the World Health Organization

8    ("WHO") with respect to Defendants' claim that the WHO expects COPD to become

9    the leading cause of death globally, and reported that the WHO stated that

10   Defendants' assertion, was "'most likely a mistake.'"  Similarly, he debunked

11   management's claim on the same slide that there are approximately 15 million

12   Americans diagnosed with COPD, and based on data from the Centers for Disease

13   Control and Prevention ("CDC"), approximately 15 million more are undiagnosed.

14   Block found Defendants' inference to be "greatly misleading" because it was based

15   on an outdated 1988-1994 study in which the CDC "concluded that approximately

16   50% of COPD patients were unaware they had COPD prior to diagnosis."

17       58.    Block went on to undermine Defendants' overly confident claims that

18   the TAM was growing, stating that Muddy Waters estimates "that from 2010 to

19   2017, the market shrank at a CAGR [compound annual growth rate] of -2.6%.  This

20   is a far cry from the estimates of 7%-10% positive growth the company has been

21   making since November 2013.  ***In our view, management has created a false***

22   ***narrative by presenting poorly-sourced estimates along with misrepresenting data***

23   ***from credible sources***."

24       59.    Block refuted Defendants' claim that the shift of patients to Medicare

25   Advantage supported their assertions that the TAM was growing because both the

26   CMS Medicare data and the Kaiser Family Foundation data used to estimate

27   Medicare Advantage trends concluded that the market was shrinking.

28

- 16 -

60.     Further in his report, Block criticized Inogen's expectation of 90% POC penetration for ambulatory COPD patients as "greatly unrealistic" because:

Many ambulatory patients are not feasible potential users because they are healthy enough that they only need oxygen therapy while they sleep, and POCs do not have sufficient battery life to make them convenient to use overnight.  Others with more advanced lung disease that can still get around or out of the house need a strong, continuous flow of oxygen, which POCs cannot provide.

61.     Block also cited an industry report which found an "overwhelming consensus" that "portable oxygen therapy is appropriate for up to only half of ambulatory oxygen therapy users."

62.     Block then criticized Defendants for intentionally (or at the very least recklessly) misstating the TAM and TAM growth.  For example, Block noted:

It appears that management became aware of investor concerns about its market estimates late last year.  As recently as November 2018, INGN's investor presentation contained a slide with the estimates of a three to four million user TAM growing at 7%-10% annually.  But since then, management has either de-emphasized or entirely stopped presenting these poor estimates.  Those same slides, which had consistently been in investor presentations since at least 2015, were removed from presentations given on January 9 and January 16, 2019.  Therefore, we believe that management is now engaged in a lowkey CYA exercise.

63.     Block called out Defendants' attempts to justify their shifting narrative:

In fact, at their most recent investor conference on January 16, 2019, management managed to go through an entire presentation without mentioning the growth of the oxygen market, which we believe is a first for INGN's executive team.  Unfortunately, management is

- 17 -

still attempting to obscure the fact that the total market is declining. *The recent disappearance of the line about 7% to 10% growth came in conjunction with management's new narrative: U.S. beneficiaries are shifting to Medicare Advantage, and therefore analysts cannot gauge the oxygen market's growth by looking at Medicare data alone*.

64.     Then, on February 12, 2019, Citron issued a report titled "Citron Exposes Elder Abuse Within Inogen's Sales Practices."   The Citron Report illuminated what Citron characterized as the Company's "dirty" reseller network and systematic abuse of elders by Inogen and resellers through their deceptive sales practices and shoddy sales network, stating that less than 10% of Inogen's sales come from Medicare despite the 75+ average age of its customers.  According to the Citron Report, Inogen had been conspiring with its reseller network to dominate Google listings, posting fake reviews, and using tactics to deceive and pressure the elderly into buying its oxygen concentrators by, among other things, falsely telling them that Medicare would not cover the cost of oxygen concentrators sold by other companies (at prices lower than Inogen's) in order to induce them to purchase Inogen's devices at outsized prices the market would not have otherwise supported.

65.     Additionally, according to the Citron Report, the top reseller of Inogen products was "secretly controlled by a convicted felon who was recently released after 5 years in federal prison" after being sentenced for deceptive marketing practices, such as posting fake reviews.  These are the same types of deceptive marketing practices Inogen's resellers were committing, and which were exposed by Citron.  The Citron Report detailed how increased sales through these nefarious resellers had artificially increased Inogen's B2B sales, sales increases that Citron opined were not sustainable on a long-term basis.  Based on its analysis of Inogen's financial reports and the firm's own research, Citron placed a target of just $46 per share on Inogen common stock.

66.     According to its report, Citron called and inquired about a POC with Inogen's biggest reseller, 1stClass Medical, and learned firsthand that the sales representative was lying about patient eligibility for Medicare reimbursements for POCs.  Citron accused two other resellers, Pure Medical and Main Clinic Supply, of posting fake internet reviews to mislead patients about Medicare eligibility and to scare patients away from more economically priced POCs by deceptively warning patients to "'Beware of Cheap Machines.'"

67.     Citron also investigated Inogen's own sales practices by interviewing Inogen sales representatives, before ultimately concluding that Inogen leveraged its position as being the only Medicare approved DME provider of oxygen therapy in certain markets to steer patients, who would otherwise be eligible for Medicare reimbursement, to out-of-pocket cash sales "through evasive and deceptive tactics." However, according to its report, Citron realized that Inogen's ability to corner certain markets had ended in 2019 due to a change in Medicare payment rules that allowed patients to obtain POCs from any enrolled Medicare supplier.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

### A.   November 2017

#### INOGEN'S 3Q17 PRESS RELEASE

68.     On November 7, 2017, after the close of trading, Inogen publicly released its third quarter of 2017 ("3Q17") financial results for the period ended September 30, 2017, and provided financial guidance for the remainder of FY17 and for FY18.  In the press release, Defendants announced:

- "Record total revenue of $69.0 million, up 26.8% over the same period in 2016";

- Inogen's 3Q17 revenue guidance would increase to a range of $244 to $248 million (growth of 22.3%), compared to the previous year's range of $239 to $243 million (growth of 20.3%);

- 19 -

- "[DTC] sales rose 43.5% over the same period in 2016, ahead of our expectations primarily due to an increased number of sales representatives and increased productivity";

- Domestic B2B sales "grew 41.7% over the same period in 2016, primarily driven by continued strong demand from traditional home medical equipment providers and our private label partner";

- DTC sales and domestic B2B would be Inogen's "strongest growing channels" and would have "similar growth rates";

- "Inogen expect[ed] rental revenue to decline in 2017 compared to 2016 by approximately 32% based on lower average rental revenue per patient and a focus on sales versus rentals";

- Inogen's "guidance range for full year 2017 net income" would be maintained at "$25 to $27 million, which represents 21.8% to 31.6% year-over-year growth"; and

- The Company's guidance range for full year 2017 adjusted EBITDA would increase to a range of $49 to $51 million (growth of 17.5%), in comparison to the previous year which saw a range of $48 to $50 million, or growth of approximately 12.9%.

69.     Defendants gave investors a "guidance range for [FY18] total revenue of $295 to $305 million," representing a range of "19.9% to 24.0% growth over the 2017 guidance mid-point of $246 million."  Moreover, Inogen's press release stated that the Company expected DTC sales "to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate," and "rental revenue to be relatively flat in 2018 compared to 2017 with reimbursement rates stable and a continued focus on sales versus rentals."

70.     Additionally, Inogen also provided investors with "a full year 2018 net income estimate of $31 to $35 million, representing 19.2% to 34.6% growth over the 2017 guidance mid-point of $26 million."

71.     Inogen also raised its "full year 2018 Adjusted EBITDA of $60 to $64 million, representing 20.0% to 28.0% growth over the 2017 guidance mid-point of $50 million."

72.     Justifying the increase in Inogen's FY17 and FY18 financial guidance, Inogen's press release quoted defendant Wilkinson misleadingly crediting the large and growing market for portable oxygen and the Company's strong DTC salesforce acumen, stating:

> The third quarter of 2017 was a record revenue quarter for us, ***driven by increased sales in our domestic business-to-business and direct-to-consumer channels*** . . . .   We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our channels.  ***We believe we should see strong results in 2018 as portable oxygen concentrators continue to be adopted worldwide***.

73.     Defendants also disclosed a shift away from the less profitable rental market on account of the strong DTC results and prospects.  Inogen's 3Q17 press release stated that "Inogen expects rental revenue to decline in 2017 compared to 2016 by approximately 32% based on lower average rental revenue per patient and ***a focus on sales versus rentals***."

74.     With respect to Inogen's increased 2017 full year guidance, the press release focused on the Company's strong sales growth, stating:

> ***The Company expects direct-to-consumer sales and domestic business-to-business sales to be our strongest growing channels and to have similar growth rates*** . . . .

75.     To further justify Defendants' confidence that the POC market was largely untapped, the press release stated that "[d]uring the third quarter of 2017, we

began hiring in our Cleveland facility to continue to expand our direct-to-consumer sales . . . ."

**INOGEN'S 3Q17 CONFERENCE CALL**

76.    On November 7, 2017, Inogen hosted a conference call with analysts and investors to discuss the Company's 3Q17 financial results.

77.    Defendant Wilkinson opened the call by misleadingly attributing the ongoing sales growth to Inogen's salesforce's strong sales acumen, stating:

> We continued to steadily invest in direct-to-consumer sales force additions in the United States.  We also worked to optimize our new customer relationship management, or CRM system, and I'm pleased that *we have delivered such strong sales and solid bottom line results* during the third quarter while we were still investing in training and productivity improvements in the system.

78.    Defendant Wilkinson conveyed that Inogen's "strategy is to hire additional sales employees in the fourth quarter of 2017 and throughout 2018 and invest in marketing activities to increase consumer awareness as we believe this is still our most effective means to drive growth of direct-to-consumer sales."

79.    Defendant Bauerlein explained why investors should expect even more revenue growth.  She stated that the Company was "continuing to invest in our new Cleveland area facility, European facility and our CRM system while also *continuing to ramp our direct-to-consumer sales reps and the related media investments, which we expect will contribute to 2018 revenue growth*."

80.    Confirming what was discussed in the press release, the Inogen CFO stated that the Company would continue to focus on sales rather than rentals.  She stated:

> We expect direct-to-consumer sales to be our fastest-growing channel, domestic business-to-business sales to have a significant growth rate and international business-to-business sales to have a modest growth

- 22 -

rate where the strategy will still be focused on the European market. We expect rental revenue to be relatively flat, meaning plus or minus 5%, in 2018 compared to 2017 due to our continued focus on sales versus rental.

81.    Defendants also highlighted Inogen's strengths in the DTC segment. For example, defendant Bauerlein boasted that "*our reps have become more productive*, and that's in spite of the headwinds that we saw on the CRM implementation." Inogen's founder and CFO further explained:

We've been able to continue to add to our Cleveland site as well. And while you know that those sales reps take 4 to 6 months to come up to productivity, we are starting to see the contributions from the people we have hired in the first half of the year, and we expect the people that we hired in the second half of the year to really contribute more materially going into 2018. And *that's really why we still expect in 2018 direct-to-consumer sales to be the fastest-growing channel in our business because we are continuing to invest there*. And that's why we really expect that to continue to be the key driver to our sales growth.

82.    In response to a Leerink analyst's request for more information on the sales representatives' productivity and when the newly hired sales representatives would begin to contribute, defendant Bauerlein confirmed that Inogen would ramp up its new sales hires quickly, stating that:

Now on the rep side, they still take about 4 to 6 months to come up to productivity, but they start contributing in the first couple of months. So they certainly start making some sales and then ramp to that full productivity in months 4 through 6. *So it's a relatively quick turn from when a rep is hired to when they start producing*.

83.     Defendants also expressed confidence that Inogen's B2B sales would experience rapid growth.  On the conference call, defendant Wilkinson stated:

> We are very pleased with our domestic business-to-business sales in the third quarter of 2017, which increased 41.7% over the third quarter of 2016, exceeding our expectations.
>
> Growth in this channel was primarily driven by purchases from traditional home medical equipment providers and strong private label demand.  Revenue from our private label partner and traditional HME providers combined represented more than half of the domestic business-to-business channel's total sales revenue in the third quarter of 2017.

84.     To justify his optimism to investors, defendant Wilkinson claimed that data likely overstated Inogen's POC penetration into the LTOT market:

> [W]e estimate that the share of portable oxygen concentrators in Medicare oxygen therapy grew from 8.0% in 2015 to 9.1% in 2016.
>
> However, this estimate does not include patient cash sales or private insurance transactions. Our direct-to-consumer cash sales in 2016 grew significantly faster than rentals. ***So we believe that this data from CMS may represent a conservative estimate of actual portable oxygen concentrator market penetration***.
>
> That said, POCs were still the fastest-growing modality in oxygen therapy based on the CMS data and still have a significant growth opportunity before reaching full market saturation.

85.     The slides Inogen published in connection with its 3Q17 financial results contained Defendants' misleading TAM and TAM growth figures.  One slide represented that the U.S. Market for POCs was experiencing "7-10% growth per year" and would grow from 3 million patients in 2015 to 4 million patients in 2019.  On the same slide, Defendants also misled investors that the market was actually

- 24 -

1   much larger than these estimates, stating that "an estimated 50% of COPD patients

2   are currently undiagnosed."

3   **INOGEN'S 3Q17 10-Q**

4   86.   Also on November 7, 2017, Inogen filed its quarterly financial report

5   with the SEC on Form 10-Q ("10-Q") for 3Q17.  The 3Q17 10-Q was signed by the

6   Individual Defendants.  As to the strength of the Company's sales growth and the

7   size of its TAM, the 3Q17 10-Q stated in pertinent part as follows:

8           Portable oxygen concentrators represented the fastest-growing

9           segment of the Medicare oxygen therapy market between 2012 and

10          2016.  ***The Company estimates based on 2016 Medicare data that***

11          ***patients    using    portable    oxygen    concentrators    represent***

12          ***approximately 9.1% of the total addressable oxygen market [i.e., the***

13          ***TAM] in the United States***, although the Medicare data does not

14          account for private insurance and cash-pay sales into the market. . . .

