# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CORY LONGO, individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

v.

OSI SYSTEMS, INC., et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 17-8841 FMO (SKx)

**ORDER RE: MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Having reviewed and considered all the briefing filed with respect to defendants' Motion to Dismiss Plaintiffs' First Amended [ ] Class Action Complaint [ ] (Dkt. 107, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

Lead plaintiff Arkansas Teacher Retirement System and named plaintiff John A. Prokop (collectively, "plaintiffs") filed their First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("FAC") against (1) OSI Systems, Inc. ("OSI"); (2) Deepak Chopra ("Chopra"); (3) Alan Edrick ("Edrick"); and (4) Ajay Mehra ("Mehra") (collectively, "defendants"), (see Dkt. 76, FAC at ¶¶ 23-30), asserting two federal securities violations on behalf of a class of persons who purchased or acquired OSI stock and convertible notes between August 21, 2013, and February 1, 2018: (1) § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"),

15 U.S.C. §§ 78j et seq., and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against all defendants; and (2) § 20(a) of the 1934 Act, 15 U.S.C. §§ 78t et seq., against defendants Chopra, Edrick, and Mehra (collectively, "individual defendants"). (See id. at p. 1 & ¶¶ 306-22).

### **ALLEGATIONS IN THE FIRST AMENDED COMPLAINT**

OSI is a manufacturer and designer of specialized electronic scanning systems and components related to security, healthcare, defense, and aerospace. (See Dkt. 76, FAC at ¶ 1). OSI's largest division, the Security Division, represents approximately 50% of the company's revenues. (See id. at ¶ 40). A significant portion of OSI's security business deals with its "turnkey" business model which provides security services "to support foreign governments and customs officials with the installation, maintenance, and operation of [OSI's] security inspection products – as well as the construction, staffing, and long-term operation of security screening checkpoints." (Id. at ¶ 6).

OSI acquired its first turnkey contract in Puerto Rico in 2010 and another in Mexico in 2012. (Dkt. 76, FAC at ¶ 67). In August, 2013, OSI announced its third turnkey contract, which was expected to generate revenues in the range of $150 million to $250 million. (See id. at ¶ 71). OSI registered its own Albanian subsidiary, S2 Albania, "to accept the rights and obligations of the [turnkey] contract" with Albania. (Id. at ¶ 82).

On September 6, 2013, OSI's Executive Vice President, Mehra, authorized the execution of a contract whereby OSI transferred 49% of S2 Albania to an Albanian company – owned by an Albanian dentist with "no reported experience in providing security services on par with the Albanian contract" – called Inspection Control & Measuring Systems SHPK ("ICMS"). (See Dkt. 76, FAC at ¶¶ 12, 28, 83 & 88). OSI sold 49% of S2 Albania to ICMS for 490 Albanian leke, or approximately $4.50, (see id. at ¶ 83), and entered into a profit-sharing agreement with ICMS with respect to the Albanian turnkey contract. (See id. at ¶¶ 83-88).

In August 2014, defendants announced that the Albanian government had suspended the turnkey contract, and that no revenues from this contract would be included in OSI's revenue projections for fiscal year 2015. (See Dkt. 76, FAC at ¶¶ 95-97). OSI then filed suit against the Albanian government in the International Court of Arbitration. (See id. at ¶ 100). In April, 2015,

the parties reached a settlement which resulted in a renegotiated contract with a revised revenue estimate of €200 million euros, or approximately $220 million dollars. (See id. at ¶¶ 100-04). The Albanian government stated that the renegotiated contract had reduced the value of the contract from €316 million euros to €210 million euros. (See id. at ¶ 101).

On December 6, 2017, investment analyst Muddy Waters Research ("MWR") – a "sophisticated financial expert"[1] – issued a report ("MWR Report") that revealed the previously "unannounced transfer" of 49% of S2 Albania from OSI to ICMS four years earlier in 2013, which plaintiffs allege defendants knowingly concealed from the public. (See Dkt. 76, FAC at ¶¶ 118-19, 142). The MWR Report charged OSI with misstating their financial disclosures because "they likely [did] not reflect the transfer" of 49% of S2 Albania to ICMS – for $4.50 – and that the corporate structure behind the Albanian turnkey contract "demonstrated that the Albanian contract was obtained through corruption." (Id.). OSI issued a press release within hours of the issuance of the MWR Report confirming OSI's partnership and profit-sharing agreement with ICMS, but denying any wrongdoing. (See id. at ¶ 121). OSI's stock price fell nearly 30% that day from $84.07 per share to $59.52 per share. (See id. at ¶ 123).

On January 31, 2018, MWR released a follow-up report that analyzed ICMS's corporate documents and reported that ICMS had "virtually no tangible assets" and that OSI alone had "provided virtually all funding to, and investment in, S2 Albania[.]" (See Dkt. 76, FAC at ¶ 126). This report directly refuted OSI's earlier contention that ICMS had "made significant capital investments toward the implementation" of the Albanian contract. (See id. at ¶ 121). The next day, OSI issued another press release, which it provided to the Securities and Exchange Commission ("SEC"), announcing that the SEC and the Department of Justice ("DOJ") had commenced investigations into OSI's compliance with the Foreign Corrupt Practices Act ("FCPA") and federal securities laws. (See id. at ¶ 129). Following this press release, OSI's stock price dropped again, this time 18% from $66.60 per share to $54.60 per share. (See id. at ¶ 130).

