**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re INOGEN, INC. SEC. LITIG. | Case No. CV 19-1643 FMO (AGRx)<br><br>**ORDER RE: MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Having reviewed and considered the briefing filed with respect to Inogen, Inc., Scott Wilkinson, and Alison Bauerlein's (collectively, "defendants") Motion to Dismiss Second Amended Complaint (Dkt. 105, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

**BACKGROUND**

In this putative securities class action, plaintiffs allege that defendants violated: (1) § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j et seq., as well as Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) § 20(a) of the Exchange Act, 15 U.S.C. §§ 78t et seq. (Dkt. 89, Consolidated Second Amended Complaint [ ] ("SAC") at ¶¶ 267-72). Plaintiffs bring this case "on behalf of all purchasers of Inogen common stock between November 8, 2017 and May 7, 2019, inclusive (the 'Class Period')[.]" (Id. at ¶ 1). Lead plaintiffs are Dr. John Vasil and Paragon Fund Management (collectively, "plaintiffs"), each purchasers of Inogen common stock on the NASDAQ. (Id. at ¶¶ 25 & 26). Defendants are: (1) Inogen, Inc. ("Inogen"), "a medical technology

company headquartered in Goleta, California"; (2) Scott Wilkinson ("Wilkinson"), "the President and CEO of Inogen and a member of its Board of Directors throughout the Class Period"; and (3) Alison Bauerlein ("Bauerlein"), the founder of Inogen and its Executive Vice President and CFO during the Class Period. (See id. at ¶¶ 27-29).

I. INOGEN'S BUSINESS.

Inogen is "a medical device company specializing in the design and manufacturing of" portable oxygen concentrators ("POCs"), "which are used to provide oxygen therapy to patients suffering from a range of respiratory conditions, such as COPD, chronic bronchitis, or emphysema."[1] (Dkt. 89, SAC at ¶ 35). "In most instances, respiratory diseases like COPD develop over a lifetime, and, as a result, patients tend to be elderly with access to Medicare insurance." (Id.). "Inogen is an accredited Medicare [provider of home medical equipment ('HME')] and is licensed to sell directly to Medicare customers in all 50 states and the District of Columbia." (Id. at ¶ 42). Inogen's Medicare licenses "are critical to Inogen because penalties associated with failing to comply with Medicare regulations would have a materially adverse effect on Inogen's business." (Id.).

"Inogen reports its financial results in three business segments: (i) [direct-to-consumer ('DTC')]; (ii) domestic [business-to-business ('B2B')]; and (iii) international." (Dkt. 89, SAC at ¶ 39). "The DTC results are divided between [1] cash sales to customers, in which the customer pays the retail price for the POC out-of-pocket, and [2] rentals, in which the customer rents the device from Inogen, and Inogen bills Medicare or private insurance for a monthly reimbursement." (Id.). "While the retail price is set by Inogen (approximately $2,400 or $70 per month for a rental), Medicare sets the monthly reimbursement rate." (Id. at ¶ 40). Plaintiffs allege that because of Medicare's reimbursement policies for POCs, "it is not cost effective to provide a new device to

---

[1] Inogen's POCs are smaller than the traditional devices used to administer oxygen therapy; they are "battery-powered tankless portable devices that concentrate oxygen and provide it directly to the patient[.]" (Dkt. 89, SAC at ¶ 36). By contrast, devices traditionally used to administer oxygen therapy use "large stationary machines [ ] to draw oxygen from the air and concentrate it, and a separate portable oxygen tank to store the concentrated oxygen." (Id.).

Medicare patients to rent when the patient has already exhausted many of the . . . available monthly payments [from Medicare].” (Id. at ¶ 41).

The domestic B2B segment of Inogen’s business “involves sales of POCs to HME providers who then sell or rent the POCs to patients.” (Dkt. 89, SAC at ¶ 43). “B2B sales are divided between those to Inogen’s own private label HME provider, and those to other competing HME providers.” (Id.). “HME providers typically buy the POC from Inogen at negotiated rates below retail price and rent or sell the units to their customers.” (Id.). Plaintiffs allege that “[d]ue to the ability of Medicare and HME providers to demand lower prices from Inogen, DTC sales at retail prices generate higher margins for Inogen.” (Id. at ¶ 44). These higher margins are, however, “tempered by the added cost of hiring sales representatives and the associated marketing efforts.” (Id.). However, “so long as there was sufficient demand for the out-of-pocket cash sales, these sales and marketing spends may be justified.” (Id.).

Key metrics for understanding Inogen’s business prospects include the total addressable market (“TAM”) for POCs and market penetration. (See Dkt. 89, SAC at ¶ 38). The TAM “represents the number of potential customers for a given market.” (Id.). “In Inogen’s case, [the TAM] is the number of people with respiratory illness that could benefit from using a POC.” (Id.). However, “[n]ot all patients on [long-term oxygen therapy (‘LTOT’)] are potential customers because POCs are inappropriate for non-ambulatory patients or for those who require the continuous flow of oxygen rather than the pulse flow provided by a POC.” (Id.). The current growth rate of Inogen’s TAM is relevant to its potential sales growth; a larger TAM means higher sales growth. (Id.). Market penetration is also an important metric for analyzing Inogen’s business. (See id.). “Lower penetration means there is more room for sales growth.” (Id.).