15          Since adopting the Company's direct-to-consumer strategy in

16          2009 following its acquisition of Comfort Life Medical Supply, LLC,

17          which had an active Medicare billing number but few other assets and

18          limited business activities, the Company has directly sold or rented

19          more  than  327,000  of  its  Inogen  oxygen  concentrators  as  of

20          September 30, 2017.

21   87.   Defendants' statements above that were premised on the size of

22   Inogen's TAM (*see* ¶¶68-86) were materially false and/or misleading at the time

23   they were made because:

24          (a)    the annual Medicare data relied on by Defendants overstated the

25   number of current oxygen therapy patients because it double-counted patients in

26   instances where only one oxygen concentrator would be used for multiple patients

27   during that year.  For example, if a patient died, given the POC's seven-to-eight year

28

1  service life, the same POC would be repurposed for another patient, which counted

2  as a second patient in the Medicare data; and

3         (b)    Defendants' inference of approximately 15 million additional

4  undiagnosed COPD patients from the approximately 15 million Americans

5  diagnosed with COPD was based on an outdated 1988-1994 CDC survey which

6  merely stated approximately 50% of patients did not know they had COPD at the

7  time they were diagnosed.

8         88.    Defendants' statements above that were premised on the growth rate of

9  the TAM (*see* ¶¶68-86) were materially false and/or misleading because both the

10 Medicare data and the Kaiser Family Foundation data for Medicare Advantage,

11 relied upon by Defendants, reported negative annual growth rates.

12        89.    Defendants' statements above that were premised on (i) the low market

13 penetration of POCs, and (ii) Inogen's ability to become the leading POC

14 manufacturer responsible for achieving 90% penetration of POCs for ambulatory

15 LTOT patients (*see* ¶¶68-86) were materially false and/or misleading at the time they

16 were made because:

17        (a)    Inogen's POCs are nonproprietary and sell at a premium price,

18 and are thus subject to price and quality competition from similar POCs made by

19 other manufacturers;

20        (b)    industry consensus is that POCs are inappropriate for up to 50%

21 of ambulatory patients, such as those who only need oxygen therapy for sleep, and

22 are thus highly unlikely to obtain a POC;

23        (c)    some patients with more advanced respiratory disease require a

24 stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

25        (d)    Defendants' conscious decision to abandon the rental market

26 would leave Inogen unable to service the larger and more stable Medicare and

27 insurance rental reimbursement market;

28

- 26 -

(e)     POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)     because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

90.     Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶68-86) were materially false and/or misleading at the time they were made because:

(a)     despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim;

(b)     the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

(c)     there was a material risk that Inogen's ability to continue to cajole POC patients into paying cash out-of-pocket via deceptive sales practices would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving customers; in fact, Inogen's abusive sales practices were constrained when, in the fall of 2018, CMS threatened to revoke Inogen's accreditation and forced the Company to re-train its sales staff not to cheat its customers;

(d)     Inogen's newly-hired sales representatives in 2018 were not of the same quality as the earlier hires because the applicant pool had virtually been exhausted;

(e)     Inogen's newly-hired sales representatives were not able to achieve the performance of their established peers because they received little training or mentorship from incompetent sales office management who funneled the quality leads to established and favored sales representatives; and

(f)     Inogen's marketing team could not generate a sufficient volume of non-duplicative leads for the sales representatives, and of those leads, there were not enough quality leads to achieve the same level of sales productivity for its aggressively growing salesforce, many of whom were instead forced to rely on stale or recycled leads.

91.     Defendants' statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs (*see* ¶¶68-86) were materially false and/or misleading at the time they were made because:

(a)     Inogen's top HME partner was run by a convicted felon employing the same or worse sales abuses as Inogen's in-house sales team;

(b)     HMEs faced price constraints from their customers and insurance reimbursement schedules, would service multiple would-be DTC customers over the lifespan of a single POC, and were purchasing more POCs than they could reasonably deploy; and

(c)     Inogen's B2B sales and DTC sales were competing for the same customers and would cannibalize business from each other.

92.     Inogen's 3Q17 10-Q was also accompanied by certifications signed by the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). These false and misleading SOX certifications stated:

1.     I have reviewed this Quarterly Report on Form 10-Q of Inogen, Inc.;

- 28 -

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- 29 -

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**B.    January 2018**

**2018 J.P. MORGAN HEALTHCARE CONFERENCE**

93.    On January 9, 2018, the Individual Defendants presented on behalf of Inogen at the J.P. Morgan Healthcare Conference.

- 30 -

94.     At the conference, defendant Bauerlein heralded Inogen's success in selling POCs directly to patients paying cash out-of-pocket, exaggerating the size and unique nature of the market for these sales despite the existence of Medicare reimbursement:

> Sales have been growing very nicely on the direct-to-consumer side, over 40% in the third quarter. And now, ***this is really people who are buying retail out-of-pocket, showing the true demand for POCs***, in the fact that patients really have an interest in getting a POC instead of the tank-based systems that they already have.

95.     The Inogen founder and CFO misleadingly asserted that hiring talented sales representatives would ensure that Inogen could continue its extraordinary DTC growth.  Defendant Bauerlein stated:

> So as we said, ***we really did want to invest in the sales team because that's our #1 limiter to growth and we were able to execute that***. Majority of those sales rep additions were in the Cleveland facility, so that started in September and through the end of the year.  So these people are still in the very early stages of coming up the curve of productivity.  They take about 4 to 6 months to come up to productivity. ***And this is the main driver of why we expect, in 2018, to have $300 million in sales at the midpoint of guidance***.  Because we expect direct-to-consumer sales to be the fastest-growing segment because of the investments that we've made in the inside sales team in 2017.  And we expect to continue to expand that team going into 2018.  And that Cleveland area facility, over the next 3 years, we expect to add 240 employees, a mix of sales and service employees.

96.     At this conference, despite expressing the most confidence in Inogen's DTC channel, Defendants conveyed a heightened (albeit disingenuous) optimism in

the B2B segment due to the spillover effects from their DTC sales and marketing teams.  Defendant Wilkinson explained:

> As I noted, while our primary go-to-market strategy is to focus on patients, the Medicare competitive bidding cuts have put pressure on the providers, such that delivering tanks is simply unsustainable. They've looked at Inogen as the leader in the space to help them transition their model from a delivery model to a nondelivery one. We're the company that has 10 years' experience employing a nondelivery model ourselves.  So we've proven that the model works, we've proven it with our products.  So our value to that provider channel is not only in the best product on the market, with a strong reliability but also in our know-how and how to administer the nondelivery model.  ***You see there we've had great growth results through our direct-to-consumer strategy, but we've also had incredible growth through the business-to-business channel in the United States.  So we've reaped the benefits on both side through our direct-to-consumer approach***.

97.    Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶93-96) were materially false and/or misleading at the time they were made because:

(a)    despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim;

(b)    the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

- 32 -

1        (c)    there was a material risk that Inogen's ability to continue to

2   cajole POC patients into paying cash out-of-pocket via deceptive sales practices

3   would be substantially constrained by CMS revoking Inogen's Medicare

4   accreditation for deceiving customers; in fact, Inogen's abusive sales practices were

5   constrained when, in the fall of 2018, CMS threatened to revoke Inogen's

6   accreditation and forced the Company to re-train its sales staff not to cheat its

7   customers;

8        (d)    Inogen's newly-hired sales representatives in 2018 were not of

9   the same quality as the earlier hires because the applicant pool had virtually been

10  exhausted;

11       (e)    Inogen's newly-hired sales representatives were not able to

12  achieve the performance of their established peers because they received little

13  training or mentorship from incompetent sales office management who funneled the

14  quality leads to established and favored sales representatives; and

15       (f)    Inogen's marketing team could not generate a sufficient volume

16  of non-duplicative leads for the sales representatives, and of those leads, there were

17  not enough quality leads to achieve the same level of sales productivity for its

18  aggressively growing salesforce, many of whom were instead forced to rely on stale

19  or recycled leads.

20      98.    Defendants' statements above that were premised on Inogen's ability

21  to grow its B2B sales of POCs to HMEs (*see* ¶¶93-96) were materially false and/or

22  misleading at the time they were made because:

23       (a)    Inogen's top HME partner was run by a convicted felon

24  employing the same or worse sales abuses as Inogen's in-house sales team;

25       (b)    HMEs faced price constraints from their customers and insurance

26  reimbursement schedules, would service multiple would-be DTC customers over the

27  lifespan of a single POC, and were purchasing more POCs than they could

28  reasonably deploy; and

- 33 -

1

2

      (c)    Inogen's B2B sales and DTC sales were competing for the same customers and would cannibalize business from each other.

3      **C.    February 2018**

4      **INOGEN'S 4Q17 AND FY17 PRESS RELEASE**

5      99.    On February 27, 2018, after the close of trading, Inogen published a

6 press release announcing its fourth quarter 2017 ("4Q17") and FY17 financial

7 results.  In the press release, Defendants announced:

8      &bull;    Total revenue of $63.8 million for FY17 was "up 25.4% over the

9 same period in 2016";

10      &bull;    Inogen's FY18 revenue guidance is increasing "to $298 to $308

11 million, up from $295 to $305 million, representing growth of 19.5% to 23.5%

12 versus 2017 full year results";

13      &bull;    "[DTC] sales rose 57.5% over the same period in 2016, ahead of

14 our expectations and primarily due to an increase in the number of sales

15 representatives, marketing expenditures, and sales representative

16 productivity";

17      &bull;    Domestic B2B sales "grew 46.1% over the same period in 2016,

18 primarily driven by continued strong demand from our private label partner

19 and traditional home medical equipment providers";

20      &bull;    Inogen expected DTC sales "***to be its fastest growing channel,***

21 ***domestic business-to-business sales to have a solid growth rate***," and for

22 rental revenue "to be relatively flat in 2018 compared to 2017 as the Company

23 continues to focus on sales versus rentals";

24      &bull;    Inogen is "increasing its full year 2018 GAAP net income . . .

25 guidance range to $36 to $39 million, up from $31 to $35 million, representing

26 growth of 71.4% to 85.7% compared to 2017 GAAP net income"; and

27

28

- 34 -

- Inogen is maintaining its full year 2018 adjusted EBITDA of $60 to $64 million, representing a range of 18.0% to 25.9% growth compared to its full year 2017 results.

100.  Justifying the increase in Inogen's FY18 financial guidance, defendant Wilkinson touted the Company's "'successful [fourth] quarter'" as being "'***driven by record sales in our domestic direct-to-consumer channel*** and strong sales in our domestic business-to-business channel.'"  As a further signal of the supposed strength of Inogen's sales and marketing strategy, the Inogen CEO told investors that in 4Q17, "'we continued hiring in our Cleveland facility primarily to expand our direct-to-consumer sales team.'"

### INOGEN'S 4Q17 AND FY17 CONFERENCE CALL

101.  During a February 27, 2018 Company-hosted conference call with analysts and investors, defendant Wilkinson created the misleading impression that Inogen's record sales growth would continue simply by increasing the number of the "talented" sales representatives hired in Cleveland and investing in customer awareness:

Our record direct-to-consumer sales of $24.5 million in the fourth quarter of 2017 exceeded our expectations, as we steadily added new inside sales representatives, with most located in our new Cleveland facility.  Our direct-to-consumer sales team consisted of 263 inside sales reps as of December 31, 2017, which represented an increase of 86 reps over our 2016 year-end total of 177.

Our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as *we believe this is still our most effective means to drive growth of direct-to-consumer sales*.

102.  Defendant Bauerlein also misleadingly attributed the sales growth to additional sales representatives and their sales acumen, stating that "[d]irect-to-

- 35 -

consumer sales for the fourth quarter of 2017 were a record $24.5 million, representing 57.5% growth over the fourth quarter of 2016, primarily due to increased sales representative headcount, increased marketing expenditures and increased productivity."

103.   During the conference call, a J.P. Morgan analyst asked "about what the historical correlation has been from adding new sales reps and how that translates into sales growth going forward and what that might mean in terms of growth rates in '18 in the DTC channel."   In response, Inogen CFO Bauerlein confirmed the misleading implication that adding sales representatives would result in a proportionate increase in sales, stating:

> *So it has closely correlated with, over time, the sales growth in that direct-to-consumer sales channel*.   So we would expect that as we've added this additional sales capacity outside of that first 4- to 6-month investment that you have for new hires, that *you will see that growth on the direct-to-consumer side associated with us increasing that sales capacity.   Because as you know, our limit to growth in creating additional consumer awareness is really tied to how much sales capacity we have*.   So as we add that additional sales capacity, we spend more in marketing to drive more leads to fill that sales capacity. And that's our plan going forward as well.   *And we do plan to continue to add reps going into 2018 as well as we still think we're a long way from full saturation on the direct-to-consumer sales side of the business*.

104.   When asked about his 10% to 12% market penetration figures, defendant Wilkinson expressed to investors the same faux confidence that the simple process of adding sales representatives and marketing spend would be effective in increasing Inogen's DTC sales because it's "relatively easy to sell somebody a unit if they have the money, because it's hard to put a price on freedom" and that the

- 36 -

1  "opportunity today is still using our sales team to convert oxygen patients, so that's
2  what we're focused on."

3      105.    The Inogen CEO also explained to investors the simplicity of the
4  Company's sales strategy:

> [W]e don't assign territories to the inside reps.  We've got leads coming
> in every day from all over the USA, and they are distributed more or
> less evenly across the sales force.  So the way we manage the sales team
> is every rep is going to get x number of new leads every month.  By not
> assigning territories, it's made it really easy for us to scale, because if
> you think about it, if we did have more territories, then you've got to
> rebalance and recut your sales territories really almost every month the
> way we've scaled the sales team.

**INOGEN'S 2017 10-K**

14      106.    That same day on February 27, 2018, Defendants publicly filed
15  Inogen's 2017 10-K with the SEC.  The 2017 10-K was also signed by the Individual
16  Defendants.

17      107.    Inogen's 2017 10-K discussed what Defendants characterized as a
18  strong and growing market for Inogen's POCs, which they essentially claimed
19  lacked any competitive pricing pressure or any threats thereof, stating:

> ***Portable oxygen concentrators represented the fastest-growing***
> ***segment of the Medicare oxygen therapy market between 2012 and***
> ***2016***.  We estimate based on 2016 Medicare data that the total number
> of patients using portable oxygen concentrators ***represents***
> ***approximately 9.1% of the total addressable oxygen market*** in the
> United States, although the Medicare data does not account for private
> insurance and cash-pay patients in the market.