---

[1] Plaintiffs allege MWR is "sophisticated financial expert" whose founder was named one of the 50 "Most Influential Thinkers" in finance and investing by Bloomberg Markets Magazine in 2011. (Dkt. 76, FAC at ¶ 142).

3

**LEGAL STANDARD**

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007) ("Twombly"); see Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) ("Iqbal"); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; see Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted); see Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. See Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Nevertheless, dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint may also be

4

dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim. Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

**DISCUSSION**

To state a claim under the 1934 Act, a plaintiff must meet the "exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act[, 15 U.S.C. § 78u-4 ('Reform Act').]" Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014); Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156, 1164 (9th Cir. 2009) ("At the pleading stage, a complaint stating claims under section 10(b) and Rule 10-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."). Under the Reform Act, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Finally, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This includes "the who, what, when, where, and how of the misconduct charged." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." Yourish v. Calif. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999). This requirement "can be satisfied by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." Rubke, 551 F.3d at 1161 (internal quotation marks omitted).

"The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

5

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809-10, 131 S.Ct. 2179, 2184 (2011) (internal quotation marks omitted). Here, defendants argue that the FAC fails to adequately plead material misrepresentations or omissions, scienter, and loss causation. (<u>See</u> Dkt. 107, Motion at 7-25).

A. <u>Material Misrepresentations or Omissions</u>.

Plaintiffs allege that defendants made material misstatements or omissions that generally fall into two categories: (1) defendants' statements about OSI's ownership of S2 Albania and its resulting "100% market share" of the turnkey contract market, (<u>see</u> Dkt. 76, FAC at ¶¶ 150, 152, 154, 156, 158, 161, 163, 195, 199); and (2) defendants' statements touting their Albanian contract and the success of their turnkey business.[2] (<u>See</u>, <u>e.g</u>, <u>id.</u> at ¶¶ 101, 143-45, 165, 167, 170, 172, 175-76, 180, 187, 195); (<u>see also</u> Dkt. 108, Plaintiffs' Opposition [ ] ("Opp") at 7-11).

1. **OSI's Ownership of S2 Albania and "100% Market Share."**

Plaintiffs allege that defendants made false and misleading statements in a February 2017, purchase agreement filed with the SEC which represented that OSI owned S2 Albania "free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim, or equity[.]" (Dkt. 76, FAC at ¶ 195). Plaintiffs also allege that defendants made misleading statements when they asserted on investor calls that OSI had a "100% market share" of the turnkey contract business. (<u>See</u>, <u>e.g.</u>, <u>id.</u> at ¶ 150). According to plaintiffs, these statements were "objectively false" as "OSI did not have 100% share of all turnkey contracts and had a secret partner who owned 49% of [S2 Albania] and 'profit sharing' rights." (Dkt. 108, Opp at 7) (alteration marks omitted).

With respect to defendants' statements that OSI had a "100% market share" in the turnkey contract market, the court is persuaded that plaintiffs have adequately pled that this statement was

---

[2] All of the misstatements and omissions alleged by plaintiffs were made or ratified by the individual defendants Chopra, Mehra, and Edrick on behalf of corporate defendant OSI. (<u>See</u> Dkt. 76, FAC at ¶¶ 26-30, 143-205). Chopra is "the founder of OSI, and at all relevant times, was the Company's President, CEO, and Chairman of the Company's Board of Directors." (<u>Id.</u> at ¶ 26). Mehra, at all relevant times, was "OSI's Executive Vice President . . . and a member of OSI's Board of Directors." (<u>Id.</u> at ¶ 28). Edrick, at all relevant times, was "OSI's Executive Vice President and CFO." (<u>Id.</u> at ¶ 27).

objectively false.  Plaintiffs allege that "OSI had secured [ ] two turnkey contracts – one in Puerto Rico in 2010 and another in Mexico in 2012[,]" and that "there were only three" turnkey contracts in the world.  (Dkt. 76, FAC at ¶¶ 67 & 206).  As plaintiffs note, OSI could not claim "100% market share" because OSI "had a secret partner who owned 49% of the Albanian contract entity and 'profit-sharing' rights."  (Dkt. 108, Opp at 7) (alteration omitted).  Defendants do not dispute that ICMS owned 49% of S2 Albania – that was purchased for $4.50 – and profit-sharing rights.  (See, generally, Dkt. 107, Motion).  Indeed, following publication of the MWR Report on December 6, 2017, OSI admitted that ICMS owned profit-sharing rights on the Albanian contract.  (See Dkt. 76, FAC at ¶ 121).

Defendants argue that "OSI did not compete with ICMS for turnkey contracts[,]" but rather, it "partnered with ICMS to implement a contract that OSI won."  (Dkt. 109, Defendant's Reply [ ] ("Reply") at 13) (emphases omitted); (see Dkt. 107, Motion at 12).  According to defendants, interpreting "100% market share" to mean that OSI would not engage a local partner is "deeply implausible" especially in light of their argument that the relationship with ICMS was "a matter of public record[.]"  (Dkt. 109, Reply  at 13-14).  However, plaintiffs allege a relationship that goes beyond simply working with a local partner.  Plaintiffs allege, and OSI has admitted, that OSI sold to an Albanian dentist – for a mere $4.50 – 49% of the entity that owned the Albanian contract, and had profit-sharing rights on that contract.  (See Dkt. 76, FAC at ¶¶ 81, 83-86).  Given ICMS's nearly half-ownership of S2 Albania and its profit rights with respect to the Albanian contract, defendants' statements asserting ownership of "100% market share" of the turnkey market were, especially in light of the additional context of the ICMS arrangement discussed below, misleading at best, and objectively false at worst.[3]  Finally, the court is not persuaded that the arrangement with ICMS was a matter of public record.  See infra at § A.2.