“Since going public in 2014, Inogen had been a high growth company that outpaced its projected earnings per share (‘EPS’) projections for 15 consecutive quarters leading up to the beginning of the Class Period in November 2017.” (Dkt. 89, SAC at ¶ 8). Plaintiffs allege that Inogen’s high growth rate raised concerns among investors and analysts regarding the sustainability of this growth. (See id.). According to plaintiffs, “[i]nvestors recognized that if the market for POCs was actually close to saturation, sales growth would soon slow and the addition

of sales and marketing expenditures would be insufficient to overcome the lack of prospective customers." (Id.).

Inogen's business strategy focused on convincing customers to purchase its POCs out-of-pocket, rather than promoting rentals of its POCs. (See Dkt. 89, SAC at ¶ 3). To that end, according to plaintiffs, Inogen opened a sales facility in Cleveland, Ohio in August 2017. (Id. at ¶¶ 3 & 229). Inogen "rapidly hired sales representatives to staff a high-pressure call center to harass, cajole and sometimes commit outright fraud in order to convince susceptible patients not to rent an Inogen POC using their Medicare or private insurance benefits, but rather to pay a premium retail price out-of-pocket to purchase the Company's POC." (Id. at ¶ 3). According to a confidential witness, "Medicare uncovered Inogen's fraudulent tactics and threatened to revoke Inogen's Medicare accreditation in the fall of 2018." (Id. at ¶ 49). Inogen "made changes to the training program to curb these abusive sales practices soon after – albeit at the cost of forgoing additional cash sales." (Id.).

II. DEFENDANTS' ALLEGEDLY FALSE AND MISLEADING STATEMENTS.

Plaintiffs allege defendants made false or misleading statements to investors about four topics: (1) the size of the TAM for POCs; (2) POCs' market penetration; (3) the use of nefarious and fraudulent sales tactics by Inogen's sales force; and (4) the extent of Inogen's growth opportunities via B2B sales and the effect of B2B sales on DTC sales. (See Dkt. 89, SAC at ¶¶ 5-10).

A. Statements Regarding the TAM.

Plaintiffs allege that defendants: (1) "falsely overstated the true size of Inogen's TAM for those patients on LTOT by claiming it was upwards of 3 million people"; (2) "misstated the basis for its calculation of the TAM"; and (3) "misstated that the TAM would grow at the rate of up to 10% a year when it was really shrinking[.]" (Dkt. 89, SAC at ¶ 10). According to plaintiffs, defendants' statements were "materially false and/or misleading at the time they were made" for the following reasons. (See id. at ¶ 87). First, the Medicare data upon which defendants relied in determining the TAM "overstated the number of current oxygen therapy patients because it double-counted patients in instances where only one oxygen concentrator would be used for multiple patients that

year." (Id.). Second, defendants' estimate of the number of COPD patients was based on outdated CDC data that did not support defendants' estimate. (See id.). Finally, defendants' statements about the growth rate of the TAM were misleading because "both the Medicare data and the Kaiser Family Foundation data for Medicare Advantage, relied upon by Defendants, reported negative annual growth rates." (Id. at ¶ 88).

B. Statements Regarding Market Penetration.

Plaintiffs allege that defendants "misstated that the POC market penetration was only approximately 6% to 12%" and "that the potential POC penetration would be 90% of the ambulatory supplemental LTOT market and 65% of the overall LTOT market[.]" (Dkt. 89, SAC at ¶ 10). According to plaintiffs, defendants' statements about "the currently low market penetration of POCs and . . . Inogen's ability at the time to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory LTOT patients . . . were materially false and/or misleading at the time they were made," (id. at ¶ 89) (emphasis omitted), because: (1) Inogen's POCs, which sold at a premium price, were subject to "price and quality competition from similar POCs made by other manufacturers"; (2) POCs are inappropriate for about 50% of ambulatory patients according to "industry consensus"; (3) "some patients with more advanced respiratory disease require a stronger continuous oxygen stream that Inogen's pulse stream POCs cannot provide"; (4) "Defendants' conscious decision to abandon the rental market would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market"; (5) Medicare reimbursement rates constrained POC rentals; and (6) "because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the three-year reimbursement period, effectively eliminating as potential customers far more than just the 18% of the patients in years four and five of their rentals." (Id.).

C. Statements Regarding Cash Sales and Sales Force.

Plaintiffs allege that defendants "misleadingly attributed Inogen's sales growth to the strong sales acumen of its sales force and marketing team, when in reality it was due in large part to nefarious sales tactics designed to deceive its elderly customer base[.]" (Dkt. 89, SAC at ¶ 10). According to plaintiffs, defendants' statements were misleading because: (1) many patients could

not afford to purchase Inogen's POCs; (2) there was a "toxic boiler room sales environment" at Inogen; (3) Inogen's sales tactics risked the revocation of its Medicare licenses by the Centers for Medicare & Medicaid Services ("CMS"); (4) Inogen's newly hired sales representatives were not of the same quality as earlier hires; (5) Inogen provided the newly hired sales representatives with little training or mentorship; and (6) Inogen's sales force was unable to generate a sufficient number of new, "quality leads[.]" (See id. at ¶ 90).