*     *     *

- 37 -

**Our market**

**We believe the current total addressable oxygen therapy market in the United States is approximately $3 billion to $4 billion**, based on 2016 Medicare data and our estimate of the ratio of the Medicare market to the total market.  As of 2016, we estimate that there are 4.5 million patients worldwide who use oxygen therapy, **including 2.5 to 3 million patients in the United States, and more than 60% of oxygen therapy patients in the United States are covered by Medicare.  The number of oxygen therapy patients in the United States is projected to grow by approximately 7% to 10% per year between 2017 and 2021**, which we believe is the result of earlier diagnosis of chronic respiratory conditions, demographic trends and longer durations of long-term oxygen therapy.

\*       \*       \*

Despite the ability of portable oxygen concentrators to address many of the shortcomings of traditional oxygen therapy, we estimate based on 2016 Medicare data that the total number of patients on portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

108.   Defendants' statements above that were premised on the size of Inogen's TAM (*see* ¶¶99-107) were materially false and/or misleading at the time they were made because:

(a)     the annual Medicare data relied on by Defendants overstated the number of current oxygen therapy patients because it double-counted patients in instances where only one oxygen concentrator would be used for multiple patients during that year.  For example, if a patient died, given the POC's seven-to-eight year

- 38 -

1  service life, the same POC would be repurposed for another patient, which counted
2  as a second patient in the Medicare data; and

3         (b)    Defendants' inference of approximately 15 million additional
4  undiagnosed COPD patients from the approximately 15 million Americans
5  diagnosed with COPD was based on an outdated 1988-1994 CDC survey which
6  merely stated approximately 50% of patients did not know they had COPD at the
7  time they were diagnosed.

8         109.   Defendants' statements above that were premised on the growth rate of
9  the TAM (*see* ¶¶99-107) were materially false and/or misleading because both the
10  Medicare data and the Kaiser Family Foundation data for Medicare Advantage,
11  relied upon by Defendants, reported negative annual growth rates.

12         110.   Defendants' statements above that were premised on (i) the low market
13  penetration of POCs, and (ii) Inogen's ability to become the leading POC
14  manufacturer responsible for achieving 90% penetration of POCs for ambulatory
15  LTOT patients (*see* ¶¶99-107) were materially false and/or misleading at the time
16  they were made because:

17         (a)    Inogen's POCs are nonproprietary and sell at a premium price,
18  and are thus subject to price and quality competition from similar POCs made by
19  other manufacturers;

20         (b)    industry consensus is that POCs are inappropriate for up to 50%
21  of ambulatory patients, such as those who only need oxygen therapy for sleep, and
22  are thus highly unlikely to obtain a POC;

23         (c)    some patients with more advanced respiratory disease require a
24  stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

25         (d)    Defendants' conscious decision to abandon the rental market
26  would leave Inogen unable to service the larger and more stable Medicare and
27  insurance rental reimbursement market;

28

Cases\4850-5109-6731.v1-7/10/19

(e)     POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)     because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

111.   Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶99-107) were materially false and/or misleading at the time they were made because:

(a)     despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim;

(b)     the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

(c)     there was a material risk that Inogen's ability to continue to cajole POC patients into paying cash out-of-pocket via deceptive sales practices would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving customers; in fact, Inogen's abusive sales practices were constrained when, in the fall of 2018, CMS threatened to revoke Inogen's accreditation and forced the Company to re-train its sales staff not to cheat its customers;

- 40 -

(d)      Inogen's newly-hired sales representatives in 2018 were not of the same quality as the earlier hires because the applicant pool had virtually been exhausted;

(e)      Inogen's newly-hired sales representatives were not able to achieve the performance of their established peers because they received little training or mentorship from incompetent sales office management who funneled the quality leads to established and favored sales representatives; and

(f)      Inogen's marketing team could not generate a sufficient volume of non-duplicative leads for the sales representatives, and of those leads, there were not enough quality leads to achieve the same level of sales productivity for its aggressively growing salesforce, many of whom were instead forced to rely on stale or recycled leads.

112.   Defendants' statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs (*see* ¶¶99-107) were materially false and/or misleading at the time they were made because:

(a)      Inogen's top HME partner was run by a convicted felon employing the same or worse sales abuses as Inogen's in-house sales team;

(b)      HMEs faced price constraints from their customers and insurance reimbursement schedules, would service multiple would-be DTC customers over the lifespan of a single POC, and were purchasing more POCs than they could reasonably deploy; and

(c)      Inogen's B2B sales and DTC sales were competing for the same customers and would cannibalize business from each other.

113.   Inogen's 2017 10-K also contained the following false and misleading SOX certifications signed by the Individual Defendants:

1.      I have reviewed this annual report on Form 10-K of Inogen, Inc.;

- 41 -

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- 42 -

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**D.     April 2018**

**INOGEN'S 1Q18 PRESS RELEASE**

114.    Following the close of trading on April 30, 2018, Inogen published a press release announcing its first quarter of 2018 ("1Q18") financial results and once

- 43 -

again increased its FY18 financial guidance.  Defendants announced the following in the press release:

- Record 1Q18 revenues which had grown 50.6% over the same period in 2017 to $79.1 million;

- Net income had grown 81.4% during the same time period in 2017 to $10.8 million;

- Inogen significantly increased "its full year 2018 total revenue guidance range to $310 to $320 million, up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year results";

- "[DTC] sales rose 67.8% over the same period in 2017, ahead of expectations primarily due to increased sales representative headcount and associated consumer marketing";

- "Domestic [B2B] sales exceeded expectations and grew 60.4% over the same period in 2017, primarily driven by continued strong demand from the Company's private label partner and traditional home medical equipment providers";

- Inogen continued to expect DTC sales "to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate" and "rental revenue to be down approximately 10% in 2018 compared to 2017 as the Company continues to focus on sales versus rentals";

- Inogen increased "its full year 2018 GAAP net income . . . guidance range to $38 to $41 million, up from $36 to $39 million, representing growth of 80.9% to 95.2% compared to 2017 GAAP net income"; and

- Inogen increased "its guidance range for full year 2018 Adjusted EBITDA to $62 to $67 million, up from $60 to $64 million, representing 22.0% to 31.8% growth compared to 2017 results."

- 44 -

115. Justifying the increase in Inogen's FY18 financial guidance, defendant Wilkinson misleadingly credited the strong and growing market for POCs and the strong sales acumen of its DTC and domestic B2B salesforce, stating:

> In what is historically a seasonally slower quarter, we were able to generate *record revenues driven by strong sales in both our domestic direct-to-consumer and domestic business-to-business channels* . . . . We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our sales channels. *We are currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020*. We believe we should see strong sales growth in 2018 as portable oxygen concentrator penetration increases worldwide.

116. The Company's 1Q18 press release further touted Inogen's strong sales results and outlook, stating:

> Total revenue for the three months ended March 31, 2018 rose 50.6% to $79.1 million from $52.5 million in the same period in 2017. *Direct-to-consumer sales rose 67.8% over the same period in 2017, ahead of expectations primarily due to increased sales representative headcount* and associated consumer marketing. *Domestic business-to-business sales exceeded expectations and grew 60.4% over the same period in 2017, primarily driven by continued strong demand* from the Company's private label partner and traditional home medical equipment providers.

> *           *           *

> The Company *continues to expect direct-to-consumer sales to be its fastest growing channel, [and] domestic business-to-business sales to have a solid growth rate* . . . .

- 45 -

**INOGEN'S 1Q18 CONFERENCE CALL**

117.   During Inogen's 1Q18 conference call held later that day with analysts and investors, the Company's CEO again emphasized Inogen's purportedly strong DTC and B2B sales growth, stating:

Our record direct-to-consumer sales of $28.7 million in the first quarter of 2018 exceeded our expectations, ***primarily due to increased sales representative headcount and associated consumer spending***.  We're currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020, with the majority of those being sales reps. Given our recent success, our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe that it's still our most effective means to drive growth of the direct-to-consumer sales.

In fact, we expect to release a new TV commercial to showcase the benefits of our portable oxygen concentrators in the second quarter. Further, we initiated a direct-to-consumer pricing trial in the second quarter of 2018 to ensure our products are optimally priced.  We expect to provide an update on this trial on our next earnings call.

***First quarter of 2018 domestic business-to-business sales of $28 million was a record for us and exceeded our expectations, primarily due to continued success with our private label partner and traditional home medical equipment providers***.

\*       \*       \*

Looking ahead, ***I'm very proud of our Inogen associates and the progress made*** in what has historically been a seasonally slower quarter.  While we've been engaged in multiple initiatives to fuel future growth, ***we've accelerated current growth, especially in the domestic***

- 46 -

*direct-to-consumer and business-to-business sales channels*.   I'm very pleased with the increased adoption in these markets with our best-in-class and patient-preferred products.

118.   Defendant Wilkinson touted the quality of the sales representatives Inogen was hiring in Cleveland, stating:

> Now on the direct-to-consumer side, the results are driven by our increased hiring.  I mentioned that the hiring in Cleveland is going, I'll say, not according to plan, but ahead of plan.  We found that it's a great market.  ***We're very pleased with the talent that we're finding there***. So it has allowed us to hire.  If you were to compare our 3-year plan, we're ahead of that plan, if you look at it on a linear basis.  And we hired pretty heavily at the end of last year.  Those people are now contributing.  As you go into the first quarter, you've got – the very first people we hired actually are seasoned reps or at the end of curve.  The people hired at the very end of the year are still relatively new in the first quarter, but they climbed that curve.  So primarily, the results are based on our hiring increase.  There's some productivity improvement in there.  But if you looked at the contribution of productivity versus headcount and sales capacity, sales capacity is the bigger driver.

119.   Defendant Bauerlein further commented on the Company's sales prospects, stating that "[w]e expect direct-to-consumer sales to be our fastest-growing channel" and "domestic business-to-business sales to have a significant growth rate."

120.   In response to a question from a Leerink analyst concerning the "very quick[]" growth of B2B and "the long-term mix of business between B2B and direct-to-consumer," defendant Bauerlein reiterated the Company's misleading sales growth and TAM penetration figures to assure investors that the mix between the two channels was irrelevant to Inogen's financial prospects, stating:

- 47 -

1   Yes.  So when you look at that, while certainly B2B has a lower
2   gross margin profile, it also has much lower operating expenses
3   associated with it.  So when we look at the market opportunity, we look
4   to capture share both on the B2B side and the direct-to-consumer side
5   because we're relatively agnostic on the bottom line.  ***What we have***
6   ***been doing, though, is continuing to invest in the B2C [business-to-***
7   ***consumers] side because we're still very early in the market***
8   ***penetration curve***.  As Scott said earlier, ***9% or so penetration in the***
9   ***last data as of the end of 2016, we still have a long – we have a long***
10  ***ramp to go to continue to take share both on the direct-to-consumer***
11  ***side as well as the business-to-business side away from the tank-based***
12  ***business model***.  So our focus really is to make sure that we maintain a
13  market leadership position and that we continue to grow the market
14  both on [the] direct-to-consumer side and the B2B side and not to drive
15  a specific mix in our business.  Now inherent in guidance in 2018 is
16  that direct-to-consumer sales would be the fastest-growing channel.  So
17  that would actually be a tailwind to gross margin expansion over the
18  course of the year.

19  121.   When Inogen's founder and CFO was asked by a Needham analyst
20  whether there were "any onetime factors that drove . . . revenue this quarter that
21  won't be repeated," defendant Bauerlein responded "[n]o"; reinforcing the
22  misleading impression that Inogen's growth was truly sustainable.

23              **INOGEN'S 1Q18 10-Q**

24  122.   That same day, Inogen publicly filed its 1Q18 10-Q with the SEC.  This
25  10-Q was signed by the Individual Defendants and contained nearly identical false
26  and misleading SOX certifications attached to previous Class Period SEC filings by
27  the Company.  *See* ¶¶92, 113, *supra*.

28

- 48 -

123.   Inogen's 1Q18 10-Q also expressly incorporated, by reference, the description of the Company's business detailed above in ¶107 from the Company's FY17 10-K, and further specifically reiterated in pertinent part as follows:

Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. ***The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States***, although the Medicare data does not account for private insurance and cash-pay patients in the market.

124.   Defendants' statements above that were premised on the size of Inogen's TAM (*see* ¶¶114-123) were materially false and/or misleading at the time they were made because:

(a)   the annual Medicare data relied on by Defendants overstated the number of current oxygen therapy patients because it double-counted patients in instances where only one oxygen concentrator would be used for multiple patients during that year.  For example, if a patient died, given the POC's seven-to-eight year service life, the same POC would be repurposed for another patient, which counted as a second patient in the Medicare data; and

(b)   Defendants' inference of approximately 15 million additional undiagnosed COPD patients from the approximately 15 million Americans diagnosed with COPD was based on an outdated 1988-1994 CDC survey which merely stated approximately 50% of patients did not know they had COPD at the time they were diagnosed.

125.   Defendants' statements above that were premised on (i) the low market penetration of POCs, and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory

LTOT patients (*see* ¶¶114-123) were materially false and/or misleading at the time they were made because:

(a)     Inogen's POCs are nonproprietary and sell at a premium price, and are thus subject to price and quality competition from similar POCs made by other manufacturers;

(b)     industry consensus is that POCs are inappropriate for up to 50% of ambulatory patients, such as those who only need oxygen therapy for sleep, and are thus highly unlikely to obtain a POC;

(c)     some patients with more advanced respiratory disease require a stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

(d)     Defendants' conscious decision to abandon the rental market would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market;

(e)     POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)     because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

126.   Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶114-123) were materially false and/or misleading at the time they were made because:

1            (a)    despite ambulatory patients' preferences for a POC, the market

2    was limited to those who had thousands of dollars on hand to purchase the POC and

3    could not wait for Medicare or private insurance to process their claim;

4            (b)    the growth of out-of-pocket cash sales was due in large part to

5    skewed incentives that created a toxic boiler-room sales environment in which

6    nefarious sales tactics, in violation of Medicare policy, were employed to deceive

7    Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

8            (c)    there was a material risk that Inogen's ability to continue to

9    cajole POC patients into paying cash out-of-pocket via deceptive sales practices

10   would be substantially constrained by CMS revoking Inogen's Medicare

11   accreditation for deceiving customers; in fact, Inogen's abusive sales practices were

12   constrained when, in the fall of 2018, CMS threatened to revoke Inogen's

13   accreditation and forced the Company to re-train its sales staff not to cheat its

14   customers;

15           (d)    Inogen's newly-hired sales representatives in 2018 were not of

16   the same quality as the earlier hires because the applicant pool had virtually been

17   exhausted;

18           (e)    Inogen's newly-hired sales representatives were not able to

19   achieve the performance of their established peers because they received little

20   training or mentorship from incompetent sales office management who funneled the

21   quality leads to established and favored sales representatives; and

22           (f)    Inogen's marketing team could not generate a sufficient volume

23   of non-duplicative leads for the sales representatives, and of those leads, there were

24   not enough quality leads to achieve the same level of sales productivity for its

25   aggressively growing salesforce, many of whom were instead forced to rely on stale

26   or recycled leads.