---

[3]  To the extent defendants challenge such statements as being non-actionable, forward-looking statements, such a challenge is unpersuasive because assertions of owning "100% market share" are present facts whose "truth or falsity could be determined at the time they were made." In re ESS Tech., Inc. Sec. Litig., 2004 WL 3030058, *11 (N.D. Cal. 2004).

With respect to the February 2017, purchase agreement, defendants argue that the challenged provision states that OSI owns its subsidiaries "free and clear of any . . . encumbrance[,]" subject to the caveat, "[e]xcept as otherwise disclosed in the General Disclosure Package and the Final Offering Memorandum." (Dkt. 107, Motion at 13). Defendants contend that plaintiffs did not "attach those documents, do not plead that they inaccurately set forth OSI's ownership interest in S2 Albania, and thus have not pleaded the statement's falsity." (Id.). For their part, plaintiffs allege that the MWR Report analyzed these documents and found that "there are no deductions for non-controlling interests in the income statement, and [the] February 2017 bond offering documents appear to show the subsidiary as 100% owned by OSI[.]" (Dkt. 76, FAC at ¶ 118). Under the circumstances, without having the "General Disclosure Package and the Final Offering Memorandum" before it, the court cannot determine the truth or falsity of the February 2017, purchase agreement. Cf. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018) ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access."). Thus, the court will deny defendants' Motion as to the February 2017, statement without prejudice to defendants' ability to raise this issue again in a motion for summary judgment.[4]

### 2. Statements Touting Albanian Contract and Success of Turnkey Business.

Next, plaintiffs challenge defendants' statements "touting the Albanian contract, including its profitability, status, and financial impact" which plaintiffs allege were "affirmatively false and

---

[4] The court recognizes that defendants re-filed their Motion "without incorporating any documents by reference or attaching any exhibits[.]" (Dkt. 106, Court's Order of March 11, 2020, at 4). However, given that such documents are critical to the disposition of this particular issue, defendants, as the moving party, should have sought leave to include these documents in support of their Motion. The court's previous order was concerned with the parties' use of extensive and unnecessary extrinsic documents in the context of a motion to dismiss for failure to state a claim. See Khoja, 899 F.3d at 998.

misleading" due to the nondisclosure of OSI's contractual arrangement with ICMS. (See Dkt. 76, FAC at ¶¶ 147-48, 150-52, 154, 156, 158, 160-61, 163, 165-67, 169-70, 172-73, 175-78, 180-82, 184-88, 190-92, 197, 199-202); (Dkt. 108, Opp at 8). Plaintiffs argue that these statements were misleading "by omission, as each failed to disclose that OSI had a secret arrangement with an undisclosed partner to whom OSI transferred 49% of the contract entity and profit rights" for $4.50. (Dkt. 108, Opp at 8). According to plaintiffs, defendants had a "duty to disclose the facts regarding the secret Albanian arrangement" because "once Defendants chose to tout and affirmatively speak about a topic, they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." (Id. at 10) (quoting Khoja, 899 F.3d at 1009) (internal formatting omitted).

Defendants assert that plaintiffs have "fail[ed] to allege with particularity that the Albania contract was corrupt." (Dkt. 107, Motion at 8) (formatting omitted); (see id. at 8-13). According to defendants, "Plaintiffs never explain, through particularized . . . facts, who acted dishonestly, what they did to act dishonestly, when they did it, how they did it, or what 'money or personal gain' they received." (Id. at 9) (emphases omitted). This argument, however, misses the mark. In order to adequately plead actionable omissions, plaintiffs need only plead that information about OSI's relationship with ICMS was material to a reasonable investor such that the failure to disclose these facts in light of defendants' other public statements would be misleading.[5] See Khoja, 899 F.3d at 1008-09 ("Even if a statement is not false, it may be misleading if it omits material information."); In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1054 (9th Cir. 2014) ("[A] statement might be misleading because it is made outside the context of other material information."). Defendants do not dispute that they did not publicly announce the details of the contractual arrangement with ICMS until after the MWR Report's publication, (see, generally, Dkt. 107,

---

[5] To the extent defendants suggest that plaintiffs have not identified or explained which facts defendants failed to disclose, (see Dkt. 109, Reply at 5-6), this contention is unavailing because plaintiffs specifically argue that defendants should have disclosed the facts regarding OSI's contractual arrangement with ICMS, including the financial details of the transaction. (See Dkt. 108, Opp. at 8-11).

Motion), so if such information was material, then failure to disclose it rendered defendants' statements misleading, thereby constituting actionable omissions.