D. Statements Regarding B2B Sales.

Plaintiffs allege that defendants "misstated the growth opportunity for Inogen's domestic [B2B] sales to [HME] providers which was actually inflated, unsustainable and would erode DTC sales[.]" (Dkt. 89, SAC at ¶ 10). According to plaintiffs, defendants' statements about "Inogen's ability at the time to grow its B2B sales of POCs to HME providers . . . were materially false and/or misleading at the time they were made" for a few reasons. (Id. at ¶ 91). First, "Inogen's top HME partner was run by a convicted felon employing the same or worse sales abuses as Inogen's in-house sales team[.]" (Id.). Second, "HME providers faced price constraints from their customers and insurance reimbursement schedules, would service multiple would-be DTC customers over the lifespan of a single POC, and were purchasing more POCs than they could reasonably deploy[.]" (Id.). Finally, plaintiffs claim that Inogen's B2B and DTC sales "would cannibalize business from each other." (Id.).

E. Muddy Waters and Citron Reports.

On February 8, 2019, Muddy Waters Research published a report ("Muddy Waters Report") "challenging the claimed size of Inogen's TAM and lamenting that the Company had intentionally 'created an egregiously false narrative' about" the size of the TAM. (Dkt 89, SAC at ¶ 53). On February 12, 2019, Citron Research published the Citron Report which "illuminat[ed] what Citron characterized as the Company's 'dirty' reseller network and systematic abuse of elders by Inogen and resellers through their deceptive sales practices and shoddy sales network[.]" (Id. at ¶ 64). Inogen's stock price dropped following the release of the Muddy Waters and Citron Reports. (See id. at ¶¶ 183-84).

On February 26, 2019, Inogen announced its financial results for the fourth quarter of 2018

and for fiscal year 2018, and Wilkinson and Bauerlein participated in an Inogen-hosted conference call with analysts and investors later that day. (See Dkt. 89, SAC at ¶ 185 & 189). Although these results showed record revenue for Inogen, (see id.), Wilkinson "backtracked on Inogen's prior TAM estimate" and revealed that "B2B sales growth slowed that quarter[.]" (Id. at ¶¶ 189 & 190). Bauerlein told investors that Inogen had not seen as many efficiencies as expected from recent advertising related to the growth of Inogen's sales force, and she expected that the rate of growth in Inogen's sales force in 2019 would be "lower than the rate for the last couple of years." (Id. at ¶ 192). Inogen's stock price dropped 24% that day. (Id. at ¶ 197).

On May 7, 2019, Inogen announced its financial results for the first quarter of 2019. (Dkt. 89, SAC at ¶ 207). It "reduc[ed] its full year 2019 total revenue guidance" and informed investors that the first quarter of 2019 had been "tough[.]" (Id. at ¶¶ 207 & 208). Inogen announced that: (1) it "plans to slow the pace of hiring [of sales representatives] in 2019"; (2) it "expects domestic [B2B] sales to have a slightly negative growth rate"; and (3) its newly hired sales representatives "took longer to come up the productivity curve than [Inogen's] historical target and were not at their full potential in the first quarter." (Id. at ¶ 209). On this news, Inogen's stock price dropped again, this time by 25%. (See id. at ¶ 214).

III. SCIENTER ALLEGATIONS.

Plaintiffs allege that Inogen's management took a hands-on approach with the Cleveland sales staff. (See Dkt. 89, SAC at ¶ 217). Plaintiffs cite a Glassdoor[2] review dated January 24, 2019, which "stated that beginning no later than early 2018, Inogen executives increased their accessibility and involvement with the Cleveland sales staff." (Id.). Plaintiffs also cite a statement Wilkinson made on a November 7, 2017, conference call with investors, stating as follows: "We're pretty transparent with our employees and what our plans are and our results and our expectations." (Id.). A confidential witness and former Inogen employee ("FIE") "confirmed that

---

[2] Glassdoor is a "registration-based website in which employees may review their employers[.]" (Dkt. 89, SAC at ¶ 217).

the executives were accessible to the sales representatives at the Cleveland office."[3] (Id. at ¶ 219). Indeed, according to the FIE, Wilkinson "hosted quarterly town hall meetings and Q&A sessions with the Cleveland office staff as a forum for the latter to discuss issues." (Id.). The FIE claims that at a summer 2018 Q&A session with Wilkinson, he "rhetorically questioned the Inogen CEO, '[y]ou are telling me that out of three million people who need oxygen, all are going to buy portable concentrators from Inogen.'" (Id. at ¶ 220). The FIE claims Wilkinson responded, "well, no." (Id.).

Plaintiffs also allege scienter through Wilkinson and Bauerlein's knowledge of contradictory Medicare data and internal analytics. For instance, "when asked on the November 6, 2018 conference call if he saw any market saturation, [Wilkinson] confirmed 'we do monitor all of those metrics,' including Medicare data and 'other metrics.'" (Dkt. 89, SAC at ¶ 221). Also, on a November 7, 2017, conference call with investors, Bauerlein said that "Inogen would be reviewing productivity information for the first 120 or so of Cleveland sales representatives hired in 2017 for [Inogen] to . . . really understand the productivity of that sales force and understand what the additional market capacity is[.]" (Id. at ¶ 226) (internal quotation marks and alterations omitted). According to plaintiffs, Bauerlein reviewed such information through Inogen's customer relationship management ("CRM") system, and "[f]rom the CRM system, Defendants had access to information suggesting that [sales] leads were not quality leads because they were being recycled." (See id. at ¶¶ 77, 79, 226).