27

28

127. Defendants' statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs (*see* ¶¶114-123) were materially false and/or misleading at the time they were made because:

(a)    Inogen's top HME partner was run by a convicted felon employing the same or worse sales abuses as Inogen's in-house sales team;

(b)    HMEs faced price constraints from their customers and insurance reimbursement schedules, would service multiple would-be DTC customers over the lifespan of a single POC, and were purchasing more POCs than they could reasonably deploy; and

(c)    Inogen's B2B sales and DTC sales were competing for the same customers and would cannibalize business from each other.

**E.    August 2018**

**INOGEN'S 2Q18 PRESS RELEASE**

128. Following the close of trading on August 7, 2018, Inogen issued a press release announcing its 2Q18 financial results and once again increased its FY18 financial guidance.  The press release also announced:

- Record 2Q18 revenues that had grown to $97.2 million, a 51.6% increase over the same period in 2017;

- Net income had grown 75.2% over the same time period in 2017 to $14.6 million;

- Inogen's full year 2018 total revenue guidance range is significantly increasing "to $340 to $350 million, up from $310 to $320 million, representing growth of 36.3% to 40.3% versus 2017 full year results";

- "[DTC] sales rose 74.3% over the same period in 2017, ahead of expectations, primarily due to increased sales representative headcount and additional consumer advertising";

- • Domestic B2B sales "grew 55.7% over the same period in 2017, primarily driven by continued strong demand from the Company's private label partner and traditional home medical equipment providers";

- • Inogen continued to expect DTC sales "to be its fastest growing channel, domestic business-to-business sales to have a significant growth rate, and international business-to-business sales to have a solid growth rate," and that rental revenue would be "down approximately 10% in 2018 compared to 2017 as the Company continue[d] to focus on sales";

- • Inogen increased "its full year 2018 GAAP net income . . . guidance range to $45 to $48 million, up from $38 to $41 million, representing growth of 114.3% to 128.5% compared to 2017 GAAP net income"; and

- • Inogen is increasing "its guidance range for full year 2018 Adjusted EBITDA to $65 to $69 million, up from $62 to $67 million, representing 27.9% to 35.7% growth compared to 2017 results."

129.   As support for the guidance provided in the Company's publicly issued press release, defendant Wilkinson credited the strong sales acumen of its salesforce, stating:

> The second quarter of 2018 was a notably strong quarter for us as we generated record revenue across all three sales channels, while also reporting record operating income . . . . ***We are continuing to execute on our strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as we believe this is still our most effective means to drive high revenue growth and portable oxygen concentrator adoption***.

### INOGEN'S 2Q18 CONFERENCE CALL

130.   During Inogen's August 7, 2018 conference call with analysts and investors, the Company's CEO continued to emphasize that Inogen's strong and

1   growing DTC sales were the result of the strong sales acumen of its growing

2   salesforce, stating:

3           Given our recent success, our strategy is to continue to hire

4       additional sales representatives and invest in advertising activities to

5       increase consumer awareness, as we believe this is still our most

6       effective means to drive growth of direct-to-consumer sales.

7           ***In fact, we now expect to have 500 Cleveland-based employees***

8       ***by year-end 2020, which is up from our original target of 240***

9       ***employees***.   We expect at least ⅔ of these employees to be sales

10      representatives.

11                                  *       *       *

12          Looking ahead, I'm very proud of our Inogen associates and the

13      progress made thus far in 2018.  While we've been engaged in multiple

14      initiatives to fuel future growth, ***we've accelerated our current growth,***

15      ***especially in the domestic direct-to-consumer and business-to-***

16      ***business sales channels***.  I'm very pleased with the increased adoption

17      in these markets with our best-in-class and patient preferred products.

18      131.    Additionally, Inogen founder and CFO Bauerlein confirmed that "[w]e

19   still expect direct-to-consumer sales to be our fastest-growing channel, domestic

20   business-to-business sales to have a significant growth rate and international

21   business-to-business sales to have a solid growth rate, where the strategy will still

22   be focused on the European market."

23      132.    In response to a question from a William Blair analyst about the ramp-

24   up of Inogen's Cleveland sales facility, defendant Wilkinson falsely confirmed:

25   "***[w]e are running a little bit ahead of our plan or schedule***.  That's why we are

26   increasing our own expectations as well as communication that over the 3-year

27   period that we forecasted over that we would expect to have 500 people; about ⅔ of

28   them would be sales personnel versus the original 240 people."

1    133.   The Company's CEO also trumpeted the purported quality of the sales

2  representatives Inogen hired for its Cleveland facility, telling participants on the call

3  that, "[s]o far, I think we've done a great job.  *We're very pleased with the quality*

4  *of personnel that we've been able to attract*."

5    134.   During the call, defendant Bauerlein misleadingly attributed the

6  exceptional DTC performance to the increase of competent sales representatives:

7         We have seen improved productivity across the facilities that have the

8         seasoned reps, the California and Texas facilities, so that productivity

9         is increasing, but of course, Cleveland is heavily influenced by the

10        number of new reps in that facility.  So really, the increase is primarily

11        associated with just the increased capacity and not a productivity

12        improvement, particularly if you're just looking at a base of the total

13        number of employees and how their productivity has changed year-

14        over-year.

15    135.   Addressing a question from a J.P. Morgan analyst "about the

16  sustainability of business-to-business," the Inogen CEO and the analyst engaged in

17  the following colloquy:

18        [Analyst:] I was hoping you could talk about the *sustainability*

19        *of business-to-business*.  This is one that can be lumpy, but it does look

20        like it's really moving in the direction of full adoption here.  So I think

21        *what people would really like to better understand is, what inning are*

22        *we in, in terms of adoption from the larger players, the middle sized*

23        *and the smaller players?  And how sustainable is it in the near term?*

24        *And what could be [rallied] here in your opinion*?

25        [Wilkinson:] Yes.  It's – I just mentioned in the previous question

26        that *I think in the what inning we're in, second inning, maybe third*

27        *inning, but certainly, we're in the first third of the game, if you will*.

28

- 55 -

1    As far as sustainability, I think that, that's a time horizon type of

2    question, because over that 7 to 10 years, I mean, we absolutely believe

3    POCs will be the standard of care and the end game is, there will be a

4    conversion.

5    136.   Similarly, defendant Wilkinson publicly assured investors that based

6    on the Medicare data, "*we're still such a long way from a saturation point* and only

7    growing it 1 to 1.5 percentage points incrementally a year.  Even if the market takes

8    off and grows at a much faster rate than historical, we're still quite a ways from the

9    end of that curve."

10                                   **INOGEN'S 2Q18 10-Q**

11   137.   That same day on April 30, 2018, Inogen publicly filed its 2Q18 10-Q

12   with the SEC.  This 10-Q was signed by the Individual Defendants and contained

13   nearly identical false and misleading SOX certifications attached to previous Class

14   Period SEC filings by the Company.  *See* ¶¶92, 113, *supra*.

15   138.   Inogen's 2Q18 10-Q also expressly incorporated, by reference, the

16   description of the Company's business detailed above in ¶107 from the 2017 10-K,

17   specifically reiterating that:

18                Portable oxygen concentrators represented the fastest-growing

19          segment of the Medicare oxygen therapy market between 2012 and

20          2016. *The Company estimates based on 2016 Medicare data that the*

21          *number of patients using portable oxygen concentrators represents*

22          *approximately 9.1% of the total addressable oxygen market in the*

23          *United States*, although the Medicare data does not account for private

24          insurance and cash-pay patients in the market.

25   139.   Defendants' statements above that were premised on the size of

26   Inogen's TAM (*see* ¶¶128-138) were materially false and/or misleading at the time

27   they were made because:

28

(a)    the annual Medicare data relied on by Defendants overstated the number of current oxygen therapy patients because it double-counted patients in instances where only one oxygen concentrator would be used for multiple patients during that year.  For example, if a patient died, given the POC's seven-to-eight year service life, the same POC would be repurposed for another patient, which counted as a second patient in the Medicare data; and

(b)    Defendants' inference of approximately 15 million additional undiagnosed COPD patients from the approximately 15 million Americans diagnosed with COPD was based on an outdated 1988-1994 CDC survey which merely stated approximately 50% of patients did not know they had COPD at the time they were diagnosed.

140.    Defendants' statements above that were premised on (i) the low market penetration of POCs, and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients (*see* ¶¶128-138) were materially false and/or misleading at the time they were made because:

(a)    Inogen's POCs are nonproprietary and sell at a premium price, and are thus subject to price and quality competition from similar POCs made by other manufacturers;

(b)    industry consensus is that POCs are inappropriate for up to 50% of ambulatory patients, such as those who only need oxygen therapy for sleep, and are thus highly unlikely to obtain a POC;

(c)    some patients with more advanced respiratory disease require a stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

(d)    Defendants' conscious decision to abandon the rental market would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market;

(e)     POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)     because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

141.   Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶128-138) were materially false and/or misleading at the time they were made because:

(a)     despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim;

(b)     the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

(c)     there was a material risk that Inogen's ability to continue to cajole POC patients into paying cash out-of-pocket via deceptive sales practices would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving customers; in fact, Inogen's abusive sales practices were constrained when, in the fall of 2018, CMS threatened to revoke Inogen's accreditation and forced the Company to re-train its sales staff not to cheat its customers;

- 58 -

(d)     Inogen's newly-hired sales representatives in 2018 were not of the same quality as the earlier hires because the applicant pool had virtually been exhausted;

(e)     Inogen's newly-hired sales representatives were not able to achieve the performance of their established peers because they received little training or mentorship from incompetent sales office management who funneled the quality leads to established and favored sales representatives; and

(f)     Inogen's marketing team could not generate a sufficient volume of non-duplicative leads for the sales representatives, and of those leads, there were not enough quality leads to achieve the same level of sales productivity for its aggressively growing salesforce, many of whom were instead forced to rely on stale or recycled leads.

142.   Defendants' statements above that were premised on Inogen's ability to grow its B2B sales of POCs to HMEs (*see* ¶¶128-138) were materially false and/or misleading at the time they were made because:

(a)     Inogen's top HME partner was run by a convicted felon employing the same or worse sales abuses as Inogen's in-house sales team;

(b)     HMEs faced price constraints from their customers and insurance reimbursement schedules, would service multiple would-be DTC customers over the lifespan of a single POC, and were purchasing more POCs than they could reasonably deploy; and

(c)     Inogen's B2B sales and DTC sales were competing for the same customers and would cannibalize business from each other.

**F.     September 2018**

**2018 MORGAN STANLEY HEALTHCARE CONFERENCE**

143.   On September 12, 2018, the Individual Defendants attended the Morgan Stanley Healthcare Conference on behalf of Inogen.

- 59 -

1    144.   At one point during the conference, Morgan Stanley's Jaypreet Chadha

2    asked, "[s]o one of the things that kind of – one of the pushes you made is to drive a

3    direct-to-consumer sales strategy and move away from the rental market.  Now

4    what's the thought process there?  How that's beneficial?"  Defendant Wilkinson

5    explained the reasoning behind Inogen's focus on DTC cash sales, responding:

6        Now as Jay said, over the last several years, we've shifted our focus

7        from a rental business more to a retail business.  This really cuts out a

8        lot of the red tape of the Medicare program.  It also – when you look at

9        the reimbursement cuts that have been absorbed by Medicare, *the retail*

10       *sale is more compelling compared to rentals than they once were*

11       *when the reimbursement was much higher.  So we've shifted our*

12       *intake criteria and focus*.  You have many patients that, when they call

13       in, they've got a life-changing event where they're going to a wedding

14       or the birth of a grandchild.  And so sometimes to go through the red

15       tape of Medicare can be a cumbersome and lengthy process.  So there

16       is a big retail opportunity, life-changing products.  *People, we've*

17       *proven, will definitely spend their own money to gain back their*

18       *freedom and independence that they once had before their own*

19       *oxygen*.  So because of those dynamics, we've kind of shifted away

20       from rental.  Although, we still have rentals in our business, it's still on

21       our P&L, but our primary focus has been on the retail side over the last

22       several years.  That's what's really driven the growth of our business.

23    145.   Inogen's founder and CFO, defendant Bauerlein, then went on to

24    explain the basis for Inogen's confidence that its Cleveland facility was hiring high-

25    quality sales representatives:

26       So as you said, we've substantially increased what we think we're

27       going to do in the Cleveland facility, both in terms of sales reps as well

28       as support personnel. And we started – we actually opened the facility

- 60 -

about a year ago, last August.  ***So we've had now about 12 months experience of hiring and training people in that facility.  And we've seen a great quality of reps and a great response to us wanting to enter the market and offer jobs there and that really is what's allowed us to say that we think we've been able to hire there and those people have come up the curve and produced what we wanted and obviously, you see that in our results***.  And so because of that, ***we think that because the market penetration is still so small***, it's important to capitalize on these market opportunities, particularly in the direct-to-consumer space.  So because of that, we're looking to expand that sales force more.  And we put a target out there that is based on our comfort level that we think that, that's an achievable goal by year-end 2020.

146.   Defendants' statements above that were premised on (i) the low market penetration of POCs, and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients (*see* ¶¶143-145) were materially false and/or misleading at the time they were made because:

(a)   Inogen's POCs are nonproprietary and sell at a premium price, and are thus subject to price and quality competition from similar POCs made by other manufacturers;

(b)   industry consensus is that POCs are inappropriate for up to 50% of ambulatory patients, such as those who only need oxygen therapy for sleep, and are thus highly unlikely to obtain a POC;

(c)   some patients with more advanced respiratory disease require a stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

(d)   Defendants' conscious decision to abandon the rental market would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market;

- 61 -

(e)   POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)   because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

147.   Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶143-145) were materially false and/or misleading at the time they were made because:

(a)   despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim;

(b)   the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

(c)   there was a material risk that Inogen's ability to continue to cajole POC patients into paying cash out-of-pocket via deceptive sales practices would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving customers; in fact, Inogen's abusive sales practices were constrained when, in the fall of 2018, CMS threatened to revoke Inogen's accreditation and forced the Company to re-train its sales staff not to cheat its customers;

1          (d)   Inogen's newly-hired sales representatives in 2018 were not of

2   the same quality as the earlier hires because the applicant pool had virtually been

3   exhausted;

4          (e)   Inogen's newly-hired sales representatives were not able to

5   achieve the performance of their established peers because they received little

6   training or mentorship from incompetent sales office management who funneled the

7   quality leads to established and favored sales representatives; and

8          (f)   Inogen's marketing team could not generate a sufficient volume

9   of non-duplicative leads for the sales representatives, and of those leads, there were

10   not enough quality leads to achieve the same level of sales productivity for its

11   aggressively growing salesforce, many of whom were instead forced to rely on stale

12   or recycled leads.