With respect to materiality, defendants argue that plaintiffs have not alleged "particularized facts suggesting that the percentage ownership of S2 Albania or separate profit sharing in the Albania contract were material to investors[.]" (Dkt. 107, Motion at 12). According to defendants, because "OSI never described S2 Albania's ownership structure, nor the contract's profit margins[,]" such information could not have been material to a reasonable investor. (See id. at 13). Defendants' argument is troubling in that it suggests that because OSI never disclosed information that should have been disclosed, the failure to disclose such information could not have been material to an investor.

In any event, an omission is considered material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983 (1988) (internal quotation marks omitted). In other words, "a fact is material if there is a 'substantial likelihood' that a reasonable investor would consider it important in his or her decision making." No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 934 (9th Cir. 2003) (internal quotation marks omitted). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues [of materiality] appropriately resolved as a matter of law." Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (internal quotation marks omitted).

Here, plaintiffs have put forth several allegations regarding OSI's statements that highlight the importance of OSI's turnkey contracts to its overall business, particularly the importance of the Albanian contract. (See, e.g., Dkt. 76 FAC at ¶ 61) (Edrick stated turnkey contracts were "view[ed] [ ] as perhaps [OSI's] largest growth opportunity.") (formatting omitted); (id. at ¶ 145) ("[OSI's] selection [for the Albanian contract] reinforces the attractiveness and compelling value of [OSI's] turnkey service model.") (formatting omitted); (id. at ¶ 150) ("What's been driving the growth over the past year has been largely dominated by our turnkey security solutions.") (formatting omitted). Indeed, defendants and investment analysts alike publicly discussed the importance of OSI's

10

turnkey contracts, including the Albanian contract, on numerous occasions between August 2013 and June 2017.  (See, e.g., id. at ¶¶ 67-68, 150, 152, 154, 156, 158, 161, 163, 169, 176-78, 185, 187, 202).

Plaintiffs allege that defendants withheld the fact that OSI sold 49% of S2 Albania, which held contract and profit-sharing rights on the Albanian contract, for a mere $4.50 to ICMS, an entity owned by an Albanian dentist with "no reported experience in providing security services on par with the Albanian contract." (Dkt. 76, FAC at ¶ 88); (see Dkt. 108, Opp. at 8-11).  Following the MWR Report which disclosed these details, OSI issued a press release confirming the "partnership" and "profit shar[ing]" agreement with ICMS.  (See Dkt. 76, FAC at ¶ 121).  OSI asserted that "ICMS made significant capital investments . . . in a value well beyond" the $4.50 it paid OSI for its 49% ownership stake in S2 Albania.  (Id.).  Given that a dentist with no apparent experience in security matters paid only $4.50 for a 49% share of a company that had a profit sharing agreement on a contract worth approximately $200 million dollars, (see id. at ¶¶ 84 & 88), one would hope that the dentist's company, i.e., ICMS, had made capital investments well beyond the price of a latte that the dentist paid to get his 49% ownership stake in the company.  Nonetheless, MWR issued another report, based on its review of ICMS's corporate documents, meticulously refuting OSI's representations of ICMS's contributions to the Albanian contract, and ultimately concluding that there was "no account evidencing investment in S2 Albania by ICMS or ICMS Construction."  (See id. at ¶¶ 125-28).  The court agrees that, without this information, a reasonable investor would have been misled into believing that the Albanian contract "would inure solely to the benefit of OSI[.]"  (See id. at ¶ 149(a)); see, e.g., Khoja, 899 F.3d at 1010 (failure to disclose unreliability of testing results was misleading because the "results appeared more promising than [defendant] allegedly knew they were").

In light of the repeated public statements made by defendants regarding the importance of the turnkey contracts to OSI's business model, it is implausible and defies common sense to suggest that the sale – for a mere $4.50 – to a dentist with no known experience in the security field of a 49% ownership stake of a company that has profit-sharing rights on a contract worth approximately $200 million dollars would not be material to a reasonable investor.  See Iqbal, 556

11

U.S. at 679, 129 S.Ct. at 1950 (determination whether a complaint states a plausible claim for relief involves a "context-specific" inquiry requiring a reviewing court "to draw on its judicial experience and common sense"). Indeed, once these details were made known to the public via the MWR Report, OSI's stock price declined nearly 30% in one day. (See Dkt. 76, FAC at ¶ 280); see, e.g., No. 84 Emp.-Teamster Joint Council Pension Tr. Fund, 320 F.3d at 935 (stock price decline of 31% following disclosure "support[ed] a finding of materiality"). Considering the allegations in the light most favorable to plaintiffs, see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund, 320 F.3d at 931 ("All allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff."), the court is persuaded that facts regarding OSI's contractual relationship with ICMS would have been material to a reasonable investor and that failure to disclose such facts in light of defendants' repeated statements emphasizing the importance of OSI's turnkey business rendered such statements otherwise misleading. See, e.g., Evanston Police Pension Fund v. McKesson Corp., 411 F.Supp.3d 580, 599 (N.D. Cal. 2019) ("Having touted the good news that supply disruptions were leading to increased prices and thus increased profits, McKesson had a duty to also disclose that some portion of its increased profits was actually due to far riskier and less sustainable unlawful agreements.").