Plaintiffs also provide allegations regarding the "abusive nature" of Inogen's sales practices. (See Dkt. 89, SAC at ¶¶ 222-25). The FIE "confirmed that Inogen installed a commission system in which a quick to close cash sale earned significantly more commission than the arduous process of coordinating Medicare approval for a rental." (Id. at ¶ 223). Also, a Glassdoor review dated June 4, 2018, reported that Inogen had "been investigate[d] by [M]edicare 2 times in the last 3 years, and [is] current[ly] still [] doing many things that violate [M]edicare guidelines." (Id. at ¶

[3] The gender of the FIE is unknown, but for ease of reference, the court will use male pronouns in referring to the FIE.

224). CMS allegedly "threatened to pull [Inogen's] Medicare license[,]" (id.), and "forced Inogen to retrain the sales representatives not to mislead potential customers." (Id. at ¶ 225). According to plaintiffs, the Sales Directors at the Cleveland sales office "instructed sales representatives to not mislead customers whom the sales representatives suspected were Medicare secret shoppers." (Id. at ¶ 48); (see id. at ¶ 224) (The FIE stated that, "although the sales office instructed sales representatives to not lie to the secret shoppers, there was no such scrutiny placed on calls with real patients.").

Finally, plaintiffs allege that Bauerlein made stock sales that were "suspicious in both timing and amount[.]" (Dkt. 89, SAC at ¶ 227). On November 10, 2017, "Bauerlein entered into a 10b5-1 trading plan to [sell] nearly 84,260 shares of her 175,178 shares or nearly 50% of the shares she held during" the Class Period. (See id. at ¶ 228). Bauerlein sold these shares between February and June 2018. (See id.). "In comparison to her pre-Class Period sales over the same length of time, she only sold 38,332 shares (or 15%) of her common stock holdings." (Id.). According to plaintiffs, the timing of Bauerlein's sales was suspicious because they were "scheduled to take advantage of the hype surrounding the opening of the Cleveland sales facility in August 2017 and the subsequent sales blitz which Defendants represented would provide a large bump in Inogen's sales figures." (Id. at ¶ 229). The first "quarter worth of results impacted by the Cleveland facility would not have been released until . . . August 2018, after Bauerlein [sold] half her Inogen shares[.]" (Id. at ¶ 230).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007) ("Twombly"); Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) ("Iqbal"); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted); see Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 267, 114 S.Ct. 807, 810 (1994) (plurality opinion), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim. Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

## DISCUSSION

To state a claim under the Exchange Act, a plaintiff must meet the "exacting pleading standards of Federal Rule of Civil Procedure 9(b)[4] and the Private Securities Litigation Reform

---

[4] Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This includes "the who, what, when, where, and how of the misconduct charged." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." Yourish v. Calif. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999). This requirement "can be satisfied by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or

Act[, 15 U.S.C. § 78u-4 (the 'Reform Act' or 'PSLRA').]" Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014); Rubke, 551 F.3d at 1164 ("At the pleading stage, a complaint stating claims under [§] 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."). Under the Reform Act, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Finally, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

Section 10(b) of the Reform Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). To implement § 10(b), the SEC adopted Rule 10b-5 which makes it unlawful, in relevant part, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

"The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Erica

---

available to the defendants." Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted).

P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809-10, 131 S.Ct. 2179, 2184 (2011) (internal quotation marks omitted). Defendants argue that plaintiffs have failed to adequately plead material misrepresentation or omissions, scienter, and loss causation. (Dkt. 105-1, Memorandum of Points and Authorities in Support of Defendants' Motion [ ] ("Memo") at 6-25).

Here, the court will dismiss the SAC because plaintiffs have failed to sufficiently allege scienter.[5] "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." Metzler Inv. GMBH v. Corinthian Colls., 540 F.3d 1049, 1066 (9th Cir. 2008) (internal quotation marks omitted).

A strong inference of scienter exists where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (internal quotation marks and emphasis omitted). The Supreme Court has instructed courts to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323, 127 S.Ct. 2499, 2509 (2007)). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Id.; see also In re Alphabet, Inc.

[5] "Because the Court finds that scienter has not been adequately alleged, the Court does not proceed to falsity" or loss causation. See, e.g., Swartzendruber v. Colony Capital, Inc., 2020 WL 7754008, *5 (C.D. Cal. 2020) (declining to address remaining elements on portion of § 10(b) claim where scienter was insufficiently pled); Anderson v. Peregrine Pharms., Inc., 2013 WL 4780059, *6 (C.D. Cal. 2013) (same); see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig., 2 F.4th 1199, 1203 (9th Cir. 2021) ("If one of the[] elements [of a Rule 10b-5 claim] is missing, the claim fails."). However, with respect to falsity, the court, at this stage of the proceedings, is unpersuaded by defendants' contention, (see Dkt. 105-1, Memo at 16 n. 15), that plaintiffs' allegations based on the Muddy Waters Report are insufficient. See, e.g., Snellink v. Gulf Resources, Inc., 870 F.Supp.2d 930, 939 (C.D. Cal. 2012) ("At this pleading stage, it is inappropriate to decide the accuracy or the truth of the [short seller] report."); Henning v. Orient Paper, Inc., 2011 WL 2909322, *4 (C.D. Cal. 2011) ("The truth of the Muddy Waters report . . . is a factual dispute not appropriate for resolution at this stage.").

Sec. Litig., 1 F.4th 687, 701 (9th Cir. 2021) ("Merely reasonable or permissible inferences are insufficient. As a result, courts must take into account plausible opposing inferences and determine that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") (cleaned up). The Ninth Circuit employs a two-part test for scienter: "first, [the court] determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, [the court] conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Curry v. Yelp Inc., 875 F.3d 1219, 1226 (9th Cir. 2017) (internal quotation marks omitted).