13   **G.   November 2018**

14   **INOGEN'S 3Q18 PRESS RELEASE**

15   148.   On November 6, 2018, after the close of trading, Inogen published a

16   press release announcing the Company's 3Q18 financial results.   Defendants

17   announced in the press release:

18        •   "Total revenue of $95.3 million, up 38.0% over the same period

19   in 2017";

20        •   "[N]et income of $16.4 million, reflecting a 123.9% increase

21   over the same period in 2017";

22        •   Inogen increased "its full year 2018 total revenue guidance range

23   to $345 to $355 million, up from $340 to $350 million, representing growth

24   of 38.3% to 42.3% versus 2017 full year results"; and

25        •   Inogen narrowed "its full year 2018 GAAP net income . . .

26   guidance range to $46 to $48 million, from $45 to $48 million, representing

27   growth of 119.0% to 128.5% compared to 2017 GAAP net income."

28

- 63 -

149.    But it was not all good news.  Defendants also announced that Inogen reduced "its guidance range for full year 2018 Adjusted EBITDA to $60 to $62 million, down from $65 to $69 million, representing growth of 18.0% to 22.0% versus 2017 full year results due to continued sales and marketing investments expected in the fourth quarter of 2018."

150.    The press release also revealed that while DTC sales growth rose to 66.3%, Inogen's domestic B2B sales growth was slowing and would see a significant deceleration to 32% growth from 56% in 2Q18.

151.    The release quoted defendant Wilkinson characterizing 3Q18 as "'another successful quarter for [Inogen] as we generated **strong revenue across all three sales channels**,'" adding that the Company was "'continuing to execute on [its] strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness'" as it believed this was still its "'most effective means to drive high revenue growth and portable oxygen concentrator adoption.'"

### INOGEN'S 3Q18 CONFERENCE CALL

152.    During the conference call hosted by the Company later that day, defendant Wilkinson reemphasized to analysts and investors that Inogen's impressive DTC sales were the result of the strong sales acumen of its salesforce, stating:

> Given our recent success, our strategy is to continue to hire additional sales representatives and invest in advertising activities to increase consumer awareness, as we believe this is still our most effective means to drive growth of direct-to-consumer sales.
>
> *            *            *
>
> Looking ahead to 2019, **we expect to remain a high-growth company and to continue to invest heavily in our sales force**,

1   advertising efforts, and operations, in order to drive portable oxygen

2   concentrator adoption worldwide.

3   153.   Suggesting that Inogen's strategy to focus its efforts on out-of-pocket

4   cash sales to patients, to the near exclusion of the rental market, was the winning

5   long-term strategy, defendant Wilkinson noted that the Company's DTC cash sales

6   in 2017 "grew significantly," while its "direct rental patients on service declined."

7   154.   As for the hiring of additional sales representatives, a William Blair

8   analyst asked, "it still seems like the direct sales expense is growing at a pretty

9   healthy level.  So I assume that means more sales reps.  Why is that right or wrong?"

10  In response, Inogen founder and CFO, defendant Bauerlein, misleadingly replied:

11          Yes.  So as we said on the last quarter call, we are ahead of our

12          expectations on the hiring side.  ***Cleveland has been a great market for***

13          ***us to expand our sales base***, and we are expanding that sales base and

14          continued to do that in the third quarter.  And really, we do that because

15          ***we know that there is a known return on those types of investments,***

16          ***and we are still early in the stages of POC penetration***.

17  155.   Defendant Wilkinson was later asked by a Needham analyst about the

18  market saturation of patients, specifically "into that pool of patients willing to buy

19  out-of-pocket . . . [a]nd are you seeing any kind of signs of saturation of this pool of

20  patients that are at least willing to buy out-of-pocket?"  In response, the Inogen CEO

21  misleadingly confirmed that in addition to the Medicare data, other metrics the

22  Company monitors supported Defendants' claims there is no market saturation,

23  stating that:

24          Yes.  I mean, we do monitor all of those metrics.  And I mean,

25          obviously, we're confident when we're making these investments that

26          we're not at a point where you're at saturation.  And certainly, the

27          Medicare numbers bear that out.  ***Our other metrics bear that out***.

28          Otherwise, we wouldn't make such an investment.

- 65 -

156.   When a Leerink analyst asked about Inogen's plans for adding sales representatives for the DTC business, defendant Bauerlein responded that "we still are cautious there of trying to, again, make sure we don't get out ahead of how many people we can hire and effectively train.  So that's built into our models is looking at how many we can hire?  How many will leave?  What is the ramp-up curve?  All of that is factored into that guidance."

157.   Defendant Bauerlein sought to temper Inogen's lowered income guidance by attributing it to the increased sales and marketing investment to support the new sales representatives in the Cleveland facility which she assured investors would bear fruit in the future:

> So the level of investment, clearly, was higher than we had thought on the second quarter call, because of the ramp that we've seen on the sales reps and the number of people we have in the facility, and then the related media spend.  So that has come in ahead of what we expected on the second quarter call, which of course, leads to higher expenses in the near term.  But we think that that's the right decision.  ***So while we did lower adjusted EBITDA, it's really for those sales and marketing expenses***.  So we expect those sales and marketing expenses to also be higher in the fourth quarter, and they also were higher in the third quarter as well.  So those 2 items combined really account for the changes that we're seeing in adjusted EBITDA.

158.   Defendant Bauerlein also represented that the guidance reduction should not be a major concern because traditionally fourth quarter sales slowed in prior years, stating:

> So when we look at the Q4 expectation, obviously, it does assume a deceleration there of the growth rate.  Now remember, Q4, also last year, was strong for us on the direct-to-consumer side, against the typical seasonality where we see, typically, the stronger months are

- 66 -

1    actually Q2 and then followed by Q3.  So the comps get tougher on the

2    direct-to-consumer side going into Q4 because of that.  So I want to

3    make sure people understand that.  Obviously, as we've continued to

4    hire, that also helps offset that.

5    159.  In the slides Inogen released with its financial results, the Company

6 continued to report that the TAM was growing at a rate of 7% to 10% annually, and

7 increased its estimate to 4 million Americans on LTOT by the year 2020 from its

8 current estimate of 3 million Americans.  To justify Inogen's LTOT estimate, the

9 slides referenced Defendants' estimate of approximately 30 million Americans

10 living with COPD.  What investors did not know, however, was that Defendants

11 were doubling the CDC's count of approximately 15 million Americans currently

12 diagnosed with COPD.  Defendants' doubling of the CDC's estimate was baseless

13 because Defendants came to this number by using an outdated 1988-1994 CDC

14 study which merely found that 50% of COPD patients did not know they had COPD

15 at the time of diagnosis.  The slides also boasted that Inogen had "[h]igh standards

16 of compliance and regulations," with respect to its license "to sell directly to patients

17 & bill Medicare in [all] 50 states & [the] District of Columbia."

18                       **INOGEN'S 3Q18 10-Q**

19    160.  That same day, Inogen publicly filed its 3Q18 10-Q with the SEC.  This

20 10-Q was signed by the Individual Defendants and contained nearly identical false

21 and misleading SOX certifications attached to previous Class Period SEC filings by

22 the Company.  *See* ¶¶92, 113, *supra*.

23    161.  Inogen's 3Q18 10-Q also expressly incorporated, by reference, the

24 description of the Company's business detailed above in ¶107 from the 2017 10-K,

25 and increased Defendants' POC adoption figures purported based on 2017 Medicare

26 data:

27        Portable oxygen concentrators represented the fastest-growing

28        segment of the Medicare oxygen therapy market between 2012 and

2017.  ***The Company estimates based on 2017 Medicare data that the number of patients using portable oxygen concentrators represents approximately 10.8% of the total addressable oxygen market in the United States***, although the Medicare data does not account for private insurance and cash-pay patients in the market.

162.   But as to Inogen's FY18 financial guidance, Defendants stated that the Company still expected DTC sales to be its "fastest-growing channel," adding that domestic B2B sales would still have a "significant growth rate" and that international B2B sales would have a "solid growth rate."

163.   Defendants' statements above that were premised on the size of Inogen's TAM (*see* ¶¶148-162) were materially false and/or misleading at the time they were made because:

(a)     the annual Medicare data relied on by Defendants overstated the number of current oxygen therapy patients because it double-counted patients in instances where only one oxygen concentrator would be used for multiple patients during that year.  For example, if a patient died, given the POC's seven-to-eight year service life, the same POC would be repurposed for another patient, which counted as a second patient in the Medicare data; and

(b)     Defendants' inference of approximately 15 million additional undiagnosed COPD patients from the approximately 15 million Americans diagnosed with COPD was based on an outdated 1988-1994 CDC survey which merely stated approximately 50% of patients did not know they had COPD at the time they were diagnosed.

164.   Defendants' statements above that were premised on the growth rate of the TAM (*see* ¶¶148-162) were materially false and/or misleading because both the Medicare data and the Kaiser Family Foundation data for Medicare Advantage, relied upon by Defendants, reported negative annual growth rates.

- 68 -

1    165.   Defendants' statements above that were premised on (i) the low market

2   penetration of POCs, and (ii) Inogen's ability to become the leading POC

3   manufacturer responsible for achieving 90% penetration of POCs for ambulatory

4   LTOT patients (*see* ¶¶148-162) were materially false and/or misleading at the time

5   they were made because:

6    (a)   Inogen's POCs are nonproprietary and sell at a premium price,

7   and are thus subject to price and quality competition from similar POCs made by

8   other manufacturers;

9    (b)   industry consensus is that POCs are inappropriate for up to 50%

10   of ambulatory patients, such as those who only need oxygen therapy for sleep, and

11   are thus highly unlikely to obtain a POC;

12    (c)   some patients with more advanced respiratory disease require a

13   stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

14    (d)   Defendants' conscious decision to abandon the rental market

15   would leave Inogen unable to service the larger and more stable Medicare and

16   insurance rental reimbursement market;

17    (e)   POC rentals were heavily constrained by low Medicare

18   reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per

19   month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC

20   rentals increasingly less profitable, or in the alternative, less desirable products for

21   patients to rent on a partial cost reimbursement basis; and

22    (f)   because Medicare capped reimbursement after three years into

23   the five-year rental term, Inogen could only profitably rent to patients early into the

24   three-year reimbursement period, effectively eliminating as potential customers far

25   more than just the 18% of the patients in years four and five of their rentals.

26    166.   Defendants' statements above that were premised on Inogen's sales

27   acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see*

28

- 69 -

1  ¶¶148-162) were materially false and/or misleading at the time they were made
2  because:

3        (a)    despite ambulatory patients' preferences for a POC, the market
4  was limited to those who had thousands of dollars on hand to purchase the POC and
5  could not wait for Medicare or private insurance to process their claim;

6        (b)    the growth of out-of-pocket cash sales was due in large part to
7  skewed incentives that created a toxic boiler-room sales environment in which
8  nefarious sales tactics, in violation of Medicare policy, were employed to deceive
9  Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

10       (c)    there was a material risk that Inogen's ability to continue to
11 cajole POC patients into paying cash out-of-pocket via deceptive sales practices
12 would be substantially constrained by CMS revoking Inogen's Medicare
13 accreditation for deceiving customers; in fact, Inogen's abusive sales practices were
14 constrained when, in the fall of 2018, CMS threatened to revoke Inogen's
15 accreditation and forced the Company to re-train its sales staff not to cheat its
16 customers;

17       (d)    Inogen's newly-hired sales representatives in 2018 were not of
18 the same quality as the earlier hires because the applicant pool had virtually been
19 exhausted;

20       (e)    Inogen's newly-hired sales representatives were not able to
21 achieve the performance of their established peers because they received little
22 training or mentorship from incompetent sales office management who funneled the
23 quality leads to established and favored sales representatives; and

24       (f)    Inogen's marketing team could not generate a sufficient volume
25 of non-duplicative leads for the sales representatives, and of those leads, there were
26 not enough quality leads to achieve the same level of sales productivity for its
27 aggressively growing salesforce, many of whom were instead forced to rely on stale
28 or recycled leads.

- 70 -

167.   Despite reporting otherwise strong earnings and sales guidance in order to keep the price of Inogen common stock from plummeting, the Company cut its FY18 EBITDA guidance from $65 to $69 million to $60 to $62 million due to sales and market expenditures which did not result in increased sales.  This announcement also partially revealed to the market that Inogen's increasing domestic B2B sales growth was unsustainable, slowing and would see a significant deceleration to 32% from 56% in 2Q18.

168.   As a result, the price of Inogen common stock declined $37.44 per share, or more than 19%, on November 7, 2018, on unusually high volume of more than 2.64 million shares traded, *i.e.*, approximately 6 times the average volume over the preceding 10 trading days.

169.   Regarding Inogen's 3Q18 results, one Leerink analyst wrote in a November 7, 2018 report that "[n]otably, B2B Domestic saw a significant deceleration vs. 1H18 – +32% vs. nearly 60% growth in the first half – which *seems to have sparked concerns among investors that something has structurally changed in this business*.

**H.   January 2019**

**2019 J.P. Morgan Global Healthcare Conference**

170.   Rather than backtrack from the misleading narrative they repeatedly peddled to investors in previous quarters, Defendants doubled down at the J.P. Morgan Global Healthcare Conference held on January 9, 2019.

171.   For example, Inogen's CEO proclaimed that other TAM estimates were inaccurate because, "we've seen some people actually make some errors in market assessment because they don't fully understand the data."