Defendants argue that the facts regarding the contractual arrangement with ICMS were "already-public information" because the relevant documents, some of which were written in Albanian, were on an Albanian government website and could have been reviewed by the reasonable investor using Google's translate feature. (See Dkt. 107, Motion at 25). However, plaintiffs allege that the profit-sharing agreement between OSI and ICMS "was not available anywhere (either in Albania or the US) and its existence was not disclosed to investors until Muddy Waters exposed the partnership[.]" (Dkt. 76, FAC at ¶ 134). In addition, the transfer agreement that gave ICMS a 49% share of S2 Albania for a mere $4.50 was "written in Albanian" and only available on the Albanian National Business Center website. (Id. at ¶ 135). Further, defendants' contention that the subject documents – written in Albanian and located on an Albanian government website – were available to the reasonable investor, (see Dkt. 107, Motion at 25), is

unpersuasive. Under defendants' theory, a reasonable investor would be obligated to scour foreign websites from all over the world – irrespective of the language of the website – to determine whether the company has revealed any information that may be material to the investor. Putting aside the fact that there is no basis or evidence to conclude that Google's translate feature is sufficient to accurately translate extremely complicated legal and financial documents, and given today's global economy and the fact that many public companies conduct business all over the world, it is plainly unreasonable to require an investor to comb foreign websites in languages such as Arabic, Chinese, Russian, etc., to determine whether the company in which he or she has invested has disclosed information that may be material to his or her investment. In any event, as plaintiffs note, "an in-person visit to Albania" was required to obtain the "Power of Attorney" document – disclosed in the MWR Report – wherein Mehra authorized the transfer to ICMS. (See Dkt. 76, FAC at ¶ 138). Construing the allegations in the light most favorable to plaintiffs, the court is persuaded that the subject documents regarding the ICMS arrangement were not readily accessible to a reasonable investor. See, e.g., Snellink v. Gulf Res., Inc., 870 F.Supp.2d 930, 942 (C.D. Cal. 2012) (filings in China were not "readily accessible for U.S. investors" and therefore not public); In re Fuwei Films Sec. Litig., 634 F.Supp.2d 419, 438 (S.D.N.Y. 2009) (publication of information in Chinese newspapers did not "transform the information contained within the articles into 'matters of general public knowledge'").

In short, defendants' repeated failures to disclose the facts regarding the contractual arrangement with ICMS when discussing the Albanian contract and OSI's turnkey business constitute actionable omissions.[6] See, e.g., Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound

---

[6] Defendants also argue that plaintiffs challenge several non-actionable forward-looking statements, (see Dkt. 107, Motion at 14-16), but this argument does not apply to plaintiffs' theory which challenges the omission of past and present facts relating to the contractual arrangement with ICMS. See, e.g., Roberti v. OSI Sys., Inc., 2015 WL 1985562, *9 (C.D. Cal. 2015) ("[T]o the extent Plaintiffs [ ] challenge Defendants' alleged omission of present facts with respect to the challenged statements, the PSLRA's safe harbor does not apply.") (emphasis and internal quotation marks omitted).

to do so in a manner that wouldn't mislead investors as to what that backlog consisted of. We cannot say, as a matter of law, that defendants fulfilled this duty.").

B.    Scienter.

"To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (internal quotation marks omitted). When considering scienter, the court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324, 127 S.Ct. 2499, 2510 (2007).    Although "[t]he inference [of scienter] need not be irrefutable, . . . or even the most plausible of competing inferences," id. (internal quotation marks omitted), it "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other [countervailing] explanations." Id.  In addition, the court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" Id. at 323, 127 S.Ct. at 2509  (emphasis in original).  Thus, courts often "conduct a dual inquiry:  first, [it] will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, [it] will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Zucco, 552 F.3d at 992.

Plaintiffs first argue that Mehra's direct participation in the negotiation and execution of the contractual arrangement with ICMS, which authorized the sale of 49% of S2 Albania for $4.50 are sufficient to establish scienter on his part.[7]  (See Dkt. 108, Opp. at 16); (Dkt. 76, FAC at ¶¶ 83-85,

_____

[7]  Plaintiffs' theory of scienter turns on the state of mind of the individual defendants – high-level OSI officers and directors – who made several actionable misstatements and omissions between August 2013 and December 2017. (See Dkt. 76, FAC at ¶¶ 26-28, 143-206). Defendants do not dispute that the individual defendants acted within the scope of their authority, (see, generally, Dkt. 107, Motion), so any allegations of scienter attributed to Mehra, Chopra, and Edrick are properly imputed to OSI.  See In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 479 (9th Cir. 2015) ("[S]cienter [of corporate officers] can be imputed to [corporate defendant] for those material misrepresentations or omissions made within the scope of their apparent authority[.]").