A. Inogen's Tracking of Data.

Plaintiffs argue that they have "sufficiently allege[d] that Defendants acted with scienter because [defendants] had access to and actual knowledge of real-time sales data and other metrics indicating the falsity of their statements." (Dkt. 109, Lead Plaintiffs' Memorandum in Opposition [ ] ("Opp.") at 18). According to plaintiffs, defendants used a CRM system to monitor sales analytics and reassured investors that "they closely monitored relevant data points and metrics to assess the size, growth and penetration of the market." (Id.); (see Dkt. 89, SAC at ¶ 226) ("[Bauerlein] discussed reviewing the sales analytics on the November 7, 2017 conference call. . . . [and] confirmed that Inogen would be reviewing productivity information . . . [to] really understand the productivity of that sales force and understand what the additional market capacity is[.]"); (id. at ¶ 221) ("[Wilkinson] confirmed 'we do monitor all of those metrics' including Medicare data and 'other metrics'" when asked if "he saw any market saturation[.]"). These allegations are insufficient to establish Wilkinson and Bauerlein's access to, or knowledge of, any specific contradictory or negative information with respect to their challenged statements.

In Lipton v. Pathogenesis, Corp., 284 F.3d 1027 (9th Cir. 2002), the plaintiffs argued scienter based on allegations that the defendants "had access to internal data demonstrating a decline in sales of" its product and because "defendants had access to IMS data that allegedly informed the defendants that patient demand for [its product] was flat." Id. at 1036. With respect

to the alleged internal data demonstrating a sales decline, the Ninth Circuit held that plaintiffs' allegations were insufficient because they did "not identify any internal reports of 'sales data,' much less plead, in any detail, the contents of any such report or the purported data." Id. As for the "IMS data," the Lipton plaintiffs failed to "allege with particularity any specific information showing that prescription data informed defendants that patient demand for [its product] was flat. Plaintiffs [did] not mention a specific IMS document relied on by defendants . . . . Nor [did] they detail with particularity the content of such data." Id. Thus, the Ninth Circuit declined to find scienter where "plaintiffs merely allege[d] that [defendants] tracked patient demand using data provided by IMS and that this data supposedly indicated that patient demand was flat" because "negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." Id.

Plaintiffs argue that "Inogen['s] use[ of] a CRM system to monitor sales analytics[,]" (Dkt. 109, Opp. at 18), which was reviewed by Bauerlein, "indicated marginal decreases in sales productivity indicative of market saturation as Inogen belatedly disclosed[.]" (Id. at 19). However, the claim that the data in the CRM system "indicated marginal decreases in sales productivity," is supported only by characterizations of the data by anonymous Glassdoor internet reviews. (See Dkt. 89, SAC at ¶ 226). As discussed below, see infra at § B., such allegations are insufficient to "detail with particularity the content of such data." Lipton 284 F.3d at 1036 ("[A] proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.") (internal quotation marks omitted). Apart from the Glassdoor reviews, plaintiffs' SAC does not identify any specific and particularized allegations, (see, generally, Dkt. 89, SAC), to support their negative characterizations of the specific data within Inogen's CRM system which was reviewed by Bauerlein. See Nguyen v. Endologix, Inc., 962 F.3d 405, 416 (9th Cir. 2020) ("[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA.") (internal quotation marks omitted).

Although plaintiffs' assertion that "specific, contemporaneous data" known to Wilkinson exists in that he confirmed the monitoring of "metrics [which] showed a shrinking TAM of only about 1.3 million users in stark contrast to Inogen's 3 million and rapidly growing TAM claim[,]" (Dkt. 109, Opp. at 18), is a much closer question, the court is not persuaded that the single allegation that Wilkinson "confirmed 'we do monitor all of those metrics' including Medicare data and 'other metrics[,]'" (Dkt. 109, Opp. at 18) (quoting Dkt. 89, SAC at ¶ 221), is sufficient to establish scienter. As in Lipton, plaintiffs' allegations fail to identify any specific, contemporaneous information known by Wilkinson. See, e.g., Lipton, 284 F.3d at 1036 (scienter insufficiently alleged where plaintiffs did not "mention a specific [ ] document relied on by defendants" nor "detail with particularity the content of such data"); Paciga v. Invuity Inc., 2018 WL 7286503, *6 (N.D. Cal. 2018) ("The complaint does not address what specific negative information officers knew about its sales data . . . that was sufficiently troubling that the officers must have known that their revenue guidance would not be met."). Plaintiffs' reliance on the Muddy Waters Report, (see Dkt. 109, Opp. at 18-19) (citing Dkt. 89, SAC at ¶¶ 54-55), is insufficient without particularized allegations identifying the data Wilkinson allegedly reviewed and confirming that this specific data was contradicted by Muddy Waters.[6]

In short, the general nature of defendants' statements about monitoring data combined with the absence of "specific information conveyed to management and related to the fraud" render plaintiffs' allegations insufficient to establish scienter under the circumstances here. See, e.g., In re Am. Apparel, Inc. S'holder Litig., 855 F.Supp.2d 1043, 1079 (C.D. Cal. 2012) ("Missing from the complaint are facts indicating that Charney was in possession of concrete knowledge that would have led him to conclude that a substantial portion of American Apparel's workers were undocumented.") (cleaned up); City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 620 (9th Cir. 2017) ("According to Plaintiff's confidential informants,

---

[6] Plaintiffs allege that Wilkinson clarified that the Muddy Waters Report had contradicted a different version of the "WinterGreen report" than the one used by Inogen. (See Dkt 89, SAC at ¶ 200). Without additional particularized allegations on this point, however, the court has no basis to conclude that the "WinterGreen report" actually used by Inogen was similarly deficient as the admittedly different report criticized by Muddy Waters.