172.   Defendant Wilkinson described the penetration of POCs into the LTOT market as in its infancy, as follows:

Now in the U.S., *the penetration of POCs, it's still really in its infant stages despite the compelling benefits for a patient, giving them*

- 71 -

1
2
3
4
5
6
7

***freedom and mobility as well as the low total cost service***.   The penetration in 2017, and that's the latest Medicare data available, is 2017, was about 11%.  And you can kind of see at the bottom of the screen how that's progressed over the last several years.  From '14 through '17, we've gone 7%, 8%, 9%, 11%.  So POCs are actually the fastest-growing modality within oxygen therapy.  But the market is still largely underpenetrated.

8
9
10
11
12
13
14
15

Our estimate is that over time, that POCs or portable oxygen concentrators will replace the tanks.  And essentially, we've said, "90% of the patients that are ambulatory would be given a POC.  If you assume that, believe that assumption, then it's 90% of the 73% ambulatory patients which means that at the end of the day, full penetration would be 65%."  So again, we're a long way from the end of curve that's why we're bullish on continued investment in expanding our sales force.

16
17
18
19
20
21
22
23
24
25
26

173.   The Company's slides used at the presentation referenced Defendants' estimate of approximately 30 million Americans living with COPD.  What investors did not know, however, was that Defendants were doubling the CDC's count of approximately 15 million Americans currently diagnosed with COPD.  Defendants' doubling of the CDC's estimate was baseless because Defendants came to this number by using an outdated 1988-1994 CDC study which merely found that 50% of COPD patients did not know they had COPD at the time of diagnosis.  Although Defendants did not rely on their misleading 7% to 10% TAM growth figures to claim the market was growing, Defendants further incorrectly represented that within 15 years, the WHO projected COPD would become the leading cause of death in the world.

27
28

Cases\4850-5109-6731.v1-7/10/19

174.   Defendants' statements above that were premised on the size of Inogen's TAM (*see* ¶¶170-173) were materially false and/or misleading at the time they were made because:

(a)   the annual Medicare data relied on by Defendants overstated the number of current oxygen therapy patients because it double-counted patients in instances where only one oxygen concentrator would be used for multiple patients during that year.  For example, if a patient died, given the POC's seven-to-eight year service life, the same POC would be repurposed for another patient, which counted as a second patient in the Medicare data; and

(b)   Defendants' inference of approximately 15 million additional undiagnosed COPD patients from the approximately 15 million Americans diagnosed with COPD was based on an outdated 1988-1994 CDC survey which merely stated approximately 50% of patients did not know they had COPD at the time they were diagnosed.

175.   Defendants' statements above that were premised on the growth rate of the TAM (*see* ¶¶170-173) were materially false and/or misleading because the WHO confirmed that COPD would not become the leading cause of death in the world.

176.   Defendants' statements above that were premised on (i) the low market penetration of POCs, and (ii) Inogen's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients (*see* ¶¶170-173) were materially false and/or misleading at the time they were made because:

(a)   Inogen's POCs are nonproprietary and sell at a premium price, and are thus subject to price and quality competition from similar POCs made by other manufacturers;

(b)   industry consensus is that POCs are inappropriate for up to 50% of ambulatory patients, such as those who only need oxygen therapy for sleep, and are thus highly unlikely to obtain a POC;

- 73 -

(c)     some patients with more advanced respiratory disease require a stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

(d)     Defendants' conscious decision to abandon the rental market would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market;

(e)     POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)     because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

## I.     February 2019

### THE MUDDY WATERS AND CITRON REPORTS

177.   As described above in ¶¶53-63, on February 8, 2019, Muddy Waters published a report revealing Inogen's "egregiously false narrative" about the size of its TAM.  On this news, the price of Inogen common stock declined by more than $3 per share, falling from its close of $139.74 on February 7, 2019 to close at $136.72 on February 8, 2019, on unusually high volume of more than 2 million shares traded, *i.e.*, more than 5.5 times the average daily volume over preceding 10 trading days.

178.   Shortly thereafter, as described above in ¶¶64-67, Citron published a report revealing Inogen's abusive sales practices on February 12, 2019.  On this news, the price of Inogen common stock – which had since partially recovered – declined again, this time falling by more than $4 per share, from a close of $142.20 on February 11, 2019 to $138.05 on February 12, 2019, on unusually high volume

- 74 -

of more than 2.74 million shares traded, *i.e.*, more than 4 times the average daily volume over the preceding 10 trading days.

### INOGEN'S 4Q18 AND FY18 PRESS RELEASE

179.   After the close of trading on February 26, 2019, Inogen published a press release announcing its 4Q18 and FY18 financial results, reporting:

- "Record total revenue of $358.1 million, up 43.6% versus 2017";

- "Record sales revenue of $336.0 million, up 49.0% versus 2017";

- "[DTC] sales rose 50.4% over the same period in 2017, primarily due to an increase in the number of sales representatives and associated consumer advertising"; and

- "GAAP net income of $51.8 million, reflecting a 146.9% increase versus 2017 and a 14.5% return on revenue."

180.   The press release, however, partially revealed B2B issues, stating that "[w]hile domestic business-to-business sales growth was primarily driven by continued adoption by traditional home medical equipment providers and internet resellers, order activity did slow from one national homecare provider in the fourth quarter of 2018."

181.   Inogen's 4Q18 B2B sales further slowed to a growth rate of only 16.0%.

182.   In addition, Inogen's press release disclosed full year 2018 results for "*[r]ental revenue of $22.1 million, down 7.7% versus 2017*."

### INOGEN'S 4Q18 AND FY18 CONFERENCE CALL

183.   During a conference call the Company hosted with analysts and investors later that day, defendant Wilkinson backtracked on Inogen's prior TAM estimate of 2.5 to 3 million patients, stating:

> [W]e've looked at it a few different ways.  We keep landing in that same area.  I will emphasize that we've always said 2.5 million to 3 million, we haven't said 3.0 million or anything, ***it's kind of [an]***

- 75 -

1    ***acknowledgment that it's an estimate, it's probably a tougher estimate***
2    ***now than it used to be*** because of the movement within the data
3    sources.  But I think, the key is it's not 20 million, it's not 500,000.  We
4    feel very good about that estimate, no change to that.

5    184.   Inogen's CEO further disclosed on the conference call that B2B sales
6    growth slowed that quarter: "While business-to-business sales continued to grow,
7    primarily due to strong demand by traditional home medical equipment providers
8    and Internet resellers, ***order activity did slow from one national home care provider***
9    ***in the fourth quarter of 2018***."

10    185.   When a Piper Jaffray analyst asked about the return on investment in
11    the sales and marketing teams, the Inogen founder and CFO partially revealed what
12    had already been obvious to Inogen:

13    [T]here were some inefficiencies as we did scale this business so
14    quickly.  And there were some learnings there as we increased the
15    advertising spend, we didn't see as much efficiencies there as we had
16    hoped, and we really are focused on that now as a key area that we're
17    looking at in 2019, to improve our overall results, is to look at getting
18    those reps fully up to speed and also making sure we have effective and
19    efficient sources for the lead sources that we need.

20    186.   Defendants also partially revealed information suggesting the market
21    was actually closer to being saturated than they had previously represented to
22    investors.  Defendant Bauerlein stated that she expected "the rate of sales force
23    expansion in 2019 should be lower than the rate for the last couple of years."

24    187.   Similarly, Defendants also moved up their estimated timetable for full
25    POC penetration of the B2B market (despite the slowdown in orders from the one
26    national homecare provider).  Defendants now disclosed that instead of the seven-
27    to-ten years estimate discussed during the 2Q18 conference call, full adoption would
28    occur within five years.  When questioned by a Needham analyst about the change,

- 76 -

1    defendant Wilkinson also back-pedaled on previous claims he and his co-defendant
2    had been misleadingly feeding to investors in previous quarters:

3          Again, I'll say it's an estimate.  We're seeing some of the challenges
4          that people have.  Could it take longer?  Yes, it could take longer.  Could
5          it go faster?  Yes, it could.  For us, again, that's why it's so important
6          that we have access to the market ourselves so that we have more
7          control of our own destiny.

8          188.   Confirming Muddy Waters' suspicions, Defendants also significantly
9    reduced Inogen's growth rate of the market for LTOT from 7% to 10% per year
10   down to a more modest and vague "low single digits."  As defendant Wilkinson
11   explained, "[w]hile Medicare beneficiary data showed a decline in 2017, when
12   taking into account the shift to Medicare advantage, private insurance, retail sales
13   and the expanding cap base, we believe that overall patient growth was in the low
14   single digits in 2017, and we expect that trend to continue for the next few years."

15                            INOGEN'S 2018 10-K

16         189.   On February 26, 2019, Inogen publicly filed its 2018 10-K with the
17   SEC.  This 10-K was signed by the Individual Defendants and contained nearly
18   identical false and misleading SOX certifications attached to previous Class Period
19   SEC filings by the Company.  *See* ¶¶92, 113, *supra*.

20         190.   Inogen's 2018 10-K also repeated defendant Wilkinson's description of
21   the market growth that:

22         While there is no up-to-date single source of long-term oxygen therapy
23         market data, based on market data from various industry sources and
24         our own internal data, ***we believe that growth in the number of oxygen***
25         ***therapy patients in the United States was low single digits in 2017,***
26         ***and we now expect that trend to continue for the next few years***.

27         191.   On this news, the price of Inogen common stock nosedived even
28   further, plummeting more than 24% from a close of $140.06 on February 26, 2019

                                     - 77 -

1   to $106.28 on February 27, 2019, on unusually high volume of more than 3.64

2   million shares traded, *i.e.*, more than 5 times the average daily volume over the

3   preceding 10 trading days.

4       192.   A February 28, 2019 Medtech Insight article titled "Inogen's Stock

5   Collapses After Earnings Call Addressing Short-Seller Concerns" noted that

6   Inogen's share price "plummeted after its most recent earnings call where the

7   company's CEO seemed to acknowledge it did not trust its own research firm that

8   gave it a glowing market report and prospective analysis."

9       193.   The Medtech Insight article quoted Muddy Waters' Block, attributing

10  the decline in share price "'to the evasiveness of TAM size, their assessment of

11  recent low single digit growth, and downshifting the long-term growth language to

12  five years from 7-10.'"

13      194.   Undaunted, Defendants continued to mislead investors.  During the

14  Company's February 26, 2019 conference call with analysts and investors,

15  defendant Wilkinson took the opportunity to dispute the findings uncovered by

16  Muddy Waters and Citron.  But in doing so, Inogen's CEO further misled the market

17  by stating that the Company's prior figures were from an outdated 2015

18  WinterGreen report and were now stale, rather than the 2017 report which was the

19  version criticized by Muddy Waters.  The Inogen CEO continued with a litany of

20  misleading statements:

21          •     "[R]educed reimbursement rates as a result of competitive

22      bidding, enhanced Medicare coverage and billing requirements and

23      other factors have created access issues and *caused the cash pay*

24      *market, which is not reflected in the Medicare data, to grow*

25      *substantially for both new and existing patients*."

26          •     "Lastly, we are an accredited home care provider, licensed

27      to provide respiratory products in all 50 states, *heavily regulated by*

28      *Medicare and the FDA and subject to frequent audits to maintain*

- 78 -

1   *these accreditations and licenses and we take compliance with the law*
2   *seriously*.

3            Specifically, we have compliance requirements in place
4   for our authorized Internet resellers.  And without commenting on any
5   specific Internet resellers, we expect that our Internet resellers abide by
6   all applicable laws and regulations."

7       •    "While some patients would rather receive products using
8   their insurance benefits, the reimbursement dynamics in oxygen
9   therapy have led some patients to seek better options, even if it means
10  paying out of pocket. We are proud that we and our customers can make
11  a difference in these patient's lives."

12   195.   Defendant Wilkinson likewise continued to tout Inogen's DTC sales
13  force and marketing team, describing them as a "fantastic asset."

14   196.   In the 2018 10-K, although Defendants lowered its rate of oxygen
15  therapy patient growth from 7% to 10% to the "low single digits," they continued to
16  assert that "[w]e estimate approximately 3 million patients in the United States used
17  long-term oxygen therapy in 2017 based on 2017 Medicare data and our estimate of
18  the size of the Medicare market relative to the total market."

19   197.   The 2018 10-K also reiterated Defendants' misleading market
20  penetration figures, stating that "[b]ased on 2017 Medicare data, we estimate the
21  number of patients using portable oxygen concentrators represents approximately
22  10.8% of the total addressable oxygen market in the United States, although the
23  Medicare data does not account for private insurance, Medicare Advantage,
24  Medicaid and cash-pay patients in the market."

25   198.   Defendants' statements above that were premised on the size of
26  Inogen's TAM (*see* ¶¶194-197) were materially false and/or misleading at the time
27  they were made because:

28

1          (a)    the annual Medicare data relied on by Defendants overstated the

2 number of current oxygen therapy patients because it double-counted patients in

3 instances where only one oxygen concentrator would be used for multiple patients

4 during that year.  For example, if a patient died, given the POC's seven-to-eight year

5 service life, the same POC would be repurposed for another patient, which counted

6 as a second patient in the Medicare data; and

7          (b)    Defendants' inference of approximately 15 million additional

8 undiagnosed COPD patients from the approximately 15 million Americans

9 diagnosed with COPD was based on an outdated 1988-1994 CDC survey which

10 merely stated approximately 50% of patients did not know they had COPD at the

11 time they were diagnosed.

12     199.  Defendants' statements above that were premised on (i) the low market

13 penetration of POCs, and (ii) Inogen's ability to become the leading POC

14 manufacturer responsible for achieving 90% penetration of POCs for ambulatory

15 LTOT patients (*see* ¶¶194-197) were materially false and/or misleading at the time

16 they were made because:

17          (a)    Inogen's POCs are nonproprietary and sell at a premium price,

18 and are thus subject to price and quality competition from similar POCs made by

19 other manufacturers;

20          (b)    industry consensus is that POCs are inappropriate for up to 50%

21 of ambulatory patients, such as those who only need oxygen therapy for sleep, and

22 are thus highly unlikely to obtain a POC;

23          (c)    some patients with more advanced respiratory disease require a

24 stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide;

25          (d)    Defendants' conscious decision to abandon the rental market

26 would leave Inogen unable to service the larger and more stable Medicare and

27 insurance rental reimbursement market;

28

(e)    POC rentals were heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016 down to $36.14 to $41.91 per month in 2017, rendering Inogen POC rentals increasingly less profitable, or in the alternative, less desirable products for patients to rent on a partial cost reimbursement basis; and

(f)    because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals.