211). Defendants argue that Mehra's knowledge of the contracts with ICMS is insufficient because plaintiffs "point[] to no facts demonstrating that [OSI's] relationship with ICMS violated the FCPA or otherwise was corrupt[.]" (Dkt. 107, Motion at 19). However, Mehra need not have known there was anything illegal or improper with respect to the ICMS arrangement; rather, plaintiffs' theory depends on whether Mehra was deliberately reckless in omitting the details of the ICMS arrangement in light of knowledge of the importance of the Albanian contract to investors. (See Dkt. 108, Opp. at 16); (Dkt. 76, FAC at ¶ 206). Indeed, plaintiffs allege that Mehra announced just a few weeks prior to authorizing the agreement with ICMS that Albania's selection of OSI for security services "reinforces the attractiveness and compelling value of [OSI's] turnkey service model."[8] (Dkt. 76, FAC at ¶ 145). Given Mehra's direct involvement in the $4.50 sale to the Albanian dentist and the other indicia of scienter alleged by plaintiffs, the court is persuaded that plaintiffs have adequately pled an inference of scienter on Mehra's part.[9]

Plaintiffs also rely on a core operations theory to infer knowledge of the ICMS arrangement to the other individual defendants. (See Dkt. 76, FAC at ¶¶ 231-41); S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 781 (9th Cir. 2008) (the court may infer that "facts critical to a business's 'core operations' or important transactions are known to key company officers"). Under this theory,

---

[8] Plaintiffs have also alleged that OSI had "a separate incentive program tied to the annual performance of [OSI's] turnkey solutions business" that led Mehra to focus on the turnkey contracts. (See Dkt. 76, FAC at ¶ 265). According to plaintiffs, Mehra's salary in 2017 was increased by approximately 14%, in part due to his oversight and management of OSI's turnkey business. (See id. at ¶ 267). Such incentives contribute to a strong inference of scienter on Mehra's part. See, e.g., In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F.Supp.2d 1069, 1092 (N.D. Cal. 2005) (allegations of defendants' incentives "squarely contribute to a strong inference of scienter" where they "specifically and directly tie[] executive bonuses to the very instrument used to commit" fraud).

[9] Defendants also contend that Mehra could not have acted with scienter because the ICMS transfer had not yet occurred at the time Mehra made the alleged omission on August 21, 2013. (See Dkt. 107, Motion at 16-17). However, the time period between Mehra's statement in late August 2013 and his execution of the authorization documents on September 6, 2013, is minimal and insufficient to undermine consideration of the allegations. In any event, plaintiffs allege other actionable omissions by Mehra such as when he signed a Form 10-K on August 27, 2014, which failed to disclose the arrangement with the Albanian dentist. (See Dkt. 76, FAC at ¶ 166).

"[a]llegations regarding management's role may help satisfy the PSLRA scienter requirement . . . where they are particular and suggest that defendants had actual access to the disputed information," or "such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." Reese v. Malone, 747 F.3d 557, 575-76 (9th Cir. 2014) (internal quotation marks omitted), overruled on other grounds as recognized by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605 (9th Cir. 2017). Such allegations may be "viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter[.]" Id. at 575.

Defendants contend plaintiffs have not sufficiently pled allegations to establish scienter under a core operations theory. (See Dkt. 107, Motion at 19-21). First, defendants argue that allegations that "Chopra, Mehra, and Edrick participated in the Company's day-to-day operations and had access to information are insufficient to establish an inference of scienter" absent some "additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." (Id. at 20). However, plaintiffs do more than simply allege participation in day-to-day operations. As an initial matter, Chopra is the founder of OSI and was the company's President, CEO, and Chairman of the Board of Directors; Edrick, at all relevant times, was the Executive Vice President and CFO. (See Dkt. 76, FAC at ¶¶ 26-27). According to plaintiffs, defendants monitored and specifically discussed the Albanian contract in nine separate board meetings between October 2013, and December 2015, though plaintiffs allege that Edrick participated in only one meeting. (See id. at ¶¶ 217-18). The meeting minutes reflect regular reporting by defendants on financial results and operational status updates relating to the Albanian contract. (See id.). Further, plaintiffs allege that there were numerous public statements made or approved by defendants between August 2013, and December 2017, where defendants discussed the success of the Albanian contract, (see, e.g., id. at ¶¶ 172-73), and the importance of OSI's turnkey business and the Albanian contract's role in that regard. (See, e.g., id. at ¶¶ 150-52, 160-61); In re Zillow Grp., Inc. Sec. Litig., 2019 WL 1755293, *19 (W.D. Wash. 2019) ("The Court has previously held that scienter can be inferred where a corporate officer states that he or

16

she knew about or was monitoring the subject of the misleading statements."). The allegations regarding the financial and operational status of the Albanian contract are sufficiently particularized to "suggest that defendants had actual access to" details of the sale to an Albanian dentist for a mere $4.50 of approximately half of an OSI subsidiary. See, e.g., Reese, 747 F.3d at 575 & 577 (allegations that defendant made "her own very specific representations" of company information "strongly suggest[ed] she had access to the disputed information and the total mix of allegations ma[d]e such a conclusion irrefutable").

Next, defendants argue that plaintiffs' core operations theory fails because the Albanian contract does not "constitute nearly all of [OSI's] business" such that the "financial impact of this relatively minor portion of OSI's business is not so dramatic that it can support a finding of scienter." (Dkt. 107, Motion at 21). Plaintiffs, however, have alleged that OSI's core operation is its overall turnkey business, (see Dkt. 76, FAC at ¶¶ 231-36), and that only a small group of executives, including the individual defendants, oversaw and managed the Albanian contract.[10] (See id. at ¶¶ 38, 221, 226, 229). Indeed, plaintiffs allege that defendants were intimately familiar with OSI's turnkey business which fell under its Security Division, a division that accounted for 49%-58% of OSI's total revenues for fiscal years 2014 through 2017. (See id. at ¶ 232). Moreover, defendants regularly made statements touting OSI's turnkey business – made up of three total contracts – as "driving the growth" in OSI's Security Division's success. (See, e.g., id. at ¶¶ 150, 152, 160, 182, 185, 197, 202). Under the circumstances, "[i]t is thus 'absurd' to suggest