Cadent's channel surfing would have been 'readily apparent' from Cadent's financial documents, which [corporate defendant] had direct access to through the data room that Cadent set up for potential buyers. But Plaintiff does not allege that [individual defendants] personally accessed the data room, or that the confidential informants personally disclosed Cadent's channel surfing to [individual defendants]."); see also Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001) ("Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness.").

B. Confidential Witness and Glassdoor Reviews.

Plaintiffs also claim that defendants "were well aware that Inogen's sales figures were due to abusive, unsustainable sales tactics." (Dkt. 109, Opp. at 19). According to plaintiffs, given Wilkinson and Bauerlein's hands-on management style, they were clearly aware of Inogen's "abusive" sales tactics. (See id. at 19-20); (Dkt. 89, SAC at ¶¶ 217-18).

Plaintiffs' allegations are based on the FIE and anonymous internet postings. (See, e.g., Dkt. 89, SAC at ¶¶ 217-20, 222-26). "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements[:] [f]irst, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge[;] . . . [s]econd, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." Zucco, 552 F.3d at 995. "The first prong of this two-part confidential witness test analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." Id. To determine whether this prong is satisfied, courts "look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia." Id. (internal quotation marks omitted).

Here, it is not clear that the FIE has the requisite personal knowledge to support plaintiffs' allegations as to Wilkinson and Bauerlein. For example, the FIE states that the "executives were

accessible to the sales representatives at the Cleveland office" because Wilkinson "hosted quarterly town hall meetings and Q&A sessions with the Cleveland office staff[,]" but the FIE refers to only a single personal interaction with Wilkinson. (See Dkt. 89, SAC at ¶¶ 219-20). Further, Wilkinson's reply of, "well, no," to the FIE's question asking whether "out of three million people who need oxygen, all are going to buy [POCs] from Inogen[,]" (id. at ¶¶ 52, 220), is insufficient to establish that Wilkinson "knew TAM figures were overstated." (Dkt. 109, Opp. at 19). Nor do plaintiffs provide an adequate basis for the FIE's personal knowledge of the details regarding CMS's investigation and ultimate findings, or of what Wilkinson and Bauerlein might have known about the investigation.[7] (See Dkt. 89, SAC at ¶ 49); Zucco, 552 F.3d at 995 ("[T]he complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report.").

With respect to the anonymous Glassdoor reviews, plaintiffs do not make clear whether they are using these as "confidential witnesses" or whether they intend the reviews to be evidence to corroborate the FIE's testimony. (See, generally, Dkt. 109, Opp.); (Dkt. 89, SAC). In any event, "[c]ourts typically treat anonymous internet postings as tantamount to confidential witness statements." ScripsAmerica, Inc. v. Ironridge Global LLC, 119 F.Supp.3d 1213, 1261 (C.D. Cal. 2015) (collecting cases). Under the confidential witness standard, the reviews do not pass muster under the first prong of the test. See Zucco, 552 F.3d at 995. Plaintiffs' SAC does not provide the level of detail required to assess the Glassdoor reviewers' personal knowledge, such as job descriptions, employment dates, office locations, seniority levels, or whether the reviewers were even verified to have worked for Inogen. (See, generally, Dkt. 89, SAC).

---

[7] The FIE's other allegations "confirm[ing] that Defendants knew of the nefarious sales tactics" are reliable with respect to the sales directors because the "sales directors specifically instructed salespeople not to lie to those they suspected to be CMS secret shoppers[.]" (Dkt. 109, Opp. at 20); (see Dkt. 89, SAC at ¶¶ 48, 224). However, they are insufficient to ascribe scienter to Wilkinson and Bauerlein. See, e.g., Ferraro Family Found., Inc. v. Corcept Therapeutics Inc., 501 F.Supp.3d 735, 767 (N.D. Cal. 2020) (allegations of illicit instructions given to confidential witnesses were insufficient to support scienter where plaintiffs failed to sufficiently allege the individual defendants themselves gave the instructions to sales representatives "or even that the Individual Defendants were aware that these instructions were being given").

In short, the allegations based on the FIE and the Glassdoor reviews are insufficient to allege a strong inference of scienter. See, e.g., In re Apollo Grp., Inc. Sec. Litig., 2011 WL 5101787, *11 n. 7 (D. Ariz. 2011) ("Because Plaintiffs have not pled such reliability and knowledge with regard to the anonymous internet postings, they do not support a strong inference of scienter."); Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1063 (9th Cir. 2014) (witness allegations "lack[ed] foundation" where witnesses had no "first hand knowledge regarding what the individual defendants knew or did not know about [corporate defendant's] financial health"); McGovney v. Aerohive Networks, Inc., 367 F.Supp.3d 1038, 1054 (N.D. Cal. 2019) ("[A]s currently alleged, the [confidential witnesses] lack personal knowledge and reliability because the complaint lacks important details about the[ir] employment information[.]").