200.    Defendants' statements above that were premised on Inogen's sales acumen and its ability to achieve easy and sustainable growth of POC cash sales (*see* ¶¶194-197) were materially false and/or misleading at the time they were made because:

(a)    despite ambulatory patients' preferences for a POC, the market was limited to those who had thousands of dollars on hand to purchase the POC and could not wait for Medicare or private insurance to process their claim;

(b)    the growth of out-of-pocket cash sales was due in large part to skewed incentives that created a toxic boiler-room sales environment in which nefarious sales tactics, in violation of Medicare policy, were employed to deceive Inogen's impressionable elderly customer base into buying POCs out-of-pocket;

(c)    there was a material risk that Inogen's ability to continue to cajole POC patients into paying cash out-of-pocket via deceptive sales practices would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving customers; in fact, Inogen's abusive sales practices were constrained when, in the fall of 2018, CMS threatened to revoke Inogen's accreditation and forced the Company to re-train its sales staff not to cheat its customers;

(d)     Inogen's newly-hired sales representatives in 2018 were not of the same quality as the earlier hires because the applicant pool had virtually been exhausted;

(e)     Inogen's newly-hired sales representatives were not able to achieve the performance of their established peers because they received little training or mentorship from incompetent sales office management who funneled the quality leads to established and favored sales representatives; and

(f)     Inogen's marketing team could not generate a sufficient volume of non-duplicative leads for the sales representatives, and of those leads, there were not enough quality leads to achieve the same level of sales productivity for its aggressively growing salesforce, many of whom were instead forced to rely on stale or recycled leads.

## VI.     MORE NEWS REVEALING DEFENDANTS' FRAUDULENT CONDUCT COMES OUT IN MAY 2019

201.   Finally, after the close of trading on May 7, 2019, Inogen published a press release announcing its 1Q19 financial results and conducted a conference call with Inogen investors and stock analysts.  As quoted in the press release, defendant Wilkinson disclosed that despite Inogen's intentional shift away from the Medicare rental reimbursement market, it was actually a major headwind in generating future revenue.  Even worse, B2B sales continued to decrease.  As quoted in the press release, the Inogen CEO said:

> The first quarter of 2019 was a tough quarter for us given the **decline in domestic business-to-business sales** and the increased direct-to-consumer sales and marketing expenditures. . . .  We believe there is still a large opportunity for portable oxygen concentrator adoption worldwide; however, **there are patient access issues given the current reimbursement environment** and the restructuring challenges that some providers are facing in converting their oxygen business to a

non-delivery model.  As a result, we are focused on multiple initiatives to drive sales and marketing efficiencies and build a more predictable revenue stream over time.

202.   The press release further revealed that the POC market was not as grand as Defendants previously described:

> *Inogen is reducing its full year 2019 total revenue guidance to $405 to $415 million*, down from $430 to $440 million, representing growth of 13.1% to 15.9% versus 2018 full year results.  While the Company still expects direct-to-consumer sales to be its fastest growing channel, *it plans to slow the pace of hiring in 2019* and place more emphasis on sales representative productivity.  Inogen still expects international business-to-business sales to have a solid growth rate, but *now expects domestic business-to-business sales to have a slightly negative growth rate*.  Given the difficult growth comparisons Inogen faces in the domestic business-to-business channel, the restructuring challenges of some providers, and its rental plan, *it expects negative growth in the domestic business-to-business channel in the second quarter of 2019 compared to the second quarter of 2018*, with modest growth in the back half of 2019 compared to the back half of 2018.

203.   During a company-held conference call held later that day, defendant Wilkinson disclosed to investors that the new sales representatives were not as effective as earlier hires, and alerted investors to additional issues in both the DTC and B2B markets, disclosing:

> Looking at the first quarter of 2019, we generated total revenue of $90.2 million, reflecting growth of 14.1% over the first quarter of 2018.

> Direct-to-consumer sales of $39 million in the first quarter of 2019 increased 35.9% over the first quarter of 2018 primarily due to

- 83 -

increased sales representative headcount and associated consumer advertising. ***However, the sales reps we hired in the second half of 2018, on average, took longer to come up the productivity curve than our historical target and were not at their full potential in the first quarter***.

     ***Moving forward, we plan to slow down the addition of new sales representative hires and focus on improving the productivity of our sales team***. Over the last 2 quarters, we have also applied with it a separate rental team that will focus exclusively on new rental additions to drive overall sales productivity. And we plan to roll this out across our entire group in the coming quarters.

     As we've continued to grow our sales staff and the associated number of required leads has grown, we have seen the cost per generated lead trend higher than historical averages. We believe we will see increased productivity of our sales reps throughout 2019, which should reduce our overall cost per sale despite expected increased marketing spend.

     ***First quarter 2019 domestic business-to-business sales of $26.1 million decreased 7% from the first quarter of 2018 primarily due to a decline in sales to our private label partner***. These sales declines were a partner due to one large national home care provider who significantly reduced orders in the first quarter of 2019 as compared to the same period in 2018.

     Specifically, this provider who we discussed in our last earnings call accounted for revenue of $700,000 in the first quarter of 2019, down from $9.3 million in the first quarter of 2018.

204. Defendants retreated from their previous misleading assurances that Inogen could achieve its growth by focusing on sales within the DTC and B2B

1   markets by announcing that they had created a separate rental team.  Moreover,
2   defendant Wilkinson informed investors on the conference call that "[w]e do plan to
3   slightly change our rental intake criteria to accept more new rental patient additions
4   to increase access to patients who otherwise could not obtain a POC from their
5   current home care provider."

6   205.   To attempt to offset its lowered expectations, Inogen relaxed its rental
7   intake criteria to approve rentals closer to the end of the 36-month rental-period for
8   Medicare reimbursements.  Inogen's CEO described it as follows:

9       But we are going to relax the last criteria upfront. When we talk about
10      that criteria, we've got a minimum number of billable months
11      remaining for a rental patient or an insurance patient that we require to
12      consider bringing them on service and deploying a POC.  So we can
13      relax that criteria and it creates more a bigger portion of the leads that
14      come in every month to become rental candidates.

15  206.   In stark contrast to Defendants' earlier praise of Inogen's Cleveland
16  salesforce, defendant Wilkinson confirmed that the sales representatives hired in
17  3Q18 were under performing and also blamed the productivity issues on insufficient
18  support from the Cleveland management (of which included Wilkinson) and
19  seasoned representatives.  The Inogen CEO described the issues as follows:

20      Let me back up to probably the first half of '18 is kind of a benchmark.
21      We started to hire at a heavier rate than historical in the first half of the
22      year.  And things, I'll say, that even exceeded our expectations.  As we
23      continued and actually cranked up hiring to an even higher rate as we
24      went into the third quarter, that's where things didn't meet our
25      expectations.  And as I said in my prepared remarks, when we look at
26      productivity of reps, they no longer were matching what we have seen
27      from a historical productivity standpoint.  We got a little bit ahead of
28      ourselves on management.  I think we mentioned that in the previous

- 85 -

call that we had to shore up our management but we found that we still need to invest in further training on management so that there are even better resource for the new reps that we have.  If you look at most of the incremental hiring is in our Cleveland facility.  That's where we have space.  So that's why most of the hiring is there.  But the folks are not surrounded by 5-year veteran reps there.  It's a relatively new facility.  So we need to make an even bigger investment into training and support of those new reps to drive that productivity.

207.   Defendants' statements above revealed that Inogen's state of affairs was not one of a company whose core product sold itself, but instead reflected the reality that Inogen had to claw for sales of its premium-priced product, including resorting to unscrupulous sales tactics.

208.   On this news, the price of Inogen common stock plummeted again, falling more than 25%, from a close of $91.14 per share on May 7, 2019 to a close of $67.79 on May 8, 2019, on unusually high volume of more than 5.2 million shares traded, *i.e.*, more than 10 times the average daily volume over the preceding 10 trading days.

209.   On May 8, 2019, the Motley Fool posted an article titled "Why Inogen Shares Are Plunging Today."  In the author's view, "[t]he mixed quarterly results weren't great, ***but the huge contraction in the share price appears to be related to management's full-year guidance updates***."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

210.   As alleged herein, Inogen and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of

- 86 -

1  the federal securities laws.  As set forth herein in detail, the Individual Defendants,

2  by virtue of their receipt of information reflecting the true facts regarding Inogen's

3  business metrics and financial prospects, their control over and/or receipt and/or

4  modification of Inogen's allegedly materially misleading statements, and/or their

5  associations with the Company which made them privy to confidential proprietary

6  information, participated in the fraudulent scheme alleged herein.

7    **A.    Defendants' Knowledge and Access to Knowledge of TAM, TAM Growth, Market Saturation and Unscrupulous Sales Tactics**

8

9  211.   On Glassdoor, a registration-based website in which employees may

10  review their employers, a review dated January 24, 2019 stated that beginning no

11  later than early 2018, Inogen executives increased their accessibility and

12  involvement with the Cleveland sales staff.  On the November 7, 2017 conference

13  call, defendant Wilkinson confirmed the Company's approach to employee

14  communications and interactions:

15      We're pretty transparent with our employees and what our plans are

16      and our results and our expectations.  We expect them to be transparent

17      with each other.  If there's issues, we confront them directly.  We don't

18      sweep them under the rug.  And direct and open communication is

19      valued in our organization.  Even if the risk of maybe turning somebody

20      off, that's better than ignoring an issue or sweeping it under the rug.

21  212.   Both the Glassdoor reviews and FIE confirm that sales representatives

22  were encouraged to and did raise their concerns about the quality and quantity of

23  leads and Inogen's TAM estimates with management.

24  213.   FIE confirmed that the executives were accessible to the sales

25  representatives at the Cleveland office.  Defendant Wilkinson hosted quarterly town

26  hall meetings and Q&A sessions with the Cleveland office staff as a forum for the

27  latter to discuss issues.

28

214.   During a summer 2018 Q&A session, FIE, an inside sales representative at Inogen's Cleveland facility from September 2017 to December 2018, confronted Wilkinson about Inogen's addressable market figures used to justify the number of sales representative hired in Cleveland.   FIE rhetorically questioned the Inogen CEO, "'[y]ou are telling me that out of three million people who need oxygen, all are going to buy portable concentrators from Inogen.'" Defendant Wilkinson responded, "'well no,'" highlighting his understanding that Inogen's TAM figures, even if they could be characterized as accurate or justifiable, were misstated or at least highly misleading.

215.   Defendant Wilkinson was also independently aware of these issues because when asked on the November 6, 2018 conference call if he saw any market saturation, the Inogen CFO confirmed "we do monitor all of those metrics" including Medicare data and "other metrics."

216.   As confirmed by Glassdoor reviews and FIE, Defendants were aware of the high pressure call center conditions in the Company's sales offices.   Contrary to their representation to investors that their products were easy to sell, sales representatives hounded and pressured customers to buy Inogen POCs with cash, with little regard as to whether customers could afford the product or if seeking rental reimbursement was in their best interests.

217.   Unsurprisingly, FIE described Inogen sales policies that pressured sales representatives to push cash sales, even when a customer would have otherwise preferred a rental or saved money by using Medicare.   FIE confirmed that Inogen installed a commission system in which a quick to close cash sale earned significantly more commission than the arduous process of coordinating Medicare approval for a rental.   Furthermore, Inogen used a sales quota system which rewarded cash sales with more points than rentals.   This result was the one intended by Defendants, as they had confirmed on the conference calls that the Company was shifting away from rentals and focusing on sales.   The quotas varied from month to

- 88 -

month and terrorized the sales staff.  With these seemingly arbitrary sales quotas, employees were always on edge because if they underperformed, they would lose their job.

218.   Even if the abusive nature of Inogen's sales practices was not clear from the Company's sales policies, CMS's secret shopper audits made obvious to Defendants that Inogen's sales representatives misled patients into believing there was no Medicare reimbursement for POCs.  One Inogen employee reported in a June 4, 2018 Glassdoor review that, "[t]hey have been investigate[d] by [M]edicare 2 times in the last 3 years, and current[ly] still are doing many things that violate [M]edicare guidelines."  FIE confirmed that although the sales office instructed sales representatives to not lie to the secret shoppers, there was no such scrutiny placed on calls with real patients.  As revealed by FIE, in the fall of 2018, Inogen was caught red-handed and CMS threatened to pull its Medicare license.

219.   As Inogen's Medicare accreditation is essential for Inogen to be able to contact and sell to eligible Medicare patients, its importance was obvious to the Individual Defendants who, in Inogen's SEC filings, noted that a manufacturer seeking to rent DTC "would need to meet national accreditation and state-by-state licensing requirements and secure Medicare billing privileges."  Because many of Inogen's sales opportunities stemmed from converting Medicare patients to a cash sale, the inability to sell to this market would be a critical blow to Inogen's business model.  CMS forced Inogen to retrain the sales representatives not to mislead potential customers.  As a result, it was likely that fewer patients could be steered to the more profitable out-of-pocket cash sale.

220.   Inogen used a CRM system to monitor sales analytics.  Defendant Bauerlein, for example, discussed reviewing the sales analytics on the November 7, 2017 conference call.  The Inogen founder and CFO similarly confirmed that Inogen would be reviewing productivity information for the "first 120 or so [of Cleveland sales representatives hired in 2017] for us to see – really understand the productivity

- 89 -

of that sales force and understand what the additional market capacity is" on the February 27, 2018 conference call.  From the CRM system, Defendants had access to information suggesting that leads were not quality leads because they were being recycled.  As one September 29, 2018 Glassdoor reviewer noted, "the leads that are coming in now are not any different than the leads that came in last month or last year but the quality of leads has not increased to compensate for the aggressive growth in DTP Sales."  Similarly, an October 17, 2018 Glassdoor review asserted that "*[t]he leads are washed out and the industry is saturated*.  I have worked there for almost 2 years and this is coming from someone that has never missed quota."  Additionally, a December 7, 2018 Glassdoor review noted that that when it came to the lead quality, "*[m]anagement even acknowledged a mistake in marketing* yet only the sales representatives suffer."

**B.    Defendant Bauerlein's Suspicious Insider Stock Sales**

221.   The scienter of Inogen founder and CFO, defendant Bauerlein, is further evidenced by her Class Period transactions in Inogen stock.   These transactions were suspicious in both timing and amount, permitting her to accumulate more than $10 million in ill-gotten gains during the fraud alleged herein.