---

[10] Defendants argue that plaintiffs' confidential witness ("CW") allegations supporting the assertion that only a small group of individuals were privy to OSI's turnkey contracts should be disregarded because none of the CWs "has any personal knowledge about the Albania contract or OSI's operations in Albania." (See Dkt. 107, Motion at 17). However, the CW supporting these claims specifically alleged she was a "Rapiscan Executive from 2013 to 2015" who "had direct communications with [ ] Mehra" until February 2014 and thereafter with Chopra. (Dkt. 76, FAC at ¶ 38). The CW's knowledge regarding the small group of individuals who controlled the Albanian contract came directly from "conversations with Mehra." (Id.). While this particular CW did not have first-hand knowledge of the Albanian contract, she did have knowledge of the group of executives who controlled the contracts. Construing all reasonable inferences in plaintiffs' favor, the court is persuaded that these allegations may be considered as part of the "'holistic' review" of plaintiffs' allegations to determine whether plaintiffs have alleged a strong inference of intentional conduct or deliberate recklessness. See Zucco, 552 F.3d at 992.

that the individual Defendants were not aware of issues relating to [the Albanian contract]." Roberti, 2015 WL 1985562, at *13 (core operations inference of scienter applied where plaintiffs alleged knowledge of problems relating to issues in "largest and most profitable division" at OSI involving contracts that were "very closely controlled" by the individual defendants); see, e.g., Patel v. Axesstel, Inc., 2015 WL 631525, *11 (S.D. Cal. 2015) (individual defendants who were part of "only six employees in executive or administrative roles. . . . would be among the first (and only) to know of the details of major contracts").

The Supreme Court has emphasized that, "[i]n making [a] determination [of scienter], the court must review 'all the allegations holistically.'" Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48, 131 S.Ct. 1398, 1324 (2011); Tellabs, 551 U.S. at 326, 127 S.Ct. at 2511 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Here, the court is persuaded that plaintiffs have put forth sufficient allegations to create a strong inference of scienter with respect to the individual defendants. See, e.g. Berson, 527 F.3d at 987-88 (plaintiffs adequately alleged an inference of scienter via core operations theory where high-level managers knew about adverse "stop-work orders" because the individual defendants "were directly responsible for [corporation's] day-to-day operations, so it [was] hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work"); In re Cadence Design Sys., Inc. Sec. Litig., 692 F.Supp.2d 1181, 1192 (N.D. Cal. 2010) ("[T]he inference that [one individual defendant] knew or was reckless regarding the nature of the agreements is incompatible with an inference that the other Individual Defendants lacked scienter."). Given that plaintiffs have adequately pled an inference of knowledge of the ICMS deal by the individual defendants, and considering the allegations "holistically" in the context of numerous public statements emphasizing the importance and success of the Albanian contract and OSI's turnkey business, (see Dkt. 76, FAC at ¶¶ 143-206), the court is persuaded that plaintiffs have adequately alleged that defendants were deliberately or consciously reckless in omitting material information relating to the $4.50 sale of 49% of S2 Albania to ICMS as this information could have influenced a reasonable investor's purchasing decision. See In re

VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 702 (9th Cir. 2012) ("Scienter requires either 'deliberate recklessness' or 'conscious recklessness[.]'").

    C.    Loss Causation.

"To prove loss causation, the Plaintiffs must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the Plaintiffs." Or. Pub. Emps. Ret. Fund, 774 F.3d at 608 (internal quotation marks and brackets omitted). "Thus, like a plaintiff claiming deceit at common law, the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016). "Stated in the affirmative, the complaint must allege that the defendant's share price fell significantly after the truth became known" or was "revealed to the market[.]" Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1062-63 (9th Cir. 2008) (internal quotation marks omitted).

Plaintiffs allege that on December 6, 2017, "the relevant truth and/or foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions . . . began to be revealed[.]" (Dkt. 76, FAC at ¶ 274). On that day, investment analyst MWR issued a report that "revealed [ ] that [OSI] had transferred 49% of its Albanian contract entity to ICMS for approximately $4.50 [and that] OSI's accounts and SEC disclosures did not reflect the transfer[.]" (Id.). According to plaintiffs, "[a]s a direct and proximate result of these partial disclosures, OSI's common stock price plummeted nearly 30%[,]" falling from $84.07 per share to a close of $59.52 per share. (See id. at ¶ 280).

Defendants argue that the MWR Report released on December 6, 2017, cannot be a corrective disclosure because it was only an "author's uncorroborated, highly speculative opinion that OSI procured the contract through a 'bribe.'" (Dkt. 107, Motion at 24). However, as plaintiffs point out, the "MWR Report disclosed verifiable facts and documents about the Albanian contract from sources that were not reasonably available to investors – many of which OSI ultimately

confirmed itself[.]"[11] (Dkt. 108, Opp. at 23); (see Dkt. 76, FAC at ¶ 274) (MWR Report disclosed details, among others, that OSI transferred 49% of S2 Albania and profit-sharing rights to ICMS for approximately $4.50).