C. Bauerlein's Stock Sales.

Plaintiffs argue that Bauerlein's "unusual and suspicious sale of approximately 50% of her shares" in November 2017 "bolsters a strong inference of scienter." (Dkt. 109, Opp. at 22); (see Dkt. 89, SAC at ¶ 227-30). According to plaintiffs, these sales "were scheduled to take advantage of the hype surrounding the opening of [Inogen's] Cleveland sales facility in August 2017[.]" (Dkt. 89, SAC at ¶ 229).

"While suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, such sales only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Metzler, 540 F.3d at 1066-67 (internal quotation marks omitted). "Three factors are relevant to this inquiry: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." Id. at 1067. The Ninth Circuit "typically require[s] large[] sales amounts – and corroborative sales by other defendants – to allow insider trading to support scienter." Id.

Here, Bauerlein sold 50% of her shares during the Class Period. (Dkt. 89, SAC at ¶ 228). This amount may be sufficient to satisfy the first factor. See e.g., Azar v. Yelp, Inc., 2018 WL 6182756, *19 (N.D. Cal. 2018) (finding scienter where defendant sold 20% of holdings during the class period, but noting that the amount was "not alone sufficient to infer scienter"). But the timing

of Bauerlein's sales does not appear to support a strong inference of scienter. Bauerlein made the decision to sell in November 2017, several months before "any of the hard performance results from the Cleveland facility would be known to the public." (Dkt. 89, SAC at ¶ 229). According to plaintiffs, Bauerlein knew as of November 2017 – only three months after the facility opened and three months before her first sale would occur – that the Cleveland facility would not perform as Inogen had represented. (See Dkt. 109, Opp. at 23 & n. 17); (Dkt. 89, SAC at ¶ 229-30). But Inogen's sales numbers actually improved in the months following the opening of the Cleveland sales facility, and Inogen reported continued improvement through November 2018, well after the end of Bauerlein's scheduled sales in June 2018. (See, e.g., Dkt. 89, SAC at ¶¶ 103, 132, 153, 228). Considered altogether, see supra at §§ A. & B., plaintiffs fail to sufficiently allege an inference of scienter from the fact that Bauerlein scheduled stock sales in November 2017 – one year before Inogen first reported slightly adverse financial data. (See Dkt. 89, SAC at ¶¶ 153-54) (alleging that Inogen's November 2018 "3Q18 Press Release" announced improved financials though "it was not all good news").

Also, plaintiffs' allegations, (see Dkt. 89, SAC at ¶ 228) ("In comparison to her pre-Class Period sales over the same length of time, she only sold 38,332 shares (or 15%) of her common stock holdings."), seeking to show that these scheduled sales were inconsistent with Bauerlein's history, are insufficient. It is not clear when, during the "pre-Class Period," Bauerlein made the sale of 38,332 shares, or whether these "sales" occurred regularly or only once. (See, generally, id.); see, e.g., In re Cisco Sys. Inc. Sec. Litig., 2013 WL 1402788, *9 (N.D. Cal. 2013) ("It is axiomatic that Chambers' earlier trading activity was circumscribed by the number of stock shares he possessed and was permitted to trade. Since Plaintiffs provide none of that information, the Court is unable to assess whether Chambers' stock sales were significant enough and uncharacteristic enough to cast doubt on his motives.") (cleaned up). Finally, the fact that Bauerlein is the only defendant alleged to have engaged in "suspicious" insider trading undermines an inference of scienter. See, e.g., Ronconi, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable

characterizations of the company's affairs were known to be false when made.") (internal footnote omitted); Ferreira v. Funko Inc., 2021 WL 880400, *30 (C.D. Cal. 2021) ("[T]he absence of any allegations of sales by five of the seven Individual Defendants weighs heavily against an inference of scienter.") (cleaned up).

D. Core Operations Theory.

Lastly, plaintiffs point to a core operations theory to support scienter. (See Dkt. 109, Opp. at 21-22). The Ninth Circuit has identified three circumstances in which scienter may be inferred through a core operations theory. See S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785-86 (9th Cir. 2008). "First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations." Id. at 785 (internal quotation marks omitted). "Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information[.]" Id. at 786. "Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." Id.

As to the first circumstance, as the court explained earlier, see supra at §§ A.-C., it is not persuaded that plaintiffs' other allegations raise a "cogent and compelling" inference of scienter, and plaintiffs provide no additional allegations to support their core operations theory.[8] (See, generally, Dkt. 89, SAC).

With respect to the second circumstance, plaintiffs argue that it applies because: (1) defendants had access to disputed information such as "knowledge of the actual size of TAM and the market saturation"; (2) defendants admitted to tracking sales data and metrics; and (3) because of Wilkinson's purportedly hands-on management of the Cleveland sales facility, he

[8] Plaintiffs' reference to the "Individual Defendants' top-level positions" and reliance on Patel v. Axesstel, Inc., 2015 WL 631525 (S.D. Cal. 2015), (see Dkt. 109, Opp. at 22), are unpersuasive as they have not identified any allegations to suggest that Inogen is so small or closely controlled by Wilkinson and Bauerlein that they "would be among the first (and only) to know[,]" Patel, 2015 WL 631525, at *11, of the operational issues raised in the SAC.

"undoubtedly knew that sales representatives were engaging in fraudulent sales tactics and complaining about stale sales leads." (Dkt. 109, Opp. at 22). However, this argument is unpersuasive for the reasons discussed above. See supra at §§ A. & B.; see, e.g., Swartzendruber, 2020 WL 7754008, at *6 (plaintiffs failed to establish core operations theory where they did not "provide additional detailed allegations about defendants' actual exposure to critical information concerning [defendants' issues]") (internal quotation marks omitted).