222.   Directly following Defendants' dissemination of misinformation to the market at the beginning of the Class Period, on November 10, 2017, Bauerlein entered into a 10b5-1 trading plan to dump nearly 84,260 shares of her 175,178 shares or nearly 50% of the shares she held during the period Defendants' fraud was ongoing.  Over a short period of time between February and June 2018, just as Inogen stock had neared its inflated peak, Bauerlein disposed of those 84,260 shares for profits totaling more than $10 million.  In comparison to her pre-Class Period sales over the same length of time, she only sold 38,332 shares (or 15%) of her common stock holdings.

223.   The timing of these sales is particularly suspicious because they were scheduled to take advantage of the hype surrounding the opening of the Cleveland

- 90 -

sales facility in August 2017 and the subsequent sales blitz which Defendants represented would provide a large bump in Inogen's sales figures. It would take four to six months, not including the time to prepare Inogen's quarterly reports, before any of the hard performance results from the Cleveland facility would be known to the public. Defendant Bauerlein capitalized on Defendants' false statements about the "easy money" the Cleveland facility was purportedly bringing to investors before any actual results could come to light to prove Defendants' statements false (or at the very least, misleading).

224. All of defendant Bauerlein's sales occurred between February and June 2018 prior to the slow trickle of disclosures revealing Defendants' false and misleading statements to Inogen investors. Because the initial group of sales representatives would not hit full productivity until at least February 2018, the first full quarter worth of results impacted by the Cleveland facility would not have been released until the 2Q18 financial results were disclosed in August 2018, after Bauerlein dumped half her shares on Defendants' false and misleading, yet, at the time, difficult to disprove narrative.

## VIII.  LOSS CAUSATION/ECONOMIC LOSS

225. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Inogen common stock and operated as a fraud or deceit on Class Period purchasers of Inogen common stock by misrepresenting the Company's business metrics and financial prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Inogen common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Inogen common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

226.   The Class Period inflation in Inogen's stock price was removed when information concealed by Defendants' false or misleading statements was revealed to the market.   The information was disseminated through a series of partial disclosures that slowly revealed the nature of Inogen's inflated TAM, TAM growth and market penetration figures, and that its sales representatives did not possess any special acumen to easily convert leads into profitable cash sales.  These disclosures, as more particularly described below, removed artificial inflation from Inogen common stock, causing economic injury to Plaintiffs and other members of the Class.

227.   The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements, such as the lack of POC penetration into the 3 million TAM figure and comments that the sales team was performing better than expected. Defendants' continued misrepresentations maintained the price of Inogen common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Inogen even after Defendants' partial disclosures.

228.   None of the partial disclosures were sufficient on their own to fully remove the inflation from Inogen's stock price because each only partially revealed the nature of the inflated TAM, TAM growth rate and market penetration figures, and the lack of special sales acumen of its salesforce.  During the Class Period, the price of Inogen common stock declined as a result of these partial disclosures of truth and the materialization of the risks concealed by Defendants' misrepresentations and omissions.

229.   The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  The following stock price declines are not necessarily comprehensive since fact and expert discovery are not complete.   These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

230.   As described in detail above in ¶¶148-169, on November 7, 2018 after trading had closed, Inogen issued its 3Q18 financial results and Defendants disclosed that Inogen cut its FY18 EBITDA guidance to $60 to $62 million from $65 to $69 million, and also revealed that growth in Inogen's domestic B2B sales were slowing and would see a significant deceleration to 32% growth from 56% in 2Q18.

231.   As a direct result, when the market opened the next day, November 7, 2018, the price of Inogen common stock dropped and ultimately closed at $155.86, which was more than 19% lower than the previous closing price on high trading volume.

232.   This disclosure did not fully correct Defendants' misrepresentations regarding the TAM and its growth rate and Inogen's sales acumen.  As described above in ¶¶170-176, Defendants continued to mislead investors during the January 2019 J.P. Morgan Global Healthcare Conference.

233.   As described in detail above in ¶¶53-63, 177, on February 8, 2019, Muddy Waters published a report challenging the claimed size of Inogen's TAM. Based on his research, Block stated that Inogen's TAM was "actually shrinking," and that the Company's sales would peak "no later than next year."  According to Block, Inogen "embodies much of what is dysfunctional about today's capital markets: Misleading statements by management, shoddy market research presented as authoritative, thorough sell-side capture, and of course significant enrichment of insiders through stock sales."

234.   As a direct result, the price of Inogen common stock dropped and ultimately closed at $136.72 per share on February 8, 2019, which was more than 2% lower than the previous closing price on high trading volume.

235.   As described in detail above in ¶¶64-67, 178, on February 12, 2019, Citron issued a report illuminating what it characterized as the Company's "dirty" reseller network which used deceptive tactics to sell Inogen POCs.  In addition, it

1 uncovered that Inogen's own sales representatives had also misled patients to believe
2 that the POCs were not covered by Medicare.

3   236.   As a direct result, the price of Inogen common stock dropped and
4 ultimately closed at $138.05 per share on February 12, 2019, which was nearly 3%
5 lower than the previous closing price on high trading volume.

6   237.   As described in detail above in ¶¶179-193, on February 26, 2019, after
7 trading had closed, Inogen issued its FY18 and 4Q18 financial results, and
8 Defendants revealed that B2B "did slow from one national homecare provider."  In
9 addition, Defendants expressed a lack of confidence in their TAM and TAM growth
10 rate estimates, significantly lowering the growth rate estimate from 7% to 10%
11 annually to the "low single digits."

12   238.   As a direct result, when the market opened the next day, February 27,
13 2019, the price of Inogen common stock dropped and ultimately closed at $106.28,
14 per share which was more than 24% lower than the previous closing price on high
15 trading volume.

16   239.   But Defendants continued to misrepresent the facts revealed by the
17 Muddy Waters and Citron investigations.   For example, defendant Wilkinson
18 claimed Inogen had successfully complied with Medicare regulations and that
19 customers considered purchasing POCs with cash rather than going through
20 insurance a "better option."  Defendant Wilkinson continued to herald the sales team
21 as a "fantastic asset."

22   240.   As described in detail above in ¶¶201-209, on May 7, 2019, after
23 trading had closed, Inogen issued its 1Q19 financial results, and Defendants revealed
24 a "decline in domestic business-to-business sales" for the quarter, and "reduc[ed] its
25 full year 2019 total revenue guidance to $405 to $415 million, down from $430 to
26 $440 million."  Defendants disclosed that the Inogen's new sales representatives did
27 not possess the sales acumen Inogen had previously disclosed and confirmed Inogen
28 would slow the pace of hiring of sales representatives.  Instead, Inogen pivoted back

- 94 -

1   to the rental market it had previously abandoned, indicating that the DTC sales

2   model was not generating the level of sales Inogen had assured investors.

3        241.   As a direct result, when the market opened the next day, May 8, 2019,

4   the price of Inogen common stock dropped and ultimately closed at $67.79 per share,

5   which was more than 25% lower than the previous closing price on high trading

6   volume.

7        242.   The economic losses suffered by Plaintiffs and other members of the

8   Class were a direct result of Defendants' misrepresentations and omissions which

9   resulted in Inogen's common stock price being artificially inflated and subsequent

10  decline in the value of that stock when Defendants' prior misrepresentations and

11  omissions were revealed.

12  **IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE**

13       243.   Plaintiffs and the Class are entitled to a presumption of reliance

14  pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market

15  doctrine because the market for Inogen common stock was an efficient market at all

16  relevant times by virtue of the following factors, among others:

17           (a)   Inogen stock met the requirements for listing and was listed and

18  actively traded on the NASDAQ, a highly efficient market;

19           (b)   As a regulated issuer, Inogen filed periodic public reports with

20  the SEC;

21           (c)   Inogen regularly communicated with public investors via

22  established market communication mechanisms, including the regular dissemination

23  of press releases on national circuits of major newswire services and other wide-

24  ranging public disclosures, such as communications with the financial press and

25  other similar reporting services; and

26           (d)   Inogen was followed by approximately ten securities analysts

27  employed by major brokerage firms during the Class Period who wrote reports that

28  were distributed to the salesforces and certain customers of their respective

- 95 -

1   brokerage firms.   These reports were publicly available and entered the public

2   marketplace.

3       244.   As a result of the foregoing, the market for Inogen common stock

4   promptly incorporated current information regarding the Company from publicly

5   available sources and reflected such information in the price of the stock.   Under

6   these circumstances, all those who transacted in Inogen stock during the Class Period

7   suffered similar injury through their transactions in Inogen stock at artificially

8   inflated prices and a presumption of reliance applies.

9       245.   Without knowledge of the misrepresented or omitted material facts,

10  Plaintiffs and other Class members purchased or acquired Inogen common stock

11  between the time Defendants misrepresented and failed to disclose material facts and

12  the time the true facts were disclosed.   Accordingly, Plaintiffs and other Class

13  members relied, and are entitled to have relied, upon the integrity of the market price

14  for Inogen stock, and are entitled to a presumption of reliance on Defendants'

15  materially false and misleading statements and omissions during the Class Period.

16  **X.   THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
       DEFENDANTS' MATERIALLY FALSE AND MISLEADING
17     STATEMENTS AND OMISSIONS**

18      246.   The statements alleged herein to be false and misleading are not subject

19  to the protections of the Private Securities Litigation Reform Act of 1995's

20  ("PSLRA") statutory Safe Harbor for forward-looking statements because: (a) they

21  are not forward-looking; (b) they are subject to exclusion; or (c) even if purportedly

22  forward-looking, Defendants cannot meet the requirements for invoking the

23  protection, *i.e.*, identifying the statements as forward-looking and demonstrating that

24  the statements were accompanied by meaningful cautionary language.   Many of the

25  statements were misleading in light of omissions of material present or historical

26  facts and cannot be considered forward-looking.

27      247.   Under the PSLRA's statutory Safe Harbor for written statements, a

28  forward-looking statement is protected if it is: (a) identified as such; and

- 96 -

(b) "accompanied by meaningful cautionary statements."   15 U.S.C. §78u-5(c)(1)(A)(i).   An oral forward-looking statement must be accompanied by an oral cautionary statement that it is forward-looking, that actual results may differ materially, and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such factors; and (b) the referenced written document must contain meaningful cautionary language.   15 U.S.C. §78u-5(c)(2)(B).

248.   The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-5(b)(2)(A).

249.   Statements of historical fact, current condition, or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

250.   To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  A warning that identifies a potential risk, but implies that such risk had not materialized (*i.e.*, states that something might occur but does not state that something actually has already occurred) is not meaningful and does not fall within the protections of the Safe Harbor.

251.   Meaningful risk disclosures must also be substantive and tailored to the forward-looking statement they accompany.  Many of Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized, which change in circumstance was material to the reasonable investor.  Defendants' risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of the Safe Harbor.

- 97 -

252.   Nor were the historic or present-tense statements made by Defendants' assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

253.   Defendants' alleged forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis.  Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Inogen, who knew that those statements were false or misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

254.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Inogen common stock during the Class Period, who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

255.   The members of the Class are so numerous that joinder of all members is impracticable.  Inogen stock was actively traded.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Inogen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 98 -

256.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

257.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

258.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the Company's business metrics and financial prospects; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

259.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**A.    COUNT I:  For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

260.   Plaintiffs incorporate ¶¶1-259 by reference.

261.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

262. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)    employed devices, schemes and artifices to defraud;

        (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Inogen stock during the Class Period.

263. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Inogen stock. Plaintiffs and the Class would not have purchased Inogen stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**B.**    **COUNT II:  Violations of §20(a) of the Exchange Act Against All Defendants**

264. Plaintiffs incorporate ¶¶1-259 by reference.

265. The Individual Defendants acted as a controlling persons of Inogen within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Inogen stock, the Individual Defendants had the power and authority to cause Inogen to engage in the wrongful conduct complained of herein.  Inogen controlled the Individual Defendants and all of its employees.  By reason of such conduct, these defendants are liable pursuant to §20(a) of the Exchange Act.

Cases\4850-5109-6731.v1-7/10/19

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## XIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  July 10, 2019                       ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                            ARTHUR C. LEAHY
                                            MATTHEW I. ALPERT
                                            KEVIN S. SCIARANI


                                            s/ MATTHEW I. ALPERT
                                            MATTHEW I. ALPERT

                                            655 West Broadway, Suite 1900
                                            San Diego, CA 92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)
                                            artl@rgrdlaw.com
                                            malpert@rgrdlaw.com
                                            ksciarani@rgrdlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GLANCY PRONGAY &
 MURRAY LLP
JOSHUA L. CROWELL
VAHE MESROPYAN
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310/201-9150
310/201-9160 (fax)
jcrowell@glancylaw.com
vmesropyan@glancylaw.com

Lead Counsel for Lead Plaintiffs

1

**CERTIFICATE OF SERVICE**

2        I hereby certify under penalty of perjury that on July 10, 2019, I authorized

3 the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF

4 system which will send notification of such filing to the e-mail addresses on the

5 attached Electronic Mail Notice List, and I hereby certify that I caused the mailing

6 of the foregoing via the United States Postal Service to the non-CM/ECF participants

7 indicated on the attached Manual Notice List.

8                                                   s/ MATTHEW I. ALPERT
                                                    MATTHEW I. ALPERT
9
                                                    ROBBINS GELLER RUDMAN
10                                                    & DOWD LLP
                                                    655 West Broadway, Suite 1900
11                                                  San Diego, CA  92101-8498
                                                    Telephone:  619/231-1058
12                                                  619/231-7423 (fax)

13                                                  E-mail:  malpert@rgrdlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 103 -

## Mailing Information for a Case 2:19-cv-01643-FMO-AGR William Fabbri v. Inogen, Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com,2127683420@filings.docketbird.com

- **Adam Marc Apton**
  aapton@zlk.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joshua Lon Crowell**
  jcrowell@glancylaw.com,joshua-crowell-3496@ecf.pacerpro.com,info@glancylaw.com

- **Caz Hashemi**
  chashemi@wsgr.com

- **Frank J Johnson**
  frankj@johnsonfistel.com,michaelf@johnsonfistel.com,ceciliar@johnsonfistel.com,paralegal@johnsonfistel.com

- **Reed R Kathrein**
  reed@hbsslaw.com,danielles@hbsslaw.com,lisal@hbsslaw.com,sf_filings@hbsslaw.com

- **Arthur C Leahy**
  artl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Adam C McCall**
  amccall@zlk.com

- **Catherine E Moreno**
  cmoreno@wsgr.com,nstrauss@wsgr.com,ncarvalho@wsgr.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Kevin S Sciarani**
  ksciarani@rgrdlaw.com,3827167420@filings.docketbird.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle Smith**
  danielles@hbsslaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)