Defendants also argue that the MWR Report cannot be considered a corrective disclosure because "it was based on public sources that were available online, free of charge." (Dkt. 107, Motion at 25). As discussed above, the subject Albanian documents cannot be considered to have been available to a reasonable investor. See supra at § A.2. In any event, because the details of the $4.50 sale to ICMS were not previously known to the investing public, plaintiffs have adequately pled that the MWR Report revealed, in whole or in part, the truth concealed by OSI's misleading statements and/or omissions. See, e.g., Henning v. Orient Paper, Inc., 2011 WL 2909322, *8 (C.D. Cal. 2011) (analyst report's "revelation of [ ] alleged frauds" served as a corrective disclosure). Moreover, that the stock price declined nearly 30% on the same day that details of the $4.50 sale to ICMS became known to the public, (see Dkt. 76, FAC at ¶ 280), is sufficient to plead loss causation with respect to the December 6, 2017, disclosure. See, e.g., See In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 791 (9th Cir. 2020) (plaintiffs adequately alleged loss causation where "stock price fell by more than 30% . . . immediately after the market learned of" alleged disclosure).

Plaintiffs also allege there was another partial disclosure on February 1, 2018, when OSI issued a press release announcing that the SEC and the DOJ had commenced investigations into defendants' compliance with the FCPA and federal securities laws. (See Dkt. 76, FAC at ¶¶ 285-89). According to plaintiffs, OSI's stock price declined by 18% on the day after this second disclosure. (See id. at ¶ 130).

Defendants argue that the "[a]nnouncement of the investigations did not reveal a pertinent truth about anything[,]" because the "disclosure simply put investors on notice of a *potential* future

---

[11] Defendants also argue that the "FAC alleges that the corruption accusations – not the existence of the ICMS relationship – caused the drop" in OSI's stock price, (Dkt. 109, Reply at 10), but plaintiffs specifically allege a "significant 'impact'" caused by "the facts and information contained in the December 6, 2017 MWR Report[.]" (Dkt. 76, FAC at ¶ 275).

disclosure of fraudulent conduct." (Dkt. 107, Motion at 24) (internal quotation marks omitted); see also Loos v. Immersion Corp., 762 F.3d 880, 890 (9th Cir. 2014) (stating that "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal" such that "the announcement of an investigation, without more, is insufficient to establish loss causation."). However, plaintiffs have pled more than simply an announcement of an investigation. Apart from the revelations in the December 6, 2017, MWR Report, plaintiffs allege additional disclosures regarding the Albanian contract and OSI's relationship with ICMS. For example, OSI confirmed the MWR Report's statements when it issued its own press release on December 6, 2017, which verified its "partnership with ICMS" and that it had entered "a profit share in accordance with the terms of [its] agreement with ICMS." (Dkt. 76, FAC at ¶ 246) (formatting omitted). OSI also claimed that "ICMS made significant capital investments toward the implementation of [the Albanian contract] in a value well beyond [$4.50]." (Id. at ¶ 247). But on January 31, 2018, a day before OSI announced the SEC and DOJ investigations, MWR released a follow-up report that analyzed relevant corporate documents and concluded that there was "no account evidencing investment in S2 Albania by ICMS or ICMS Construction[,]" directly calling into doubt OSI's claims. (Id. at ¶ 249). Indeed, OSI announced the SEC and DOJ investigations "hours after the second [MWR] report hit the wire[,]" noting that the investigations were announced "[f]ollowing a report by a short seller[.]" (Id. at ¶¶ 285 & 290). Under the circumstances, plaintiffs have pled a series of disclosures that revealed more details regarding OSI's relationship with ICMS, including details bearing on the $4.50 sale of 49% of S2 Albania and profit-sharing rights of the Albanian contract to ICMS.

"[W]hen viewed together and in the context of the other allegations in the [FAC]," the announcement of the SEC and DOJ investigations "are sufficient to plead facts giving rise to a reasonable inference that the market became aware of the misrepresentations." In re Questcor Sec. Litig., 2013 WL 5486762, *23 (C.D. Cal. 2013) (loss causation adequately pled with respect to investigation announcement where it "came on the heels of [short-seller reports] which called into question the efficacy of scientific support for [defendant's product]"); see, e.g., Evanston Police Pension Fund, 411 F.Supp.3d at 605 ("Loss causation is also adequately alleged, when,

as here, prior revelations clearly gave investors the context necessary to interpret the investigation as revealing the fraud."). In short, the court is persuaded that plaintiffs have adequately pled loss causation with respect to the December 6, 2017, and February 1, 2018, disclosures.[12]

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Motion to Dismiss Plaintiffs' First Amended [ ] Class Action Complaint [ ] **(Document No. 107)** is **denied**.

2. Defendants shall file their Answer(s) no later than **April 14, 2021**.

Dated this 31st day of March, 2021.

/s/
_____
Fernando M. Olguin
United States District Judge

---

[12] In order to adequately plead a § 20(a) violation, plaintiffs must allege "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." No. 84 Emp.-Teamster Joint Council Pension Tr. Fund, 320 F.3d at 945 (internal quotation marks omitted). Here, plaintiffs have sufficiently alleged a primary violation, and defendants do not contest control. (See, generally, Dkt. 107, Motion). Accordingly, plaintiffs have adequately pled their claim under § 20(a).