Finally, as to the third circumstance, plaintiffs argue that it "would be absurd that the CEO and CFO of the Company would be unaware of the future prospects of its only product" or that they "would be unaware and uninvolved with ensuring compliance with Medicare regulations[.]" (Dkt. 109, Opp. at 21). As currently alleged, however, plaintiffs' SAC fails to plead sufficient facts to show this is one of the "unusual" and "exceedingly rare" circumstances where a core operations theory, without more, raises a strong inference of scienter.[9] See S. Ferry LP, No. 2, 542 F.3d at 785 & n.3; see, e.g., In re Solarcity Corp. Sec. Litig., 274 F.Supp.3d 972, 997, 1013 (N.D. Cal. 2017) (declining to find scienter under third core operations theory where plaintiffs argued that knowledge of a high contract cancellation rate alone suggested that the individual defendants should have known contracts "were obtained by deception, were of low quality, or were improperly retained").

E. Holistic Assessment.

Plaintiffs contend that, even if their allegations are insufficient when considered in isolation, "the SAC holistically alleges facts supporting a strong inference of defendants' knowledge or recklessness." (Dkt. 109, Opp. at 17) (formatting omitted). However, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." Zucco, 552 F.3d at 1006. Here, the court is

---

[9] For example, plaintiffs argue that it would "be absurd that the CEO and CFO would be unaware and uninvolved with ensuring compliance with Medicare regulations . . . especially after CMS threatened to pull the Company's accreditation." (Dkt. 109, Opp. at 21-22). However, plaintiffs' allegations regarding the specifics of CMS's investigation and its findings appear to rely entirely on the FIE and Glassdoor witnesses, (see, e.g., Dkt. 89, SAC at ¶¶ 49, 224-25), which the court has already explained are insufficient. See supra at § B.

not persuaded that plaintiffs' allegations – even when considered holistically – support a strong inference of scienter. See, e.g., id. at 1007 ("Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference – namely, that although [corporate defendant] was experiencing problems . . . there was no specific intent to fabricate the accounting misstatements[.]").

Plaintiffs allege a scheme whereby defendants "portrayed the apparent success of [Inogen's] operation through an egregiously false narrative of both the POC market and the Company's growth opportunity to investors[,]" (Dkt. 89, SAC at ¶ 5), when in reality Inogen's "impressive DTC sales numbers" and corresponding revenue figures were driven by "abusive and dishonest sales practices" which undermined the "sustainability of [its] growth[.]" (See id. at ¶¶ 3-8). However, as discussed above, plaintiffs have not sufficiently alleged the existence of any specific, contemporaneous knowledge on behalf of Wilkinson and Bauerlein which contradicted their cheerful estimates and statements about Inogen's TAM, market penetration, or the effectiveness of Inogen's sales force prior to announced revisions in 2019. While the inference that may be drawn from plaintiffs' allegations is "reasonable or permissible," see In re Alphabet, Inc. Sec. Litig., 1 F.4th at 701 (cleaned up), the inference is not as cogent or compelling as a plausible alternative inference, i.e., defendants had a reasonable basis to support their estimates and representations given that "Inogen had been a high growth company that outpaced its projected earnings per share [ ] projections for 15 consecutive quarters leading up the beginning of the Class Period[,]" and because Inogen continued to report strong revenue and growth throughout the Class Period. (See Dkt. 89, SAC at ¶¶ 8, 68, 103, 117, 132-33, 153, 185). When faced with issues affecting Inogen's bottom line, defendants announced as much to its investors and revised revenue guidance downward. (See, e.g., id. at ¶¶ 186-89, 192-94, 207-12). In short, plaintiffs' SAC fails to sufficiently plead a strong inference of scienter.[10]

---

[10] "Section 20(a) [] require[s] underlying primary violations of the securities laws." In re Rigel Pharmaceuticals, Inc. Sec. Litig., 697 F.3d 869, 886 (9th Cir. 2012) (citing 15 U.S.C. § 78t(a)). Because plaintiffs have failed to adequately plead a violation of the federal securities laws, it follows that plaintiffs have also failed to plead violations of § 20(a). See Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1206 n. 2 (9th Cir. 2016) (Section 20(a) control person liability claim "rises

F. Leave to Amend.

Rule 15 of the Federal Rules of Civil Procedure provides that the court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); see Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) (The policy favoring amendment must "be applied with extreme liberality."). The Ninth Circuit has recognized that, "[d]ue in large part to the enactment of the [Reform Act], plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." Metzler, 540 F.3d at 1054-55. "In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (internal quotation marks omitted). Given the high pleading standards that plaintiffs must meet to state a federal securities claim, the court will give plaintiffs another opportunity to state a claim.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Motion **(Document No. 105)** is **granted**.

2. The SAC **(Document No. 89)** is **dismissed with leave to amend**. The parties shall, no later than **August 20, 2021**, file a stipulation and proposed schedule for the filing of the third amended complaint and any responsive Rule 12 motion.

3. Defendants' Motion for Leave to File Supplemental Declaration with Exhibits **(Document No. 114)** is **denied as moot**.

Dated this 13th day of August, 2021.

/s/
Fernando M. Olguin
United States District Judge

---

or falls with the primary violation claim").